e8j9chr1                        Trial

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x
    UNITED STATES OF AMERICA
3              v.                          12 CR 626 (ER)
    RAYMOND CHRISTIAN a/k/a
4   "Reckless"
    GLENN THOMAS, a/k/a "Gucci"
5   TYRELL WHITAKER, a/k/a "Bow Wow"
               Defendants
6   ------------------------------x
                                   New York, N.Y.
7                                  August 19, 2014
                                   9:12 a.m.
8

9   Before:
                        HON. EDGARDO RAMOS
10                                  District Judge

11
                            APPEARANCES
12  PREET BHARARA
         United States Attorney for the
13       Southern District of New York
    ANDREW BAUER
14  KAN M. NAWADAY
         Assistant United States Attorney
15
    DAVID S. GREENFIELD
16       and
    ANTHONY STRAZZA
17       Attorneys for Defendant Christian

18  LAW OFFICES OF DON BUCHWALD
         Attorney for Defendant Thomas
19  DON D. BUCHWALD

20  KELLEY DRYE & WARREN LLP
         Attorney for Defendant Thomas
21  LEVI DOWNING

22  GEORGE ROBERT GOLTZER
         and
23  YING STAFFORD
         Attorneys for Defendant Whitaker
24  -- also present--
    S.A. Andrei Petron - FBI
25

e8j9chr1                          Trial

 1                  (In open court)

 2                  (Trial resumed; jury not present)

 3                  THE COURT:  Good morning.

 4                  MR. BUCHWALD:  Good morning, your Honor.

 5                  MR. GOLTZER:  Good morning, Judge.

 6                  THE COURT:  Mr. Buchwald.

 7                  MR. BUCHWALD:  Yes, your Honor.  If I might, I have,

 8      on behalf of all of the defendants, there is an evidentiary

 9      issue which your Honor may help us with.

10                  THE COURT:  That I did what?

11                  MR. BUCHWALD:  Which your Honor may help us with.

12                  THE COURT:  Okay.

13                  MR. BUCHWALD:  Let me hand up to you 3507-27, which

14      was 3500 material pertaining to David Evans.

15                  THE COURT:  Okay.  Who is David Evans.

16                  MR. BUCHWALD:  David Evans was the fifth cooperator

17      that the government had who they've tentatively decided not to

18      call.

19                  THE COURT:  Yes, but his name hasn't really been

20      mentioned at all.  Who did he hang with?  What was his story?

21                  MR. BUCHWALD:  It has always mystified us.  It was

22      mentioned by Danielle Williams that Evans was the one she got

23      to rob her cancer-stricken sister.

24                  THE COURT:  Okay.

25                  MR. BUCHWALD:  And it has -- I think the name and

1    faceplate has been identified by some people.  I'm not sure

2    what else in this record exists with respect to David Evans.

3            David Evans -- and adverted to this piece of 3507-27

4    during the oral argument on the admissibility of the

5    Mallory/Burden tapes as to why in our judgment the tape -- it

6    was not reliable.  It was part of that argument.

7            We propose to put in this statement that David Evans

8    attributes to Kevin Burden.  David Evans, who has also received

9    a cooperation agreement from the government, states that Kevin

10   Burden, Kev Gotti told him Fuzzy -- the F stands for Fuzzy,

11   which is David Evans' nickname, told Fuzzy that J-Mark and L-1

12   shot him, referring to Joker.  Both of them.  That's the

13   statement that David Evans attributed to Kevin Burden.  We

14   believe it is admissible under Rule 806.

15           Rule 806 pertains to the attacking or supporting a

16   declarant's credibility where the declarant's statements have

17   come in under the hearsay exception essentially; that,

18   obviously, when a declarant's statements come in and a

19   declarant wasn't called as a witness there is no opportunity to

20   cross-examine and to confront him with inconsistent statements

21   and, therefore, the requirement of confronting a witness with

22   an inconsistent statement before you admit it doesn't exist in

23   that case under Rule 806.

24           So what we would propose is -- if the government

25   stipulated -- stipulate but otherwise to call Mr. Evans in

1    order to be able to elicit this statement under Rule 806.

2              I understand informally from the government -- so we

3    want an evidentiary ruling.  My understanding is if this is

4    admissible, then either we're going to put it in our case or

5    they're going to call David Evans in the direct case.  If your

6    Honor holds it's not admissible, which we believe would be

7    error -- Rule 806, on the defense side, we believe that that

8    would be in error -- then you've answered the question and we

9    don't have to arrange for David Evans to be here either this

10   afternoon or whenever.  He is in custody.  He is at the MCC, I

11   believe, because that's where he bumped into these defendants

12   in the elevator the other day.

13             THE COURT:  Okay.

14             MR. BAUER:  Judge, a number of points.  First, this is

15   the first we're hearing of defense's interest in calling

16   Mr. Evans.  It seems given the ongoing discussions that we've

17   had about Mr. Evans and our intention as recently as last week

18   to cut him in order to remain on schedule here, it's surprising

19   to hear about this now.

20             Second of all.  As we said, it's not that we're

21   opposed to calling David Evans.  I think he'll explain this

22   statement and he'll also provide a lot of devastating evidence

23   against their defendants.  So it's not that we're necessarily

24   opposed to it.  I just don't think Rule 806 applies here with

25   the caveat, because it's being brought up this morning five

<table>
<tbody>
<tr><td>1</td><td>minutes before a trial date, and I admittedly don't have a</td></tr>
</tbody>
</table>

1   minutes before a trial date, and I admittedly don't have a

2   great facility with Rule 806, I wish we can could brief this or

3   at least have time to research it.  My understanding of Rule

4   806 is that it requires an inconsistent statement.  And it's

5   not clear to me whether you can attack this hearsay from Mr. --

6   that -- Mr. Burden's statement with additional hearsay.

7          On the first point, I don't see how this statement

8   that L-1 or J-Mark is inconsistent -- I'm sorry that -- yeah.

9   Sorry.  That L-1 and J-Mark shot Jeffrey Henry is inconsistent

10  with anything that Kevin Burden said on the video.  What he was

11  talking about on the video was Bow Wow and Gotti coming to pick

12  up guns and at that point of the video -- at the point -- the

13  point the video was made, he was saying -- he was saying back

14  in December we didn't know what was happening.

15         So, I'm not sure how this is actually inconsistent in

16  a way that invokes 806 to attack his credibility.

17         THE COURT:  Well it would be, right.  The government's

18  theory is that Kevin Burden provided the guns that at least

19  some of these defendants used to shoot at Mr. Henry, correct?

20         MR. BAUER:  Yes.

21         THE COURT:  Now, this statement purports to say that

22  Mr. Burden told David Evans that he and L-1 shot Henry; is that

23  correct?

24         MR. BUCHWALD:  That Mallory.

25         MR. BAUER:  That Mallory and L-1 shot him.

1          THE COURT:  Oh, okay.

2          MR. GOLTZER:  Same thing?

3          MR. BAUER:  Right.  So I -- I mean the fact that he

4   gave guns to two people, but he's saying -- obviously wrong,

5   but he's saying that two other people shot Joker, I'm not sure

6   what's inconsistent about that.  The theory is very clear that

7   there are lots of robbers there and lots of people shooting.

8   I'm not sure what's inconsistent about it.

9          I also -- then my second point, Judge.  I think that

10  it's -- I'm not sure that Rule 806 allows the hearsay from

11  David Evans to come in to attack Kevin Burden.  If they want to

12  call Kevin Burden and attack his credibility, that's another

13  story.

14         And then if they wanted to call Kevin Burden and

15  attack his credibility, he did the same thing which would be to

16  invoke the Fifth, which would then bring us back to Rule

17  804(b)(3) then he would have to -- then they would have to show

18  you that this statement was trustworthy.  It's not trustworthy.

19  It's all circular logic here, but I'm not entirely sure how

20  this isolated statement comes in.  And I'll just -- I will sit

21  back down with my additional caveat which is I would love to

22  have had more time to look at Rule 806 and to understand what

23  the parameters of it are.  But on its face, I don't see it.

24         MR. GOLTZER:  May I add something to complete the

25  record.

1          THE COURT:  Sure.

2          MR. GOLTZER:  Number one, I think the Court is

3     absolutely correct when the Court appears to perceive it as a

4     prior inconsistent statement.  The government's theory is that

5     my client and Mr. Thomas had two particular guns and were

6     shooting.  Apart from other evidence in the case which seems to

7     negate that.  Mr. Evans said he spoke to Burden.  Burden is on

8     that tape talking about these people purportedly getting those

9     particular guns.  And we are entitled under Rule 806 to

10    confront Mr. Burden or to impeach Mr. Burden as if he had

11    testified in this case.

12         It's not only an 806 issue.  It's a 106 issue.  Under

13    the rule of completeness that statement should come in.

14         There are constitutional implications as well.  We

15    have a right to present a defense under the Sixth Amendment.

16    Under that amendment we would have the right to call Mr. Evans.

17    The government, of course, could call him.  And we would have a

18    right to put in an inconsistent statement for Mr. Burden.

19         The government is going to rely on Mr. Burden's

20    credibility in its summation to the jury.  The government is

21    going to tell the jury, look how consistent he is, look how

22    reliable he is, look how he remembers, look how they're talking

23    about context.  And it's a critical piece that Mr. Burden told

24    somebody else that somebody else committed the shooting.

25         So under both 806 and 106 and the Sixth Amendment it

e8j9chr1                          Trial

1      needs to come in.

2                  MR. BAUER:  I'm sorry.  Two things.  Of course they

3      can call Mr. Evans as a witness.  It's a matter of whether they

4      can question him on this statement.

5                  THE COURT:  Why can't they question him on this

6      statement?

7                  MR. BAUER:  For the reasons that I'm -- for the

8      reasons that I'm saying, that it's hearsay from Mr. Burden and

9      then that that would bring us to 804(b)(3) where he's

10     unavailable.

11                 MR. GOLTZER:  It's irrelevant -- it's irrelevant that

12     it's hearsay.  What's relevant is that the statement was made.

13     It's a prior inconsistent statement by a witness whose

14     credibility they intend to argue to this jury.

15                 MR. BAUER:  Obviously they are not offering it that

16     the statement was made.  They're offering it for truth, your

17     Honor.

18                 THE COURT:  Right.

19                 MR. BAUER:  So that doesn't really hold any water.

20                 But, Judge, in terms of the consistency, both your

21     Honor and Mr. Goltzer pointed to the government's theory of the

22     case.  That's not what the measure is for consistency.  It's

23     about consistency of the witness's statements.  It's not

24     about -- you're right, our theory is that it wasn't L-1 and

25     J-Mark.  But that's not what we should be measuring consistency

e8j9chr1                          Trial

1    against.  It's the one statement that we've offered of Kevin

2    Burden's versus this statement.  And I respectfully don't see

3    that they are inconsistent.

4              MR. GOLTZER:  There's another inconsistency as well.

5    Burden takes the position on parts of the tape that he doesn't

6    know anything about the crime.  Now he's telling somebody in a

7    jail cell that it was Mallory and the other fellow, L-1, who

8    committed the crime and who murdered him.

9              Now the government is also taking the position, to

10   underscore the importance of it all, that Mallory was outside,

11   that Mallory wasn't there, and that L-1 was outside.  The

12   government is going to argue that there are seven or -- six or

13   seven people on a video tape and by the process of elimination

14   it had to be our clients.

15             We're not offering this for the truth.  We're offering

16   it as impeachment.

17             THE COURT:  But impeachment of who?

18             MR. GOLTZER:  Burden.

19             The government's arguing the credibility of Burden.

20   We're saying to the jury:  But Burden said something else when

21   he wasn't drunk on a tape having his recollection refreshed.

22             THE COURT:  Don't make a jury argument to me.  Just

23   tell me what -- Burden makes a statement on the tape.  He

24   doesn't talk about who shot Henry.

25             MR. GOLTZER:  But he says they all came that night.

1    He says they all came in a cab.  He says -- go ahead.

2              MR. BUCHWALD:  You may recall section one, the part

3    that we wanted under the document of completeness.  You

4    remember who was there.  Gucci, Bow Wow, Baby E, Baynes.  And

5    Burden is agreeing.  And -- it's Mallory and L-1.

6              MR. BAUER:  Judge, may I just put --

7              MR. BUCHWALD:  We know there are only seven people.

8              MR. BAUER:  Judge, may I just put a little bit more of

9    the statement in context.

10             This statement that Burden made for Fuzzy was at MCC

11   after he was arrested.  He made the statement after he knew

12   that Jamar Mallory made that video of him.  And in the video

13   you saw and heard how much Kevin Burden hates L-1 and in fact

14   excerpt six that we cut from before the jury was about how they

15   were out to get L-1.  So in terms of the trustworthiness he's

16   sitting in MCC hating L-1 already and J-Mark has just snitched

17   on him.  There are no hallmarks of credibility.  And if you

18   allow this statement in without the ability to cross-examine

19   Kevin Burden further, then it sits out there as something much

20   more than it really is.

21             MR. BUCHWALD:  That chronology respectfully is

22   inaccurate.  This statement is -- is made September 9, 2011.

23   The tape that Mallory makes of Burden isn't until July of 2012.

24   So, it certainly isn't in retaliation for knowing that he's

25   been taped.

e8j9chr1                          Trial

1            MR. GOLTZER:  As far as having a statement out there,

2       we've got a tape out there too that we can't cross-examine

3       Mr. Burden.

4            THE COURT:  What does the defense propose to do?  What

5       are you asking to put before the jury and in what form?

6            MR. BUCHWALD:  That David Evans told the government

7       investigators, according to Detective Bunt, on September 9,

8       2011, that Kevin Burden had told him that J-Mark and L-1 shot

9       Joker, both of them.

10           THE COURT:  Rule 806 -- the government has asked for

11      an opportunity to review this further and I'm going to give

12      them the opportunity to do that.  So you should have someone in

13      your appellate unit or whatever do this this morning -- provide

14      that where a statement, a hearsay statement as was done here

15      has been admitted in evidence, the declarant's credibility

16      here, Burden, may be attacked and then supported by "any

17      evidence that would be admissible for purposes -- for those

18      purposes if the declarant had testified as a witness."

19           So I guess one additional question is:  Could

20      Mr. Burden have been questioned concerning that statement?  And

21      presumably he could have.

22           Then the Court may admit evidence of the declarant's

23      inconsistent statement or conduct regardless of when it

24      occurred or whether the declarant had an opportunity to explain

25      or deny it.  So, again, that would weigh in favor of its

1    admission.

2            If the party against whom the statement was admitted

3    calls the declarant as a witness, the party may examine the

4    declarant on the statement as if on cross-examination.

5            I take it that would refer in this case to Mr. Evans,

6    that last part?

7            Does it make sense to bring Mr. Evans to court just in

8    case?

9            MR. BUCHWALD:  I think the declarant in that last

10   sentence is referring to Mr. Burden.  In other words, did -- if

11   we somehow could call Mr. Burden because we could immunize him.

12           MR. GOLTZER:  We can't.

13           MR. BUCHWALD:  We can't, as your Honor noted.

14           THE COURT:  Well it would appear on first glance that

15   it should be admitted but I will give the government an

16   opportunity to further research and report back later today.

17   Okay.

18           Are we ready to proceed otherwise with the witnesses?

19           MR. BAUER:  What's frustrating about the sequence of

20   how this is playing out is that it's being raised now.  And if

21   we -- if it had been raised later -- I'm sorry earlier -- then

22   we would have just called David Evans.  If you're going to rule

23   that it's admissible, that's what we'll do.  We're not going to

24   stipulate to it.  We'd call Evans.  And now our sequence of

25   witnesses is being affected by this last minute --

```
 1            THE COURT:  That's one of the problems that we run

 2   into in a case where it's a large case, there's a lot on the

 3   line, and there's a mountain of 3500 material is given to

 4   defense lawyers fairly late in the game.  The government has

 5   had this information for a couple of years.  Defense lawyers

 6   have not.

 7            MR. BUCHWALD:  In that regard we did specifically

 8   direct everybody's attention to this specific statement during

 9   the colloquy on reliability pertaining to the Mallory/Burden

10   tape.

11            THE COURT:  That suggests actually that you should

12   have brought it up earlier if that's the case.

13            MR. BAUER:  Respectfully, Judge, we turned this over

14   early.

15            MR. BUCHWALD:  And were told yesterday for the first

16   time that they -- that they were not calling Evans.  If they

17   were calling Evans, we would cross-examine Evans.

18            THE COURT:  Well except when they said that yesterday

19   everyone seemed quite pleased and this was not an issue.

20            MR. GOLTZER:  The fact it slipped our minds.  There's

21   a lot of going on here.  There are a lot of moving parts and

22   the fact that we came in the next morning as opposed to the

23   afternoon before is not a knowing and intelligent waiver of a

24   constitutional right.

25            THE COURT:  Obviously I'm not going to make a
```

1    determination that affects the defendants' rights because of

2    the convenience of the parties or the government's witness

3    sequence.

4           MR. GOLTZER:  To the extent that we're imperfect,

5    please accept our apology and to the government as well.  I

6    should note, however, that the government has changed its

7    witness order several times and we've gone out of our way to

8    accommodate it.

9           THE COURT:  That's not a factor that is of any concern

10   to the Court, quite honestly, so.

11          MR. BAUER:  Judge, there's a lot of moving parts on

12   this last day.  We have about 42 stipulations from them that

13   we're supposed to review as well.  What we'll do -- we'll try

14   to have a colleague do a little research for us and report back

15   as best we can.  But if you're going to rule that this

16   statement comes in, then we'd like to call Mr. Evans and we're

17   going to try to arrange to have him here today.

18          THE COURT:  Do arrange to have him here today.  And if

19   I need to make a phonecall, I'm happy to make a phonecall.

20   But, again, just based on the clear reading of the rule as we

21   just did on the record it would appear to be admissible.

22          In the meantime, do we have the jury?

23          THE DEPUTY CLERK:  We do.

24          THE COURT:  We have the jury and it's past 9:30.  The

25   entire jury is here.

e8j9chr1                          Trial

1            MR. BAUER:  Mr. Boone is outside.  He's an in-custody

2    witness and he's in.  Jail we brought him here on a takeout

3    order.  Could we have him --

4            THE COURT:  Absolutely.  Bring him in immediately.

5            Bring him on up, please.

6            Good morning, Mr. Boone.

7            Sir, please be seated.  Step into the witness box.

8    And you may be seated.

9            Are we ready for the jury?

10           MR. BAUER:  Yes, your Honor.

11           THE COURT:  Okay.

12           Mr. Boone, are you okay?

13           (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

e8j9chr1                        Trial

1              (Jury present)

2              THE COURT:  Good morning, everyone.  Please be seated.

3              Ladies and gentlemen, I apologize for the slightly

4    late start this morning.  We're just trying to make sure that

5    everything is aligned for you for the rest of the day.

6              With that, would the government please call its next

7    witness.

8              MR. BAUER:  Yes, Judge.  The government calls Akinto

9    Boone.

10             THE COURT:  Mr. Boone would you please rise and face

11   the courtroom deputy.

12             I want you to speak directly into the microphone in

13   front of you and I want you to please begin by stating your

14   full name and spelling your first and last name for the record.

15     AKINTO BOONE,

16        called as a witness by the Government,

17        having been duly sworn, testified as follows:

18             THE COURT:  Thank you, sir.

19             Mr. Bauer.

20   DIRECT EXAMINATION

21   BY MR. BAUER:

22   Q.  Good morning, Mr. Boone.  How old are you?

23   A.  43.

24   Q.  When were you born?

25   A.  6-14-71.

E8j9chr1                        Boone - direct

1    Q.  Where did you grow up?

2    A.  Newburgh.

3    Q.  How far did you go in school?

4    A.  Tenth grade.

5    Q.  Do you have any degrees?

6    A.  Yeah.

7    Q.  Which is what?

8    A.  GED.  Diploma.

9    Q.  Mr. Boone, I can see that you're wearing an orange

10   jumpsuit.  Can I take it that you're presently in jail?

11   A.  Yes.

12   Q.  What jail are you in?

13   A.  Orange County.

14   Q.  Since when have you been in jail?

15   A.  Since March.

16   Q.  March of this year?

17   A.  Yes.

18   Q.  Do me a favor.  Pull that microphone closer to your mouth

19   so the jury can hear you.

20          You were arrested in March of this year?

21   A.  Yes.

22   Q.  What were you arrested for?

23   A.  Violation of parole.

24   Q.  And --

25   A.  Seventh degree position.

1    Q.  And 7th degree possession.

2              Possession of what?

3    A.  Crack cocaine.

4    Q.  And you said you were on parole.  What were you on parole

5    for?

6    A.  Possession of a weapon and possession of drugs.

7    Q.  When was that case originated?

8    A.  2004.

9    Q.  How long are you scheduled to be in jail for?

10   A.  Like --

11   Q.  Now.

12   A.  Like six more weeks.

13   Q.  Until October?

14   A.  Yeah, until October.

15   Q.  Mr. Boone have you been subpoenaed to testify here today?

16   A.  Yes.

17   Q.  Does that subpoena require you to be here?

18   A.  Yes.

19   Q.  In response to that subpoena have you considered asserting

20   your Fifth Amendment rights to incriminate yourself which means

21   to not get yourself in trouble by testifying?

22   A.  Yes.

23   Q.  And have you reviewed an order signed by the court relating

24   to your testimony?

25   A.  Yes.

1   Q.  What do you understand that that order requires you to do?

2   A.  Tell the truth.

3   Q.  Does it require you to testify here?

4   A.  Yes.

5   Q.  What protections, if any, does that order give you?

6   A.  Nothing I say can -- I could be charged for.

7   Q.  And -- but does it prevent use of your statements against

8   you if you lie here today?

9   A.  I can get charged.

10  Q.  So it doesn't protect you from lying?

11  A.  No.

12  Q.  It protects you from other things, such as not lying?

13  A.  Yes.

14  Q.  If you testify truthfully today are you expecting or hoping

15  that the government will do anything for you?

16  A.  I hope you tell parole, write parole a letter and let them

17  know I came from a subpoena.

18  Q.  So you hope the government writes a letter to parole?

19  A.  Yes.

20  Q.  And what's your understanding of what will go in that

21  letter?

22  A.  That I testified honestly.

23  Q.  And why do you want that letter?

24  A.  So I can prove that I didn't lie and hopefully they'll let

25  me go.

E8j9chr1                          Boone - direct

1    Q.  Let you go earlier?

2    A.  Yes.

3    Q.  What's your understanding as to what will happen if you

4    don't tell the truth on the witness stand?  Will you still get

5    that letter?

6    A.  No.

7    Q.  Now, Mr. Boone, you testified earlier that you were

8    recently arrested for possession of crack cocaine; is that

9    right?

10   A.  Yes.

11   Q.  Have you ever sold crack?

12   A.  Yes.

13   Q.  Have you ever used crack?

14   A.  Yes.

15   Q.  How about other drugs?  Have you ever used any other drugs?

16   A.  I used everything.

17   Q.  Does that include marijuana?

18   A.  Yes.

19   Q.  Cocaine?

20   A.  Yes.

21   Q.  How about dust or PCP?

22   A.  Yes.

23   Q.  When is the last time that you used drugs like dust or

24   cocaine?

25   A.  Years ago.  A couple years ago.

E8j9chr1                          Boone - direct

1    Q.  How about selling?  Have you sold other drugs besides

2    crack?

3    A.  Yes.

4    Q.  Which drugs?

5    A.  Marijuana, PCP.

6    Q.  Have you ever sold heroin?

7    A.  Yes.  I did that for a minute.

8    Q.  But over the years which drug have you sold the most?

9    A.  Crack.

10   Q.  When approximately did you start selling crack?

11   A.  When I was like 14 or 15.

12   Q.  So that was in the 1980s?

13   A.  Yes.

14   Q.  And were you selling crack up until your arrest this year?

15   A.  Yes.

16   Q.  Focusing specifically on the time around December 2010 were

17   you selling crack at that time?

18   A.  Yes.

19   Q.  Was that in Newburgh?

20   A.  Yes.

21   Q.  By yourself or with other people?

22   A.  With other people.

23   Q.  Were you part of a gang at that time, Mr. Boone?

24   A.  No.

25   Q.  Did you have any nicknames back then?

 1   A.  Many names.

 2   Q.  Many names.  What were some of those names?

 3   A.  Reese, Vio, Take Down.

 4   Q.  Reese, Vio, the third one?

 5   A.  Take Down.

 6   Q.  Approximately how much crack were you selling back then?

 7   This is again December of 2010.

 8   A.  Maybe seven grams a day.

 9   Q.  And you said you've been arrested for selling drugs in the

10   past?

11   A.  Yes.

12   Q.  Were those -- was it once or more than once?

13   A.  Many times.

14   Q.  Were those all in Newburgh?

15   A.  Yes.

16   Q.  And this March 2014 arrest, that was your latest arrest?

17   A.  Yes.

18   Q.  Who were you with when you were arrested?

19   A.  Elena Gardner.

20   Q.  Where were you?

21   A.  In the car.

22   Q.  And you said you were arrested for crack.  Where was the

23   crack?

24   A.  In the car.

25   Q.  Whose crack was it?

1    A.  Mines.

2    Q.  Back in December of 2010 where did you sell crack?

3    A.  54 Chambers.

4    Q.  Was that the only place or one of the places you sold?

5    A.  I sold anywhere.  Anywhere I went.

6    Q.  But -- and that included selling at 54 Chambers?

7    A.  Yes.

8           MR. BAUER:  Ms. McInerney, if we can pull up what's

9    admitted as Government Exhibit 260.

10   Q.  Mr. Boone a photograph is going to come up on the screen in

11   front of you.  Can you tell me if you recognize the building

12   depicted in Government Exhibit 260?

13   A.  Do I recognize it?

14   Q.  Yes.  Do you recognize it?

15   A.  Yes.

16   Q.  What is it?

17   A.  The spot.

18   Q.  Which spot?

19   A.  54 Chambers.

20   Q.  Back in December of 2010 did you live there at 54 Chambers?

21   A.  No.

22   Q.  Who did?

23   A.  My cousin.

24   Q.  Your cousin?

25   A.  Yes.

E8j9chr1                        Boone - direct

1   Q.  Who is that?

2   A.  Tarrence.

3   Q.  Do you know Tarrence's last name?

4   A.  Norman -- I mean Stubs.

5           MR. BUCHWALD:  Sorry.  Can we have that read back.

6           THE COURT:  Madam court reporter.

7           (Record read)

8           MR. BAUER:  Ms. McInerney if we can pull up Government

9   Exhibit 215.

10  Q.  Mr. Boone do you recognize the individual in Government

11  Exhibit 215.

12  A.  Yes.

13  Q.  Who is that?

14  A.  Skate -- Tarrence.

15  Q.  Same Tarrence that lived at 54 Chambers?

16  A.  Yes.

17  Q.  Did he have any other names?

18  A.  I call him Ski, Cocky T.

19  Q.  Cocky T or Ski?

20  A.  Yeah.

21  Q.  Back in 2010 what did Tarrence do for a living?

22  A.  Sold crack.

23  Q.  Where did he sell crack?

24  A.  54 Chambers.

25  Q.  How do you know that?  How do you know he sold crack there?

E8j9chr1                          Boone - direct

1    A.  I sold with him.

2    Q.  Would customers come to the house?

3    A.  Yes.

4    Q.  How often would customers come to that house?

5    A.  Every two minutes.

6    Q.  Every two minutes?

7         Did you ever see Tarrence with money there?

8    A.  Many times.

9    Q.  Large sums of money or what you considered large sums of

10   money?

11   A.  A couple thousand.

12   Q.  What's the most you ever saw him with?

13   A.  Three to four thousand.

14   Q.  Back in 2010 how often did you visit Tarrence's house at 54

15   Chambers?

16   A.  Went by there everyday.

17   Q.  How did it work when a customer came there?  Who sold it to

18   the customer?

19   A.  Whoever go to the door.  Some people had their own personal

20   customers.

21   Q.  So you said whoever -- either whoever opened the door

22   unless it was your own personal customer?

23   A.  Yes.

24         MR. BAUER:  Ms. McInerney, if you can pull up

25   Government Exhibit 221.

1   Q.  Mr. Boone do you recognize the individual in Government

2   Exhibit 221?

3   A.  Yeah.

4   Q.  Who is it?

5   A.  Joker.

6   Q.  Do you know his real name?

7   A.  Yeah.

8   Q.  What is it?

9   A.  I forgot.

10  Q.  That's okay.  When did you meet Joker?

11  A.  I grew up with him.

12  Q.  Back in 2010 what did he do for a living?

13  A.  Who?  Joker?

14  Q.  Yeah.

15  A.  He sell crack.

16  Q.  Where did he sell crack?

17  A.  Anywhere.  He stopped buy -- he stopped by 54 Chambers once

18  in a while.  It wasn't like he -- he'd be there.

19  Q.  It wasn't like --

20  A.  It wasn't like he always be there.  He come by there once

21  in a while.

22  Q.  Would he sell when he was there?

23  A.  Yeah.

24  Q.  What kind of drugs would he sell, crack?

25  A.  Yes.

E8j9chr1                        Boone - direct

1    Q.  Did you see him selling the crack there?

2    A.  A couple times.

3    Q.  Back in 2010 what other things was Joker doing besides

     selling crack?

5    A.  He smoked dust.

6    Q.  Did you see him smoking dust back then?

7    A.  Couple times.

8    Q.  Now you mentioned earlier that you yourself have used

     drugs, right?

10   A.  Yes.

11   Q.  And that included crack?

12   A.  Yes.

13   Q.  Were you using crack back in December of 2010?

14   A.  Yes.

15   Q.  How often?

16   A.  I don't know.  Recreation.

17   Q.  So was it at least once a week?

18   A.  Yes.  A couple times a week.

19   Q.  Would you smoke crack at 54 Chambers?

20   A.  Never did there but --

21   Q.  I'm sorry?

22   A.  I said I never smoked it there.

23   Q.  Why is that?

24   A.  Because I don't do nothing in front of customers.

25   Q.  Did Tarrence have a rule about smoking crack at the house?

1    A.  Nobody did smoke crack.

2    Q.  Nobody smoked?

3    A.  No, not there.

4    Q.  So if somebody wanted to smoke crack at 54 Chambers where

5    would they have to go?

6    A.  They'd have to leave.

7    Q.  Go outside?

8    A.  Yes.

9    Q.  And you mentioned that you've been arrested many times?

10   A.  Yes.

11   Q.  For drugs?

12   A.  Yes.

13   Q.  You've been arrested for other crimes?

14   A.  Possession of a weapon.

15   Q.  How about larceny?  Have you ever been arrested for

16   larceny?

17   A.  Yes.

18   Q.  Now, Mr. Boone I'd like to draw your attention to the

19   events that took place on December 15, 2010.

20           Do you remember where you were just after midnight on

21   that day?

22   A.  I was in 54 Chambers.

23   Q.  When did you arrive there?

24   A.  I don't know.  About like -- right before midnight.

25   Q.  And when you got there, did you go in the house?

1    A.  Yes.

2    Q.  Was anyone else there?

3    A.  Yeah.

4    Q.  Who was there?

5    A.  Like seven other guys; like my little brother was there.

6    Q.  What's his name?

7    A.  Michael.

8    Q.  Michael Boone?

9    A.  Yes.

10   Q.  Who else?

11   A.  (No response).

12   Q.  Was Tarrence there?

13   A.  Tarrence was there, Cocky T.  That was Tarrence.  And this

14   other guy named Ski.

15   Q.  So another guy who also had the name Ski?

16   A.  Yeah.  There's two -- I just call Tarrence Ski but this

17   other guy, his name was Ski, everybody else call him Ski.

18   Q.  Anyone else you can think of?

19   A.  This other guy named Rail.

20   Q.  Okay.  Now what were these guys doing when you got to the

21   house?

22   A.  They was in -- Tarrence, he was cooking.  And my little

23   brother and them was in the bedroom watching, oh -- watching

24   the laptop like Smack Down.  They be rhyming on YouTube.

25   Q.  So Tarrence was cooking you said?

1    A.   Yeah.

2    Q.   And your brother Michael and the others were in?

3    A.   They was in the bedroom.

4    Q.   Whose bedroom, Tarrence's?

5    A.   Yeah.

6    Q.   And they were watching?

7    A.   Smack Down.

8    Q.   Something called Smack Down on the laptop?

9    A.   Yeah.

10   Q.   How long were you in the house for?

11   A.   I was -- I only came in.  I told everybody -- I looked, I

12   seen what they were doing -- yo I'm out.  I was leaving.  I was

13   only in there like 20 minutes.

14   Q.   Did anyone else come to the house while you were there?

15   A.   Not while I was there.

16   Q.   Was there a knock at the door while you were there?

17   A.   Yeah.  When I was leaving somebody knocked on the door so I

18   went outside.

19   Q.   Did you open the door?

20   A.   Yeah, I opened the door.

21   Q.   Who was it?

22   A.   MA.

23   Q.   MA?

24   A.   Yeah.

25   Q.   Who is MA?

1    A.  Marshall Williams.  He was at the door.

2    Q.  Who is Marshall Williams?  Is he another person who sells

3    drugs?

4    A.  No.  He don't sell drugs there he come there and buy some

5    sometime.

6    Q.  He comes there to buy some?

7    A.  Yeah.

8    Q.  So he's a crack customer?

9    A.  Yeah.

10   Q.  So when you opened the door for Marshall, what did you and

11   he do?

12   A.  Started talking.

13   Q.  And where were you standing at the time?

14   A.  I was standing in the doorway.  And he was standing in

15   front of me.

16   Q.  You say the doorway to the house at 54 Chambers?

17   A.  Yes.

18   Q.  Marshall was standing there?

19   A.  Yes.

20   Q.  Was anyone else out there?

21   A.  No.

22        MR. BAUER:  Ms. McInerney, if you can pull up

23   Government Exhibit 275 which is the 360-degree panoramic view.

24   Q.  Mr. Boone, we're pulling up this photograph panoramic view.

25   Have you seen this as part of your preparation for testifying

E8j9chr1                              Boone - direct

1   here today?

2   A.  Yes.

3   Q.  So where we are right now, what are we looking at?

4   A.  Looking at Chambers Street in front of 54.

5   Q.  From what angle?

6   A.  From First Street area.

7   Q.  Is it from First Street or is it from across the street on

8   Chambers?

9   A.  It's from across the street but you can come down First

10  Street this way.

11          MR. BAUER:  Ms. McInerney, can we turn to the left

12  towards First Street.

13  Q.  Can we stop here.

14          So Mr. Boone, what's that intersection there?

15  A.  Huh?

16  Q.  There are two streets that are intersecting there?

17  A.  That's First and Chambers.

18  Q.  That's First and Chambers?

19  A.  Yeah.

20          MR. BAUER:  Ms. McInerney, if we can scroll back

21  towards the front of 54 Chambers.

22  Q.  Where were you and Marshall talking?

23  A.  Right in front of the white door.

24  Q.  Right in front --

25  A.  My back was against the white door.

1   Q.  Your back was against the white door?

2   A.  And Marshall was standing in front of me.

3   Q.  Now was the front door closed?

4   A.  I didn't close it all the way.  I was about to leave,

5   though, when he was at the door.  I was talking to him.  I

6   ain't walk away.  So I just pulled the door close.  I didn't

7   close it.

8           MR. BAUER:  Ms. McInerney, can we pull up Government

9   Exhibit 95C.

10  Q.  Do you recognize this photo?

11  A.  Yes.

12  Q.  What is it?

13  A.  That's the foyer.  That's like the hallway usually you get

14  in, in the building.

15  Q.  And on the left of the photograph there's a white door.  Is

16  that the front door to 54 Chambers?

17  A.  Yes.

18  Q.  So where were you standing?

19  A.  I was standing right -- the door was closed though.  I was

20  standing in front of the door.

21  Q.  Kind of standing where the photographer was?

22  A.  Huh?

23  Q.  I'm sorry.  Can we pull up --

24          MR. BAUER:  Sorry.  I think 95B is what I meant to

25  say.  Sorry.  I think I confused you.  I said 95C instead of

1  95B.

2  Q.  So Mr. Boone there are actually -- the door here, 95B is

3  that the front door to 54 Chambers?

4  A.  Yes.

5  Q.  Sorry I confused you.

6          So where were you standing when you were talking to

7  Mr. Williams?

8  A.  Right there with the door closed though behind me.  It

9  wasn't locked though.  It was just pulled towards my back.

10  Q.  While you were out there with Marshall what, if anything,

11  did you see?

12  A.  There was nothing until a couple minutes and some dudes

13  walked down the street, down First Street.

14  Q.  They walked down First Street towards what?

15  A.  Towards Chambers.

16  Q.  When you say some dudes, do you remember how many dudes

17  there were?

18  A.  Seven, eight.

19  Q.  Seven to eight.

20          And what did you see them do?

21  A.  They stopped on the corner.

22  Q.  Stopped on the corner of Chambers and First?

23  A.  Yeah.

24  Q.  How were they dressed at the time?

25  A.  Masked up.

E8j9chr1                        Boone - direct

1    Q.   Masks?

2    A.   Yeah.  It was cold out.  So it wasn't nothing.

3    Q.   What do you mean?

4    A.   It was cold out so it wasn't -- wasn't like crazy dudes

5    walking up with masks on because it was cold that day.  It was

6    in December.

7    Q.   As far as you could tell did they all have masks on?

8    A.   Yeah.

9    Q.   And how about other clothing?  What were they wearing?

10   A.   Hoodies, coats.

11   Q.   Okay.  And after they stopped at the corner, what did they

12   do?

13   A.   They started walking towards where me and MA was at and

14   they stopped in front of the weed spot.

15            Next door is a weed spot.  So they stopped there.  I

16   thought in my mind, yo, those dudes are gonna rob that weed

17   spot or something.

18   Q.   Where is the weed spot?  We're looking at 275.

19   A.   Nextdoor.  Towards First Street.

20   Q.   So the house to the left?

21   A.   Yeah.

22   Q.   And how did you know that was a weed spot there?

23   A.   I be there everyday.

24   Q.   Sorry?

25   A.   I be there everyday.

E8j9chr1                          Boone - direct

1    Q.  Okay.  So you thought that they were going to rob the weed

2    spot?

3    A.  The thought came to my mind because they stopped in front

4    of the weed spot.  I said these dudes about to rob the weed

5    spot or something.  But then they started walking towards us.

6    Q.  Started walking towards you and Marshall?

7    A.  Yeah.

8    Q.  What happened next?

9    A.  They just stand in front of us.

10   Q.  Stand -- stood in front of you and Marshall?

11   A.  Yeah.

12   Q.  What did they do?

13   A.  Everybody just standing, started looking at each other.

14   Q.  Did they position themselves in any particular way?

15   A.  Like a half moon circle in front of me.  And I'm standing

16   in front of the door.  So they made a half moon circle in front

17   of me.  They said a couple things to MA.  He said something

18   back to them.  I'm just standing there looking at them.

19   Q.  Do you remember what they said?

20   A.  Something like "what's up unc," or something like that.

21   And he said --

22   Q.  "What up unc"?

23   A.  Yeah.  "What up nef."

24   Q.  "What up nephew"?

25   A.  Yeah.

1   Q.  And after they said that what, if anything, did they do?

2   A.  They didn't do nothing.  They just standing there.  Just

3   standing there.  And I started looking at like looking around

4   at their eyes and stuff like that.  And I said like oh, damn.

5   Q.  Said "oh damn"?

6   A.  Because I felt like what's this about to be.

7   Q.  I'm sorry?

8   A.  I felt it in my heart what these dudes about to do?  I

9   knew -- because they ain't saying nothing, just standing there,

10  and just looking all crazy.

11  Q.  And whether you said "oh damn" what, if anything, did any

12  of the robbers say?

13  A.  Somebody pulled out a gun first.  "Yeah you, that's right."

14  Then everybody started pull out the guns.  And I backed up.

15  When I backed up, the door came opened.  And they said, "yeah

16  get in there."

17  Q.  Now when the first person said "yeah you're right" was he

18  the first person to pull out a gun?

19  A.  Yeah.

20  Q.  Do you remember anything about that gun?

21  A.  It was a chrome.

22  Q.  It was chrome?

23  A.  Yeah.

24  Q.  And then you said as far as you could tell the rest of them

25  pulled out guns too?

E8j9chr1                              Boone - direct

1   A.  Yes.

2   Q.  And what happened after that?

3   A.  I backed up.  When I backed up like -- the door came

4   opened.  When the door came opened, they seen that the door was

5   opened, they like "yeah get in there."

6   Q.  Okay.  And so you said that they were all wearing hoodies

7   or other jackets like that.  How would you describe their

8   general appearance?  After they came up closer to you and you

9   could get a better look at them?

10          MR. BUCHWALD:  Objection, your Honor.  I believe he

11  testified it was masks and hoodies.

12          THE COURT:  Overruled.

13  Q.  How would you describe their general appearance?

14  A.  What you mean?

15  Q.  How tall they were?

16  A.  It was all different sizes.  They were like I mean -- I

17  knew they wasn't no older dudes.  I knew they were younger

18  dudes, how they was dressed.  That's it.

19  Q.  You knew they were younger based on how they were dressed?

20  A.  Yeah.

21  Q.  You what do you mean by that?

22  A.  Hoodies.  No older dude would come out with no masks, no

23  hoodies on, like that.

24  Q.  How about the fact that there were seven of them?

25  A.  Yeah.

1   Q.  What did that mean to you, if anything?

2   A.  They always be in crowds.  So I ain't really feel nothing

3   until they came in front of me and nobody said nothing.  I'm

4   like what they want?

5   Q.  So after they forced you into the house, what did you do or

6   where did you go?

7   A.  I walked back where Tarrence was at.  They walked me

8   through the crib.  They was behind me.

9   Q.  So they walked you towards where Tarrence was at.  Where

10  was Tarrence at?

11  A.  He was cooking at the stove.

12  Q.  Okay.  And were your brother and the other guys still in

13  the bedroom?

14  A.  Yeah, they was in the bedroom.

15  Q.  So as they walked you back towards where Tarrence was, what

16  did they say or what did they do?

17  A.  A couple guys ran where my little brother was at, get down,

18  get down, get on the ground, stuff like that.

19  Q.  Then what happened?

20  A.  And then a couple more was in there with me and Tarrence

21  and then I had my hands in there.  We had our hands in there

22  like that.  I just like "take the money."  Just get out of

23  there.  And they ordered me to go in the bathroom.

24  Q.  They ordered you to go in the bathroom?

25  A.  Yeah.

E8j9chr1                          Boone - direct

1   Q.  I'm sorry.  To be clear.  Approximately how many robbers

2   were in that area with you and Tarrence?

3   A.  About three.

4   Q.  And how many were -- you're saying the other ones went to

5   the bedroom?

6   A.  Yeah.  I wasn't really focused.  I was just focused on

7   what's going on right now.  I ain't -- I know somebody -- get

8   on the ground, get down, get down, all that junk in the

9   bathroom.

10          I mean -- in the room with my little brother.  And a

11   couple more dudes in there with the guns with me and Tarrence.

12   Q.  Okay.  Can you --

13          MR. BAUER:  Ms. McInerney, can we pull up Government

14   Exhibit 44A.

15   Q.  Mr. Boone have you seen this sketch before?

16   A.  Yeah.

17   Q.  Do you know what it's a sketch of?

18   A.  Sketch of the house.  The crib.

19   Q.  Of 54 Chambers?

20   A.  Yes.

21   Q.  Does it more or less accurately reflect the layout of the

22   house back in December of 2010?

23   A.  Yes.

24   Q.  So you said that they walked you towards Tarrence.  Can you

25   explain where.

1    A.  All the way to the back.  By the -- where that stove --

2    that little stove-looking thing is.

3    Q.  Okay.  So in the upper right part of the picture?

4    A.  Before the toilet and the sink, right there.  Right before

5    that.  That room right there.

6    Q.  Now you said that they were marching you towards the

7    bathroom?

8    A.  Yeah.

9    Q.  And you said something.  What did you say to them again?

10   A.  Hmm?

11   Q.  I think you said something like you know just take our

12   money?

13   A.  Take the money.  Get out of here.

14           They was like "naw, get in the bathroom."

15   Q.  Did they have guns on you at that time still?

16   A.  Yeah.

17   Q.  Were you ever striked -- struck -- struck with a gun?

18   A.  Yeah.

19   Q.  Was that before or after you got to the bathroom?

20   A.  Right when I got in the bathroom, I was ordered to go in

21   the bathroom.

22   Q.  Where did they hit you?

23   A.  The back of the head.

24   Q.  Do you still have any remnants of that --

25   A.  Yeah.

1   Q.  -- on your head?

2          Do you have a scar?

3   A.  Yes.

4          MR. BAUER:  Ms. McInerney, can we pull up Government

5   Exhibit 95G.

6   Q.  Is this a picture of that back kitchen area?

7   A.  Yes.

8   Q.  In 54 Chambers?

9   A.  Yes.

10  Q.  You said earlier that Tarrence was at the stove.  Is that

11  the stove that's on the right there?

12  A.  Yes.

13  Q.  And in the back there's a door.  On the back wall.  What's

14  that?

15  A.  That's the bathroom.

16         MR. BAUER:  Ms. McInerney, can we pull up 95J now,

17  please.

18  Q.  Is that a closeup of the door into the bathroom?

19  A.  Yes.

20  Q.  On your way to the march to the bathroom, did you look or

21  talk to -- look at or talk to Tarrence?

22  A.  Yeah.  I looked at Tarrence.  When he told me to go in the

23  bathroom, I gave Tarrence a look like -- I gave him a look

24  like, you know what's up.

25  Q.  And what did that look mean?

1    A.  Like I get in this bathroom you better pop off.

2    Q.  You better pop off?

3    A.  Well, you better got to do what you got to do because I'm

4    doing something.

5    Q.  So when you got into the bathroom what, if anything, did

6    you see?

7    A.  It was another -- the dude Ski was in the bathroom.  He was

8    leaning against the wall.

9    Q.  The dude Ski.  So not Tarrence, the other Ski?

10   A.  The other Ski, yeah.

11   Q.  And what, if anything, did you say or do with him?

12   A.  I just looked at him.  When he seen me come in the

13   bathroom, he looked at me, like put his hand to his mouth, like

14   shh.  I'm thinking in my mind shoot they behind me --

15   Q.  Say that again.

16   A.  He looked at me, like he was hiding in the wall, he like

17   shh.  I looked down like they behind me, you talking about some

18   shush.

19   Q.  And how many guys walked you into the bathroom originally?

20   A.  Only one was behind me because he couldn't fit in there.

21   Q.  What do you mean, they couldn't fit?

22   A.  Like the doorway.  Somebody hit the doorway.  And I made a

23   right.  I turned around.  And I spinned on him and grabbed the

24   gun.

25   Q.  Okay.  Did that guy tell you to do anything?

E8j9chr1                              Boone - direct

1   A.  Who?

2   Q.  The guy who walked you into the bathroom?

3   A.  Yeah.  He told me to get down.

4   Q.  Did you go down?

5   A.  I spinned around and grabbed the gun.

6   Q.  You spinned around and did what?

7   A.  Grabbed the gun.

8   Q.  And can you describe what you did when you grabbed the gun?

9   A.  Well both our hands, put it straight up in the air like

10  trying to tussle for the gun.

11  Q.  Can you demonstrate for the jury when you say your hands

12  were in the air?

13  A.  (Witness complies).

14  Q.  Indicating his hands were raised above his head.

15          So you were -- you were wrestling with him for the

16  gun?

17  A.  Yes.

18  Q.  Do you remember what kind of gun that was?

19  A.  No.  It was a plastic one.

20  Q.  It's what?

21  A.  It was a plastic one.  That's all I know.

22  Q.  Do you remember what color it was?

23  A.  Black.

24  Q.  So it was different than the chrome one that you had seen

25  earlier?

1   A.  Yes.

2   Q.  So and that guy who you were wrestling with, did he have a

3   mask on?

4   A.  Yes.

5   Q.  What, if anything, did you notice about that mask?

6   A.  Just regular mask.  Like -- regular mask.  One of them

7   biker mask, them velcro with the strap on the back.

8   Q.  A velcro mask that --

9   A.  Yeah.  It's got the velcro strap in the back, the bike

10  mask.

11  Q.  Okay.

12  A.  Gortex like with the velcro in the back.  Like the BMX

13  masks.

14  Q.  Could you see his face?

15  A.  No.

16  Q.  How tall was he as compared to -- as compared to you?

17  A.  My height.

18  Q.  How tall are you?

19  A.  Five-eleven.

20  Q.  And how about his build?

21  A.  He wasn't like strong like me.

22  Q.  You're pretty stocky, right?

23  A.  Yeah.

24  Q.  Muscular?

25  A.  Yeah.

1  Q.  How about him?  Was he --

2  A.  No.  I wrestled a gun from him, so -- he wasn't like built

3  like I'm built.

4  Q.  Would you say he was skinny?

5  A.  Yeah.

6  Q.  So you said that you ultimately got the gun from him.  But

7  walk us through what happened.  You were wrestling with him and

8  the gun is in the air, right?

9  A.  Yes.

10 Q.  Did anybody else -- any of the other robbers come join that

11 fight?

12 A.  Yeah.  Somebody -- the dude with the chrome gun, he reached

13 in there and bust me in the head with the gun again.

14 Q.  You said the dude with the chrome gun?

15 A.  Yeah.

16 Q.  Now, how do you know it was the same dude, based on the gun

17 or something else?

18 A.  Based on the gun.

19 Q.  You recognize -- the same gun that was pointed in your

20 face?

21 A.  Yes.

22 Q.  Outside the house?

23 A.  Yes.

24 Q.  Was the same gun that struck you in the head?

25 A.  Yes.

E8j9chr1                    Boone - direct

1    Q.  So that's twice now you've been struck in the head?

2    A.  Yes.

3    Q.  You have a scar from that?

4    A.  Yeah.  I was struck on the side of the head and I was

5    struck in the back of the head.

6    Q.  Were there other people helping in that fight too?

7    A.  That's all I seen the gun, I mean.

8    Q.  But there were other --

9    A.  There was other people in there wrestling with Tarrence at

10   that time.  Everybody started fighting around.

11   Q.  Okay.  So you said you ultimately got the gun.  At any

12   point during the struggle when you were fighting for the gun

13   did you hear any gunshots?

14   A.  Not while we was tussling.  But while we was tussling after

15   that gun shots went off.

16   Q.  You said not while you were tussling for the gun?

17   A.  Yeah.  After I -- I didn't hear it before we was tussling.

18   After the tussling, after that, that's when the gun starts

19   going off.

20   Q.  Well once you got the gun, what did the robbers do?

21   A.  They fleed.

22   Q.  Towards where?

23   A.  Towards the door.

24   Q.  And what did you do with the gun?

25   A.  Me?

E8j9chr1                              Boone - direct

1    Q.  Yeah.  What did you do with the gun?

2    A.  Shot it.

3    Q.  Towards what?

4    A.  Towards the door.  Towards the other wall that's -- there's

5    another room in front of this right here.

6    Q.  Towards the robbers?

7    A.  Yes.

8            MR. BAUER:  Ms. McInerney, can we pull up 95K, please.

9    Q.  Do you recognize this photograph, Mr. Boone?

10   A.  Yes.

11   Q.  Where is this photograph being taken from?

12   A.  From back by the -- where I was at.

13   Q.  By the kitchen bathroom area?

14   A.  Yes.

15   Q.  It's facing towards what?

16   A.  Facing towards out the front door.

17   Q.  Was it out the front door or is it towards the hallway?

18   A.  Well it ain't the front door.  It's going towards that way.

19   Q.  Towards the front door?

20   A.  Yeah, towards the front door.

21   Q.  And right there in the middle of the photograph there's a

22   wall, right?

23   A.  Yes.

24   Q.  When you said you were shooting towards a wall --

25   A.  They was -- the dudes --

1           MR. BUCHWALD:  Objection.  Shooting towards the front

2    door.

3           THE WITNESS:  Yeah.  I was shooting towards that way.

4    Q.  So you said the robbers were running towards the door?

5    A.  Yeah.

6    Q.  What types of things were they saying?

7    A.  I ain't hear anybody saying nothing.

8    Q.  I'm sorry?

9    A.  I didn't hear nobody saying nothing.

10   Q.  Okay.  So you said that you shot towards the door?

11   A.  Yeah.

12   Q.  How many times did you shoot?

13   A.  Two times, three times, I don't know.

14   Q.  Where did you go after you shot?

15   A.  I ducked back behind the wall.

16   Q.  That wall in the photograph?

17   A.  Yeah.

18   Q.  Were you there by yourself or with anybody else?

19   A.  Tarrence and them was behind me.

20   Q.  At that point did you notice anything about Tarrence?

21   A.  He was shot.

22   Q.  Did you know at that point that he was shot?

23   A.  It was before that -- well, after I shot towards the door I

24   ran towards the door thinking they left.  But they ain't never

25   leave.  They shot back.  You know what I'm saying.  Then I

E8j9chr1                         Boone - direct

1   ducked behind the wall right there.

2   Q.  So they shot back towards you?

3   A.  Yes.

4   Q.  And that's when you ducked behind that wall?

5   A.  Ducked behind the wall.  And Tarrence like was behind me.

6   He was ducked behind the wall right here.

7   Q.  When you were behind that wall, did you stay there or did

8   you peek out to see where they were?

9   A.  I stayed there for a minute.  After they then -- we waited

10  for a while.

11  Q.  Any of those bullets that were coming back towards you, did

12  any of them hit you?

13  A.  One grazed me in the face.

14  Q.  Where were you when you were grazed in the face?

15  A.  Right here.  I was behind the wall right here.  I stuck my

16  head around the wall.

17  Q.  You put your head around the wall and it grazed you in your

18  face?

19  A.  Yes.

20  Q.  You pointed to your cheek.  Do you still have a scar there?

21  A.  Yeah, right here.

22  Q.  So you said that you heard, obviously -- well, you shot

23  twice you said, right?

24  A.  Yeah.

25  Q.  And you heard and felt gunshots coming in your direction,

E8j9chr1                        Boone - direct

1   right?

2   A.  Yes.

3   Q.  How many shots did you hear in total?

4   A.  I heard like one, two, three.  I don't -- about three

5   shots.

6   Q.  And you said some of those shots were heading in your

7   direction, correct?

8   A.  Yes.

9   Q.  Did you hear shots going in any other direction as far as

10  you can tell?

11  A.  I don't know what direction.  I just heard shots and I

12  just -- I ducked back behind the wall and just stayed there for

13  a minute until I didn't hear nothing else.

14  Q.  You said until you didn't hear anything else?

15  A.  Yeah.

16  Q.  And then what did you do after that?

17  A.  I waited for a while in the -- and I just made a noise like

18  "yo, hurt?"  And I barked for my little brother.  And he said

19  "yo."  And then he came out the room.  That's when Tarrence

20  said, "I think I'm shot."  I turned around and looked at him.

21  And he pulled his pants down and showed us.  I was like, "Oh,

22  man."

23  Q.  And Tarrence showed you that he had been shot?

24  A.  Yes.

25  Q.  Where in his body had he been shot?

1    A.   In leg, the top, the upper part of his leg.

2    Q.   And at that point did you still have the gun in your hand?

3    A.   Yes.

4    Q.   So what did you all do next after you looked around and

5    made sure everyone was okay?

6    A.   Made sure everybody was all right.  Then we said, "Yo we

7    got to get out of here."  So we left.  We went outside and

8    Tarrence had his car in front of the door.  So we all jumped in

9    the car and we pulled off.  And before we got -- we was going

10   up Chambers.  We was about going up First Street, and I said,

11   "Man I'm on parole" and I had the gun so -- I said let me out.

12   So they stopped and I got out the car and they turned up.

13   Q.   They turned up where?

14   A.   Turned up First Street to go to the hospital -- I mean

15   Third Street to go to the hospital.

16   Q.   What did you do with the gun?

17   A.   I walked up, just so happened it was Sunday night, so it

18   was garbage night.  So I just walked up and I lift up the

19   garbage bag and I slipped the gun under there.  And I dipped in

20   the house up the street.

21   Q.   Did you ever go to the hospital?

22   A.   No.  I was -- I was on parole.  And I knew that --

23   Q.   Were you in pain, though, at the time?

24   A.   All right.

25   Q.   You were all right?

E8j9chr1                        Boone - direct

1   A.  I'm all right.

2   Q.  Not now.

3   A.  Oh, then.

4   Q.  On that day, were you in pain after being hit in the head

5   and grazed in the face?

6   A.  I was all right then.  I was just worried about everybody

7   else.  It was like -- I don't know.  I was in a daze.  Yeah, it

8   hurt but, however, I don't know.

9   Q.  Mr. Boone, did you ever get a good look at any of the

10  robbers' faces?

11  A.  No.

12  Q.  You said that you got -- when you were fighting for the gun

13  somebody came to -- the robber you were fighting with, somebody

14  came to his aid to help him?

15  A.  Yes.

16  Q.  You said at the same time Tarrence was wrestling with a

17  bunch of the robbers?

18  A.  Yeah.

19  Q.  How far apart were you and Tarrence?

20  A.  We was right there.  Tarrence was right there by this stove

21  right here.  And I was right there by the bathroom door.

22  Q.  Okay.

23          MR. BAUER:  Sorry, your Honor.  One moment.

24          THE COURT:  Yes.

25          (Pause)

1   Q.  Mr. Boone, going back to the fight with -- the struggle

2   you're having with the guy with the gun, okay?

3   A.  Yeah.

4   Q.  During that time you were struggling with him, your hands

5   are in the air, correct?

6   A.  Yes.

7   Q.  Did you ever strike him?

8   A.  I headbutted him.

9   Q.  You headbutted him?

10  A.  Yeah.

11  Q.  Had you ever headbutted anybody before?

12  A.  No.

13  Q.  And when you headbutt him where did you hit him?

14  A.  In the face.

15  Q.  In that mask?

16  A.  Yeah.

17          MR. BAUER:  Sorry, your Honor.

18          (Pause)

19  Q.  Do you know if Tarrence did anything to any of the robbers?

20  A.  I heard he stabbed one of them.

21  Q.  You heard that.  You didn't see it during the fight?

22  A.  I didn't see nothing doing to his fight, you know what I

23  mean.

24  Q.  I'm sorry?

25  A.  I wasn't even paying attention to his fight.  I didn't even

E8j9chr1                         Boone - direct

1   know he was shot until -- I was just focused on what I was

2   doing.

3   Q.  And once you got the gun from that robber, where did he go?

4   A.  He took off.

5   Q.  He took off?

6   A.  Yeah.  I didn't care -- I wanted them to leave.  That's it.

7   I didn't care if they just left.  Just get out of here.

8             MR. BAUER:  Your Honor, no further questions.

9             THE COURT:  Cross-examination.

10             MR. GREENFIELD:  Thank you, Judge.

11             THE COURT:  Mr. Greenfield.

12   CROSS-EXAMINATION

13   BY MR. GREENFIELD:

14   Q.  Good morning, Mr. Boone.

15   A.  Good morning.

16   Q.  If I can, starting with the incident that happened at 54

17   Chambers Street, I'd like to have you focus your attention on

18   that, okay?

19   A.  Yeah.

20   Q.  Of the seven people who you say were there, were any of

21   them not wearing a mask?

22   A.  All of them had masks.

23   Q.  All of them had masks?

24   A.  Yeah.

25   Q.  Can you describe all the masks that the people were

1    wearing?

2    A.  I can't describe none of them but the one that was in front

3    of me while I was fighting.

4    Q.  That was your concern when it happened?

5    A.  That's it, yeah.

6    Q.  The guy you were with, the struggle you were having with

7    him?

8    A.  Yes.

9    Q.  You were not focusing on anything else in the apartment?

10   A.  Not at that moment.

11   Q.  Now, if you can step back a little bit in time.  You see

12   these people on the street, these folks.  When they come around

13   the corner, you say from First Street on the Chambers Street --

14   am I right about that?

15   A.  Yes.

16   Q.  They walk toward where you are talking with --

17   A.  First they stopped on the corner.  They had a little huddle

18   on them.  I was talking with MA.  So I glanced at them.  And I

19   didn't think nothing of them.  And they walked up a little bit.

20   Q.  You were standing outside right by the door with

21   Mr. Williams; am I correct?

22   A.  Yes.

23   Q.  While you were outside, did any of the people that came up

24   on you point a gun at you, tell you to empty your pockets and

25   give them your possessions?

1   A.  No.

2   Q.  Were you robbed by anybody on the street in front of 54

3   Chambers Street?

4   A.  No.

5   Q.  Was Mr. Williams robbed by anybody in front of the

6   apartment on 54 Chambers Street?

7   A.  No.

8   Q.  If anybody said that, they'd be lying; is that right?

9   A.  Yes.

10          Well, not while I was there.  They could have been

11  robbed any other day.

12  Q.  Talking about yourself.  When this robbery -- well when

13  this incident occurred inside of Chambers, right before it,

14  there were no robberies that occurred in your presence?

15  A.  Not in my presence.

16  Q.  And you were not a victim of a robbery in front of 54

17  Chambers Street?

18  A.  Not in front.

19  Q.  If anybody said that, they'd be a liar?

20  A.  That's -- that ain't my job.

21  Q.  Now, after you left -- after you got out of the car and you

22  went wherever you went, there came a time when you met with

23  Detective Goodman.  Do you remember that?

24  A.  Yes.

25  Q.  A female detective, right?

E8j9chr1                          Boone - cross

1    A.  Yes.

2    Q.  She asked you a lot of questions about the case itself,

3    what happened at Chambers Street?

4    A.  Yes.

5    Q.  She asked you questions about whether you could recognize

6    anybody?

7    A.  Yes.

8    Q.  Did you give her an answer?

9    A.  I said no.

10   Q.  You recall this vividly, talking to Detective Goodman,

11   correct?

12   A.  Yes.

13   Q.  Was she taking notes and writing a report?

14   A.  Yes.

15   Q.  And as far as you were concerned she wrote a report after

16   the fact, correct?

17   A.  (No response).

18   Q.  I'm sorry.  I didn't hear your answer.

19   A.  I don't even know what you said.

20   Q.  Well she was taking notes; am I right?

21   A.  Yeah, she was taking notes as I was talking to her.

22   Q.  Now you said it was cold out that day.  Newburgh itself is

23   right on the Hudson River, correct?

24   A.  (No response).

25   Q.  Right next to it?

E8j9chr1                          Boone - cross

1    A.  Yeah.

2    Q.  And when the wind is blowing in the wintertime it gets cold

3    out there, right?

4    A.  Yes.

5    Q.  And would you say that based on your answer before you

6    didn't -- you were not concerned when you saw people wearing

7    masks walking down the street?

8    A.  That's how they -- that's how dudes do in the winter.  They

9    wear the masks.  They wear the hoodies.  They wear the coat.

10   So I didn't think nothing of it.  It wasn't nothing to me.  You

11   can get away wearing a mask in the winter.

12   Q.  Now, if we can, after your meeting with these folks on the

13   street you're in the apartment.  You go toward the area on the

14   diagram you pointed to, the kitchen area; am I right?

15   A.  Yes.

16   Q.  And then you're told to go in the bathroom?

17   A.  Yes.

18   Q.  And you went in the bathroom?

19   A.  I ain't go right at -- I waited for a minute.  I ain't go

20   in no bathroom.

21   Q.  You didn't want to go in the bathroom?

22   A.  No.

23   Q.  Is that when you made the decision to tussle the guy for

24   the gun?

25   A.  No.  I made the decision when -- as soon as he told me to

E8j9chr1                          Boone - cross

1    go in the bathroom, it was on.

2    Q.  And once the tussle for the gun occurred, and correct me if

3    I'm wrong, your focus was you and the guy with the gun?

4    A.  Yes.

5    Q.  You were not taking account of what was going on around

6    you?

7    A.  Not at that moment.

8    Q.  You were not making note for the future as to what was --

9    what you might be asked was happening around you when you were

10   fighting another person for a gun; am I right?

11   A.  No.

12   Q.  When you were -- when you got possession of that gun, did

13   you know that Tarrence Smith had been stabbed?

14   A.  No.

15   Q.  When you got possession of that gun, did you take note of

16   where Tarrence Smith was when you got possession of that gun?

17   A.  Not Tarrence.  I was looking at the dudes run out the door.

18   Q.  Excuse me.  Tarrence Smith stabbed the guy?

19   A.  He did.

20   Q.  Were you aware of that when it happened?

21   A.  No.

22   Q.  You were talking earlier about selling drugs at that

23   location.  You were selling them for yourself?

24   A.  Yes.

25   Q.  Was it your product, street word?  Was it your product that

E8j9chr1                          Boone - cross

1    you were selling?

2    A.   Yes.

3    Q.   Were you partners with anybody in there?

4    A.   No.

5    Q.   You were just selling drugs at the same location that other

6    drug dealers were selling?

7    A.   Yes.

8    Q.   But as you sit on the stand now your recollection was that

9    during the time that this incident occurred at 54 Chambers

10   Street none of the masked men ever had their masks taken off?

11   A.   I didn't never see them with no mask on.

12   Q.   And all of them were armed?

13   A.   All of them I saw.

14            MR. GREENFIELD:  I have no further questions of this

15   witness.  Thank you, sir.

16            THE COURT:  Any further cross?

17            MR. BUCHWALD:  Yes, sir.

18            THE COURT:  Mr. Buchwald.

19   CROSS-EXAMINATION

20   BY MR. BUCHWALD:

21   Q.   Good morning, Mr. Boone.

22   A.   Good morning.

23   Q.   I want to focus on the time that you were tussling with the

24   fellow with the gun.  Do you remember -- did there come a

25   point while you were tussling where one of the other robbers

E8j9chr1                         Boone - cross

1   came to assist the person that you were tussling with?

2   A.  Yes.

3   Q.  And was that the fellow who hit you on the head with the

4   gun?

5   A.  Yes.

6   Q.  And this recollection of yours is a recollection that you

7   had way back in the beginning?  Even when you testified in the

8   state grand jury you remembered the fellow who helped the guy

9   you were wrestling with hit you on the head with the gun,

10  correct?

11  A.  Yeah.

12  Q.  And hit you hard enough that you got a gash on your head,

13  correct?

14  A.  Yes.

15  Q.  Now, the gun that you took away from the fellow that you

16  were tussling with, do you recall having told the authorities

17  that that was a black gun, an automatic?

18  A.  Black gun, yeah.

19  Q.  Black.  Do you remember also having told them that it was

20  an automatic, somewhat big, but it wasn't a .40, maybe a

21  9-millimeter?

22  A.  Could have told them that.  It wasn't -- it wasn't a big

23  gun.

24  Q.  Let me show you what's previously been marked for

25  identification as Exhibit 3509-5.

E8j9chr1                          Boone - cross

1          You recall that when you spoke to Detective Roberta

2     Goodman, the female detective, do you remember that?

3     A.   Yeah.

4     Q.   And that was in early January of 2011, a couple of weeks

5     after the events at 54 Chambers, correct?

6     A.   Next month.

7     Q.   And she took notes, correct?

8     A.   Yeah.

9     Q.   Let me show you 35 -- and then they came and they asked you

10    to sign a statement, correct?

11    A.   Yes.

12         MR. BUCHWALD:  May I approach, your Honor?

13         THE COURT:  You may.

14    Q.   First let me show you the last page of 3509-5.  Is that

15    your signature, sir?

16    A.   Yes, it is.

17    Q.   And now let me show you the -- about one-third of the way

18    down on page two and see if that refreshes your recollection as

19    to how you described the gun that you managed to snatch away

20    from one of the robbers.

21    A.   Mm-hmm.

22    Q.   Does that refresh your recollection, sir?

23    A.   Yes.

24    Q.   And did you describe it as black?

25    A.   Mm-hmm.

E8j9chr1                    Boone - cross

1   Q.  Automatic, somewhat big, but it wasn't a .40, maybe a nine,

2   correct?

3   A.  Yeah.  It was a black gun.  It wasn't big enough to be like

4   a .40 cal or nothing like that.  I don't know guns that much,

5   but I know it wasn't big, big, big.  Nothing like that.  Nice

6   size.  It wasn't no .40.  I know what a .40 look like.

7   Q.  Now, I believe you testified that all of the robbers who

8   you saw as they approached you while you were standing outside

9   of 54 Chambers wore masks and had guns; is that correct?

10  A.  Yes.

11  Q.  And all of the robbers who you saw when you were in 54

12  Chambers wore masks and had guns; is that correct?

13  A.  All the ones I seen.

14  Q.  Do you recall at one point being asked -- withdrawn.

15          Do you recall testifying in the state grand jury in

16  March of 2011?

17  A.  Yes.

18  Q.  And at that time do you recall being asked to give your

19  best estimate as to the number of robbers.  Do you remember

20  being asked the question in the grand jury?

21  A.  Yes.

22  Q.  And do you remember at that time saying, "My best estimate

23  is seven.  I know it was more than five"?

24  A.  Yes.

25  Q.  And you were testifying to the best of your ability at that

E8j9chr1                          Boone - cross

1    time; is that correct?

2    A.   That's right.

3    Q.   You know the difference between an automatic and a

4    revolver, correct?

5    A.   Yes.

6    Q.   Now, I just want to see if I understand what it is that you

7    did with the gun.  You had the gun?

8    A.   Yes.

9    Q.   That you had taken away from the robber while you were at

10   54 Chambers, correct?

11   A.   Yes.

12              (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

E8jnchr2                          Boone - cross

1    Q.  You decided to not go to the hospital with Tarrence, is

2    that right?

3    A.  Yes.

4    Q.  Did anybody else who was there at the apartment go with

5    Tarrence to the hospital?

6    A.  Yes, everybody went.  I told them to let me out of the car.

7    Q.  You went partway but you wanted to be dropped off, correct?

8    A.  Yes.

9    Q.  You told people don't tell anybody I was here, correct?

10   A.  Yes.

11   Q.  You got out of the car a couple of blocks away from 54

12   Chambers, correct?

13   A.  Yes.

14   Q.  At that point you still had the gun?

15   A.  Yes.

16   Q.  You made a decision to conceal that gun, to throw it away,

17   do something, correct?

18   A.  I hid it.  I caught myself hiding it, but I was going to

19   come back and get it, but being that it was garbage night that

20   night, I wasn't even thinking.  I went out there the next day

21   and it was gone.  The garbage was gone.  I said holy shit.

22   Q.  You took the gun and you put it in --

23   A.  It was a garbage can with a, it was filled to the top with

24   I garbage bag on top.  So I lifted the garbage bag and put the

25   gun under there.  I went a couple of houses up and went in the

1   building.  I didn't want to go into the house with the gun.

2   Q.  You were concerned about being charged with having

3   possession of that gun?

4   A.  I wasn't concerned at that time.  I just didn't want to go

5   in the house with the gun.  I was going to come back out and

6   get it, but I stayed in there so long, I came back out, I came

7   back out the next morning.

8   Q.  Well, were you concerned that perhaps you had shot somebody

9   when you fired that gun toward the front?

10  A.  Yeah, I was.

11  Q.  Yes, right?

12  A.  Yeah.  I heard plenty of people got shot that night.  I was

13  shooting, they was shooting I was was like, dag, did I shoot

14  anybody.  I shot out of fear.

15  Q.  Even when you were interviewed on January, in early January

16  by Detective Goodman, you asked if you were going to be charged

17  with anything for shooting the gun?

18  A.  Yeah.

19  Q.  Right.  And she assured you you wouldn't be?

20  A.  Yeah.

21          MR. BUCHWALD:  If I can have just a moment, your

22  Honor.

23          I have no further questions, your Honor.

24          MR. GOLTZER:  No cross.

25          THE COURT:  Any redirect?

1       MR. BAUER:  Yes, your Honor.

2    REDIRECT EXAMINATION

3    BY MR. BAUER:

4    Q.  Mr. Boone.

5    A.  Yes.

6    Q.  The first lawyer there asked you whether you were actually

7    robbed at all that day, right?

8    A.  Yes.

9    Q.  And you said you weren't, right?

10   A.  No.

11   Q.  When you were in the house, I believe you testified that

12   you had suggested that they just take what you had on you,

13   right?

14   A.  Yeah, just take it and get out of here.

15   Q.  And they didn't bite at that?

16   A.  No.

17   Q.  What did you think they were there for?

18   A.  I thought they was there for a robbery.  I don't know.

19   Then I was thinking, dag, they might try to kill me now.

20   Q.  While they were saying no or not biting at your offer, what

21   did you think that they may want?

22   A.  Take me down.

23   Q.  Take you down?

24   A.  Yeah.

25   Q.  Did you think that you were the target?

1   A.  Everybody was I guess.  I don't know.

2   Q.  And why would you have been a target?

3   A.  Because I'm like, you know what I mean.

4   Q.  I'm sorry.

5   A.  I was like the roughest guy.  I was thinking like they was

6   getting me away from everybody else so they can do what they

7   wanted to do with everybody else.

8   Q.  What do you think they wanted to do if they got rid of you?

9   A.  I don't know what was on their mind.  I don't know.

10  Whatever.  Robbing, raping, I don't know.

11  Q.  You testified on direct and then on cross that, as far as

12  you remembered, all the robbers had masks, all the robbers had

13  guns, right?

14  A.  Yes.

15  Q.  Sitting here three and a half years later, do you remember

16  getting a good look at every single one of the robbers or not?

17  A.  No.

18  Q.  No?

19  A.  No.

20          MR. BAUER:  Ms. McInerney, can we pull up Government

21  Exhibit 95B, please.

22  Q.  This is the photo I showed you earlier, right, 95B?

23  A.  Yes.

24  Q.  This is from the front door of the house?

25  A.  Yes.

e8jnchr2                         Boone - redirect

1    Q.  As we are looking at it, it looks like the front door is

2    off centered from that inner door, is that right?

3    A.  Yes.

4              MR. BAUER:  If we can pull up 95K.

5              Ms. McInerney, let's do the whole 95K first and then

6    we will put them side by side.

7    Q.  Looking closely at 95B, past that door, past that wall,

8    towards the exit of the house, are you looking there?

9    A.  Yes.

10   Q.  You see in that hallway on the right there appears to be a

11   door open with a doorknob?  Do you see that?

12   A.  Yes.

13   Q.  That the inner door or the outer door?

14   A.  That's the inner door.

15   Q.  Straight ahead, is that a wall or is that a door?

16   A.  That is a wall.

17             MR. BAUER:  Right.  So now if we can put those up next

18   to each other, Ms. McInerney.

19   A.  You got to go around the corner to get out the door.

20   Q.  Right.  So standing where you were shooting, could you have

21   shot through the front door?

22   A.  No.  There wasn't no holes in the door and I couldn't shoot

23   through the front door.

24             MR. BAUER:  No further questions.

25             THE COURT:  Mr. Greenfield.

1    MR. GREENFIELD:  I will follow Mr. Buchwald.

2    THE COURT:  Very well.  Mr. Buchwald.

3    MR. BUCHWALD:  Yes.

4  RECROSS EXAMINATION

5  BY MR. BUCHWALD:

6  Q.  Directing your attention to 95B, the photo on the right as

7  you look at the screen, do you know a Detective Fredericks?

8  A.  I don't know no detective.

9  Q.  Newburgh Police Department?

10  A.  No.

11  Q.  The CSU unit?

12  A.  The only body I know is Goodman.

13  Q.  Pardon me?

14  A.  The only body I knew was Goodman.  She's the only one that

15  talked to me.  I don't know anybody else.

16  Q.  Do you know if Detective Fredericks has described this

17  photograph, 95B, as being off center --

18    MR. BAUER:  Objection.

19  Q.  Let me at least ask the question.  As being off center and

20  skewed and not really showing accurately what you can see as

21  you stand by the right side of the door looking in?

22    MR. BAUER:  For many reasons, objection, your Honor.

23    THE COURT:  Sustained as to the form of the question.

24  Q.  Let me show you what has been marked as Defendant's Exhibit

25  P in evidence.

1              MR. BUCHWALD:  Can we put that up.  I think it's on

2      there.

3      Q.  Are you able to see that on the screen, sir?

4      A.  Yes.

5      Q.  You can see that, sir?

6      A.  Yes.

7      Q.  All right.  Do you know if this is a photograph taken from

8      the back of the apartment as you walk straight back and look

9      out toward the front door with the hallway door open?

10     A.  That's in the little foyer right there.  That's not in the

11     back.

12     Q.  As you look ahead from the back looking through the foyer,

13     am I correct that a portion of the front door area is visible

14     from the back?

15     A.  Not from the back.  If you are in the back, you can't see

16     nobody at the door.  You got to come in the hallway to see

17     somebody at the door.

18     Q.  This photograph is from behind the hallway, is it not?

19             MR. BAUER:  That is not what he said.

20     A.  No.  That's by the door.

21     Q.  The door that is open that's closest to you is the hallway

22     door, isn't that right?

23     A.  That is a room right here, right where that door -- that

24     door right there.  It is a room that stick out.  So if you in

25     front of that room, you can see the doorway.  But if you are in

1   the back, you can't see it because the room sticks out.

2   Q.  There is a room as you walk into the house at 54 Chambers?

3   A.  There is a room right there.

4   Q.  As you walk into the house at 54 Chambers, there's one room

5   on the left, correct?

6   A.  Yes.  Yes, that's what sticks out.

7   Q.  There is an interior door, is that correct?

8   A.  Yes.

9   Q.  Then you can continue to walk all the way back to the

10  bathroom?

11  A.  Yes, then you go to the bathroom.

12  Q.  Is the doorway that is closest to the viewer here as you

13  see this photograph, the interior hallway door?

14  A.  That's by the room.  That's the end of the room.  This is

15  the back of the room.  And before you get to the kitchen and

16  all that, that's the front of the room, and it sticks out.  If

17  somebody knock on the door, even if they open the door, you got

18  to come around here to this hallway to see somebody at the

19  door.  If you are in the back where the kitchen part is, you

20  can't see nobody.

21  Q.  Sir, do you have any reason to believe that this is not an

22  accurate photograph of the apartment?

23  A.  Why wouldn't it be?

24  Q.  Say again?

25  A.  Why wouldn't it be?

e8jnchr2                           Boone - recross

1    Q.  You lived there.

2    A.  I said why wouldn't it be.

3         MR. GOLTZER:  Why wouldn't it be he said.

4    Q.  Why wouldn't it be?

5    A.  Yes.

6    Q.  It is an accurate photograph as far as you can tell,

7    correct?

8    A.  Yeah.

9    Q.  The part of the door to the outside that is exposed if one

10   were standing outside and trying to get into the house would be

11   the part of the doorway where the doorknob is, isn't that

12   correct?

13   A.  What did you say?

14        MR. BUCHWALD:  Can we have the photograph of the white

15   door, 95A.

16   Q.  You see the white door there?

17   A.  Yes.

18   Q.  The right side of that door as you face the doorway from

19   the outside is the area where the doorknob is, is that correct?

20   A.  Yes.

21   Q.  And that right side of the door?

22   A.  Uh-huh.

23   Q.  The foot or maybe 15 inches, that is visible on defendant

24   Exhibit P, if you go back to Defendant Exhibit P, is the area

25   of the doorway, the front doorway where that knob is if the

1    door had been closed, correct?

2    A.  Yes.

3            MR. BUCHWALD:  I have nothing further.

4            THE COURT:  Mr. Greenfield.

5    RECROSS EXAMINATION

6    BY MR. GREENFIELD:

7    Q.  Mr. Boone?

8    A.  Yeah.

9    Q.  As you sit on the stand now --

10   A.  Yes.

11   Q.  -- there's no doubt in your mind that anybody took any

12   money from you while you were standing in front of 54 Chambers

13   Street before the incident occurred inside 54 Chambers Street?

14   A.  Yes.  Nobody didn't take nothing from me.

15           MR. GREENFIELD:  I just had one question.  Thank you.

16           THE COURT:  OK.  Anything further?

17           MR. BAUER:  No, your Honor.

18           THE COURT:  OK.  Mr. Boone, you may step down.

19           (Witness excused)

20           THE COURT:  Will the government please call its next

21   witness.

22           MR. NAWADAY:  The government calls David Evans.

23           I am just going to recover whatever has been left up

24   here.

25           THE COURT:  Very well.

1    DAVID EVANS,

2         called as a witness by the Government,

3         having been duly sworn, testified as follows:

4              THE COURT:  Mr. Nawaday.

5    DIRECT EXAMINATION

6    BY MR. NAWADAY:

7    Q.  Do you have any nicknames?

8    A.  Yes.

9    Q.  What are they?

10   A.  Fuzzy.

11   Q.  That's Fuzzy?

12   A.  Yes.

13   Q.  Mr. Evans, if you could just pull the microphone a little

14   closer?

15              THE COURT:  Or pull the chair in.

16   Q.  And speak as loudly and clearly as you can.

17              How old are you?

18   A.  25.

19   Q.  Are you married?

20   A.  No.

21   Q.  Do you have any children?

22   A.  Yes.

23   Q.  How many?

24   A.  Two.

25   Q.  How far did you go in school?

e8jnchr2                          Evans - direct

1   A.   Tenth grade.

2   Q.   Starting from the beginning what schools, did you go to?

3   A.   Gidney Avenue North, Junior High and NFA.

4   Q.   What is NFA?

5   A.   Newburgh Free Academy.  It's a high school.

6   Q.   Around what year did you stop going to NFA?

7   A.   2004.

8   Q.   Where are you living right now?

9   A.   I am incarcerated.

10  Q.   Where?

11  A.   MCC.

12  Q.   That is a federal prison?

13  A.   Yes.

14  Q.   What year and month did you go to jail?

15  A.   September 16, 2011.

16  Q.   Before you went to jail, where did you live?

17  A.   In Newburgh.

18  Q.   How long had you lived in Newburgh?

19  A.   My whole life.

20  Q.   Are you familiar with Chambers Street, Dubois Street,

21  Lander Street and Broadway in Newburgh?

22  A.   Yes.

23  Q.   How are you familiar with those streets?

24  A.   Basically I chilled on those streets before.

25  Q.   Did you do anything besides chill on those streets?

e8jnchr2                          Evans - direct

1    A.  Sell drugs, robbed people on the streets.

2    Q.  Look around the courtroom.  Do you recognize anyone from

3    Newburgh?

4    A.  Yes.

5    Q.  Who?

6    A.  Reckless, Bow Wow, and Gucci.

7    Q.  Starting with Reckless, please describe an article of

8    clothing Reckless is wearing and where Reckless is in the

9    courtroom?

10   A.  White shirt, with the gray right there.

11           MR. NAWADAY:  May the record reflect the witness has

12   identified Raymond Christian?

13           THE COURT:  The record will so reflect.

14   Q.  You mentioned Bow Wow?

15   A.  Yes.

16   Q.  Please describe an article of clothing Bow Wow is wearing

17   and where Bow Wow is in the courtroom?

18   A.  The light skinned guy over there.  I can't see what he's

19   wearing.

20           MR. NAWADAY:  Can the witness stand up.

21           THE COURT:  Do you want to stand up and see what he's

22   wearing.

23           THE WITNESS:  Gray shirt.

24           MR. NAWADAY:  May the record reflect that the witness

25   has identified Tyrell Whitaker?

1              THE COURT:  The record will so reflect.

2    Q.  You mentioned someone named Gucci?

3    A.  Yes.

4    Q.  Please --

5    A.  Gucci is right there in the brown with the glasses.

6              MR. NAWADAY:  May the record reflect that the witness

7    has identified Glenn Thomas?

8              THE COURT:  The record will so reflect.

9    Q.  Are you testifying today under a cooperation agreement?

10   A.  Yes.

11   Q.  And under that agreement did you have to plead guilty to

12   crimes you've committed?

13   A.  Yes.

14   Q.  And what crimes were those?

15   A.  Robbery, conspiracy to commit murder, brandishing firearms,

16   drug charges.

17   Q.  Did you have to plead guilty also to committing

18   racketeering offenses?

19   A.  Yes.

20   Q.  What group or groups did your commission of racketeering

21   offenses involve?

22             MR. GOLTZER:  Objection relevance?

23   A.  What you do you mean?

24             THE COURT:  The objection is overruled.  Do you want

25   to rephrase, Mr. Nawaday.

e8jnchr2                          Evans - direct

1    Q.  You said you pleaded guilty to racketeering offenses?

2    A.  Yes.

3    Q.  What did that involve?

4    A.  What you mean by that?

5    Q.  What were your racketeering offenses?

6    A.  Murders and robberies.

7    Q.  And did you commit those offenses alone or with others?

8    A.  With others.

9    Q.  With a particular group?

10   A.  Yes, with the Bloods.

11   Q.  Where were these Bloods located?

12   A.  In Newburgh.

13   Q.  I think you mentioned -- I'm going to walk through some of

14   the crimes you just mentioned.  I think you mentioned a

15   conspiracy to commit murder?

16   A.  Yes.

17   Q.  What did that involve?

18   A.  Me and a couple of other blood members, basically we jumped

19   this guy named Tyrik Legette and he ended up getting stabbed to

20   death.

21   Q.  And did Tyrik Legette have a nickname?

22   A.  Big Reek.

23   Q.  Why did you participate in the stabbing death of Big Reek?

24   A.  Because it was mandatory.  It was a call that happened.

25   Q.  What do you mean it was mandatory.  It was a call?

e8jnchr2                          Evans - direct

1   A.  Basically he became a plate.  He did something, he violated

2   one of the homeys, one of the Blood members, and we had to

3   retaliate.

4   Q.  Around when did that happen?

5   A.  April 2009.

6           THE COURT:  I'm sorry.  Did you say that he became a

7   plate?

8           THE WITNESS:  Yes.

9           THE COURT:  P-l-a-t-e?

10          THE WITNESS:  Yes.

11          THE COURT:  What does that mean?

12          THE WITNESS:  Basically that means when somebody

13  violates codes and regulations, we retaliate by -- we basically

14  beat them up, stab them, kill them.

15  Q.  Mr. Evans, if you can please speak up.

16          When someone becomes a plate does that relate to the

17  term food?

18  A.  Yes.

19  Q.  So explain how food and plate, those terms interplay with

20  each other if at all?

21  A.  Basically plate and food is two different words, but they

22  mean the same thing.  It means if I violate I become food, a

23  plate.  That means they could retaliate on me, stab me, kill

24  me, whatever the call is.

25  Q.  I take it you were a member of the Bloods?

e8jnchr2                          Evans - direct

1    A.  Yes.

2    Q.  By the way, did Big Reek have any children?

3    A.  Yes.

4    Q.  What were their names, if you know?

5    A.  One's name was Little Reek and Tyangi.

6    Q.  Little Reek, do you know Little Reek's real name?

7    A.  Tyrik Legette.

8    Q.  Did Little Reek have any other nicknames?

9    A.  Freaky.

10   Q.  When did you become a member of the Bloods?

11   A.  2006.

12   Q.  For about how long were you a Blood member?

13   A.  Probably until 2010.

14   Q.  Were you a member of any other gangs?

15   A.  Yes.

16   Q.  What gangs?

17   A.  The Ashy Bandits.

18   Q.  Around when were you a member of the Ashy Bandits?

19   A.  2000 to 2006.

20   Q.  How old were you when you first became a member of the Ashy

21   Bandits?

22   A.  10, 11.

23   Q.  When you are an Ashy Bandit who else was a member of the

24   Ashy Bandits?

25   A.  Me, Twizzy, Bow Wow, Burtle, Cs, Mouse.

e8jnchr2                          Evans - direct

1    Q.  You mentioned Bow Wow.  Is that the same Bow Wow you just

2    identified in the courtroom?

3    A.  Yes.

4    Q.  Were you ever sent to a group home for minors?

5    A.  Yes.

6    Q.  What led to that?

7    A.  Basically, me and Twizzy stole a car.  I ended up getting

8    caught, and I ended up doing time for it.

9    Q.  Around when did that happen?

10   A.  2005.

11   Q.  How old were you then?

12   A.  I was 15.

13   Q.  How long were you in the group home?

14   A.  Just a year.

15   Q.  What did you do for money when you got out of that group

16   home?

17   A.  Sold drugs.

18   Q.  What drugs did you sell?

19   A.  Crack.

20   Q.  Where did you sell?  How did it work?

21   A.  Basically I sold on Chambers Street, Lander Street,

22   basically hand to hand, cussies would walk up ask you for crack

23   how much they want, basically I give hand to hand or I have my

24   phone.

25   Q.  What you do you mean you had your phone?

e8jnchr2                           Evans - direct

1    A.  I had cussies that called me on my phone.

2    Q.  You used the word cussy.  What do you mean?

3    A.  Basically that is a crackhead, somebody that smokes.

4    Q.  Were you dealing crack cocaine from 2008 to 2011?

5    A.  Just like 2010.

6    Q.  About how much did you sell per week during that period?

7    A.  From like 2007, 2008, I was copping close to a hundred

8    grams.

9    Q.  A week?

10   A.  Yeah.

11   Q.  From 2008 to 2010, what streets in Newburgh were known

12   places for selling crack cocaine?

13   A.  Chambers, Lander, Dubois Street, Lutheran, South Miller.

14   Q.  How did it work?  Were you the only one selling on those

15   streets at those times?

16   A.  No.

17   Q.  Who else was selling out on those streets?

18   A.  Other blood members on Lander street, Dubois Street.

19   Q.  Could anyone sell on those streets?

20   A.  Not anyone.  Basically if you from that side of town, if

21   you Blood or affiliate, like saying basically if you wanted to

22   be Blood or you Blood, you hang out with the Bloods, you can

23   sell over there.

24   Q.  Do you know the term 550?

25   A.  Yes.

1   Q.  What does that mean?

2   A.  It's basically somebody that want to be Blood, but who's

3   not Blood.

4   Q.  Do you know what splits are?

5   A.  Split cells, yes.

6   Q.  What are they?

7   A.  It's basically when a cussy come up to me and asked me for

8   a hundred, we split it 50/50.

9   Q.  Who would you split with?

10  A.  Whoever is out there.  Whoever's out there that got it.

11  Q.  Why did you do that?

12  A.  Basically I was did it because we boys, respect.

13  Q.  I want to talk about some of the crimes you committed.

14          Have you ever committed any assaults?

15  A.  Yes.

16  Q.  What assaults have you committed?

17  A.  Robberies that went wrong, basically tieing people up,

18  beating them with the guns.

19          THE COURT:  I'm sorry, Mr. Evans.  Keep your voice up,

20  please.

21          THE WITNESS:  Yes, sir.

22          THE COURT:  Can you bring the microphone closer.

23  Q.  Did you use any weapons with any of those assaults?

24  A.  Yes.

25  Q.  Please describe one assault you've committed?

e8jnchr2                          Evans - direct

1    A.  When me and Charles robbed a weed spot we basically tied

2    this dude up, pistol whipped him, and took his money and his

3    weed.

4    Q.  Around when did that happen?

5    A.  2009, 2010.

6    Q.  Have you ever carried a firearm?

7    A.  Yes.

8    Q.  When have you carried a firearm?

9    A.  A while, like 2006 to 2010.

10   Q.  And how often did you typically carry a firearm?

11   A.  I would say every day, every other day.

12   Q.  Back then, for what purpose did you carry a firearm?

13   A.  Protection.

14   Q.  From what?

15   A.  Other gang members, getting robbed.

16   Q.  Why did you think you could get robbed?

17   A.  Anybody can get robbed, and you get caught, just get caught

18   in the wrong place at the wrong time.

19   Q.  Were you dealing drugs at the time?

20   A.  Yes.

21   Q.  Were you ever fearful that you could be robbed of your

22   drugs?

23   A.  Yes.

24   Q.  Do you know what missions are?

25   A.  Yes.

e8jnchr2                          Evans - direct

1   Q.  What are they?

2   A.  Basically it's, missions is a call that a big homey will

3   give us, the big Blood member will give us to go do.

4   Q.  To go do what?

5   A.  Basically whatever the mission is, whatever he tell us to

6   do.  If he tell us to go stab somebody, we stab somebody; shoot

7   somebody, we shoot somebody; rob somebody, we rob somebody.

8   Q.  Have you ever committed a mission to assault a rival gang

9   member?

10  A.  Yes.

11  Q.  Give an example.

12  A.  One day something happened across town on the Crip side of

13  town with one of the homies.  We ended up going over there and

14  retaliating and shooting.

15  Q.  What did you do?

16  A.  I went over there and I was shooting, too.

17  Q.  Around when did that happen?

18  A.  2009.

19  Q.  You said you've committed robberies before.  Were those

20  armed?

21  A.  Yes.

22  Q.  Have you ever committed a robbery with someone named

23  Danielle?

24  A.  Yes.

25            MR. NAWADAY:  If we can please pull up Government

1   Exhibit 219.

2              Mr. Evans, you will see something show up on your

3   screen.  Do you recognize that?

4   A.  Yes, I do.

5   Q.  Who is that?

6   A.  That is a picture of Danielle.

7   Q.  How do you know Danielle?

8   A.  Basically she used to chill with us in Newburgh.

9              MR. GREENFIELD:  I can't hear the witness, Judge.

10             THE COURT:  Can you speak up, please, Mr. Evans.

11  A.  She used to chill with us, Blood Alley, she used to drive

12  around take us places.

13  Q.  When you say "us" who do you mean?

14  A.  Me, other blood members.

15  Q.  Was she 550?

16  A.  Yes, she was.

17  Q.  Is this the Danielle you committed the robbery with?

18  A.  Yes.

19  Q.  Please tell the jurors what happened with that robbery?

20  A.  Basically her best friend Jamie had a robbery.  Danielle's

21  mother's boyfriend was selling coke at the time, and basically

22  they wanted us to rob the house so me and Cory kicked in the

23  door and robbed the house.

24  Q.  Who is Cory?

25  A.  Cory, I don't know his last name.  He's an Ashy Bandit.

e8jnchr2                        Evans - direct

1   Q.  Were you armed?

2   A.  Yes.

3   Q.  What happened when you kicked in the door?

4   A.  Basically, we started robbing the house.  We started

5   pointing guns at people that was in the house and looking for

6   the drugs.

7   Q.  Who was in the house?

8   A.  Danielle's mom and some little girl, her little sister.

9   Q.  Did you get anything?

10  A.  No.

11  Q.  What happened next?

12  A.  Basically we ran out the house and jumped in Jamie and

13  Danielle's car.

14  Q.  What were you looking for?

15  A.  We was looking for drugs and money.

16  Q.  Around when was this robbery?

17  A.  2009, 2010.

18  Q.  Did there come a time when you began providing information

19  or cooperating with the Newburgh police?

20  A.  Yes.

21  Q.  Around when did that happen?

22  A.  2010.

23  Q.  How did that come about?

24  A.  Basically I got stabbed by Little Reek.  They came and

25  asked me some questions, and I provided them the answers.

e8jnchr2                         Evans - direct

 1              MR. NAWADAY:  Can we please pull up Government Exhibit

 2   209.

 3   Q.  Do you recognize that?

 4   A.  Yes, I do.

 5   Q.  Who is that?

 6   A.  That is a picture of Little Reek.

 7   Q.  Is that the person you also knew as Freaky?

 8   A.  Yes.

 9   Q.  Was this Big Reek's son?

10   A.  Yes, it was.

11   Q.  How did it come about that Little Reek stabbed you?

12   A.  Basically, I had my kids in 2008, 2009.  I started falling

13   back, I stopped going to meetings and all that, so basically

14   they made me a plate.

15   Q.  You said you had a kid at some point?

16   A.  Yes.

17   Q.  You started falling back.  What you do mean?

18   A.  Like I started taking more responsibility with my kids

19   instead of into the streets.

20   Q.  Then you were made a plate?

21   A.  Yes.

22   Q.  Again, what does that mean?

23   A.  Basically, a plate is a mission they got to follow to

24   basically stab me.  That's how I got stabbed, whatever the

25   mission was, beat me up, jump me, stab me.

e8jnchr2                          Evans - direct

1    Q.  So what happened?

2    A.  I ended up getting stabbed.

3    Q.  Was it just Little Reek or other people?

4    A.  It was a couple of other people.

5    Q.  Where did you get stabbed?

6    A.  My side right here, left side.

7    Q.  After you got stabbed, what happened?

8    A.  Basically went to the hospital, got stitches, came home.

9    Q.  At some point after that you started speaking with Newburgh

10   police?

11   A.  Yes.

12   Q.  Were you under arrest for anything at that point?

13   A.  No, I wasn't.

14   Q.  About how long did you provide information to authorities?

15   A.  At that time, before I got locked up?

16   Q.  Yes.

17   A.  Like a year.

18   Q.  What types of information did you provide?

19   A.  Everything that came to mind, robberies and murders.

20   Q.  Who did you meet with during that period?

21   A.  FBI agents.

22   Q.  By the way, at the time you started meeting with FBI

23   agents, do you know if they knew about all your crimes at that

24   point?

25   A.  No, I did not.

1    Q.  Did there come a time when you were no longer on the

2    streets?

3    A.  Yes.

4    Q.  Around when did that happen?

5    A.  2011, September.

6    Q.  And how did that come about?

7    A.  Basically, they put me on pretrial.  I ended up failing a

8    urine test from them and they ended up locking me up.

9    Q.  What do you mean you ended up failing a urine test?

10   A.  I had to take a urine test for them, for pretrial.  And I

11   ended up giving them dirty for marijuana.

12   Q.  And did you self-surrender?

13   A.  Yes.

14   Q.  And since then, September 2011, have you been in federal

15   prison?

16   A.  Yes, I have.

17   Q.  After you failed the drug test, did you continue meeting

18   with the government?

19   A.  Yes.

20   Q.  Was that to try to get to a cooperation agreement?

21   A.  Yes.

22   Q.  What did you have to do in order to get a cooperation

23   agreement?

24   A.  Basically I had to tell them all the crimes that I

25   committed.  I had to tell the truth and commit no further

1    crimes.

2    Q.   Did you meet multiple times with government agents?

3    A.   Yes, I did.

4    Q.   Who was typically there when you met with the government?

5    A.   The prosecutor, agents from the police department from the

6    city of Newburgh, federal agents.

7    Q.   About how many meetings did you have before you pleaded

8    guilty?

9    A.   A lot.  Over 20.

10   Q.   And I think you said that you did plead guilty to a

11   cooperation agreement?

12   A.   Yes.

13   Q.   I'm going to show you what's been marked for identification

14   as Government Exhibit 423.

15            Please take a look at this and tell us if you

16   recognize it.

17   A.   Yes.

18   Q.   What is it?

19   A.   It's my cooperation agreement.

20   Q.   Please turn to the last page and tell us if you recognize

21   any of the signatures?

22   A.   Yes, my signature.

23   Q.   The government offers Government Exhibit 423.

24            MR. GOLTZER:  No objection.

25            THE COURT:  423 will be received.

1             (Government's Exhibit 423 received in evidence)

2   Q.  What is your understanding of what you had to do under that

3   agreement?

4   A.  Tell the truth, commit no further crimes, and cooperate

5   when they need me to.

6   Q.  Did you have to plead guilty to the crimes you committed?

7   A.  Yes, I did.

8   Q.  What is your understanding of what the government has to do

9   under that agreement if you do everything you're supposed to

10  do?

11  A.  Just submit a letter for me to the judge.

12  Q.  Your sentencing judge?

13  A.  Yes.

14  Q.  Is that called a 5K letter?

15  A.  Yes, it is.

16  Q.  What's your understanding of what goes in that letter.

17  A.  Everything, the good and the bad.

18  Q.  What do you mean the good and the bad?

19  A.  Basically all the good that I did and all the bad, all my

20  charges.

21  Q.  Will the government recommend a particular sentence for

22  you?

23  A.  No.

24  Q.  Without that letter, what is your understanding of the

25  maximum time you are facing?

e8jnchr2                          Evans - direct

1   A.  Life.

2   Q.  Without that letter, what is your understanding of the

3   mandatory minimum time you're facing?

4   A.  Life.

5   Q.  If you get that letter, what's the lowest sentence you can

6   get?

7   A.  Time served.

8   Q.  Even if you get that letter, what's the highest sentence

9   you can get?

10  A.  Life.

11  Q.  What sentence are you hoping to get?

12  A.  Time served.

13  Q.  About how many people did you tell the government about who

14  you committed crimes with?

15  A.  A lot.

16  Q.  Do you have a ballpark number?

17  A.  Over 20.

18  Q.  Do you know what the government did with that information?

19  A.  No, I do not.

20  Q.  Under your agreement would you have to testify against any

21  of those people you told the government about?

22  A.  Yes.

23  Q.  What is your understanding of what happens if you lie under

24  this agreement?  Do you get your letter?

25  A.  No.

1   Q.  What is your understanding of what happens if you tell the

2   truth?  Do you get your letter?

3   A.  Yes.

4   Q.  Do you believe your sentence depends on the outcome of this

5   trial?

6   A.  No.

7   Q.  Has anyone told you what sentence you will get?

8   A.  No.

9   Q.  You have testified before in another case, right?

10  A.  Yes.

11  Q.  Who was that against?

12  A.  Anthony.

13         MR. GREENFIELD:  Objection, relevance.

14         THE COURT:  Overruled.

15  A.  Anthony Boykin.

16  Q.  What was his nickname, if any?

17  A.  Double O.

18  Q.  I want to focus you on 2008 to 2010.  You said you were

19  selling crack during that period?

20  A.  Yes.

21         MR. NAWADAY:  Ms. McInerney, if you can please pull up

22  Government Exhibit 251.

23  Q.  Mr. Evans, looking at Government Exhibit 251, what streets

24  were you selling on from 2008 to 2010?

25  A.  Chambers Street, Lander Street, sometimes Dubois and

1    Lutheran.

2    Q.  What were the cross-streets for Chambers, Dubois, and

3    Lander?

4    A.  Chambers and First, Lander between Lander and Farrington

5    and South, Dubois and Broadway and Lutheran and Broadway.

6    Q.  How often were you out on those streets when you were

7    selling.

8    A.  Every day.

9    Q.  I want to turn to the people you identified starting with

10   Bow Wow.

11            Did you know Bow Wow by any other names?

12   A.  No.

13   Q.  About how long have you known Bow Wow?

14   A.  Six, seven years now.

15   Q.  How did you first meet him?

16   A.  Basically I met him when he was an Ashy Bandit.

17   Q.  Do you know if he ever became Blood?

18   A.  Not that I know of.

19            MR. GOLTZER:  What was that question?  I'm sorry.

20            MR. BUCHWALD:  Can you ask Mr. Nawaday to keep up his

21   voice.

22            THE COURT:  Can we have the last question and answer

23   read back, please.

24            (Record read)

25   Q.  Do you know if he ever sold drugs during that time period

1  that you were out there?

2  A.  Yes.

3  Q.  How do you know that?

4  A.  Basically I seen him do hand to hand to a couple of cussies

5  before.

6  Q.  Describing what you actually saw?

7  A.  Basically cussies walking up to him asking him for

8  something.  He would give them whatever they ask for.  They

9  would get the money and walk off.

10  Q.  About how many times did you see that?

11  A.  Two or three times.

12  Q.  What were you doing out there while you saw it?

13  A.  Same thing, smoking and selling drugs.

14  Q.  Did you ever see him work with anyone else while he was out

15  there?

16  A.  No.

17  Q.  You said you know Gucci?

18  A.  Yes.

19  Q.  Did you know Gucci by any other names?

20  A.  No.

21  Q.  About how long have you known Gucci?

22  A.  A couple of years.

23  Q.  Do you know if Gucci was a member of any gangs?

24  A.  He was -- I remember he used to be Crip.

25  Q.  How do you know that?

1    A.  Basically he used to chill on the Crip side.  He used to

2    wear blue flags.

3    Q.  Do you know if he ever became Blood?

4    A.  Not that I know of.

5    Q.  Do you know who Princess is?

6    A.  Yes, that's his sister.

7    Q.  Is Princess a member any of gangs?

8    A.  I think she still -- I don't know if she's still Blood, but

9    but when I was home she used to be Blood.

10            MR. BUCHWALD:  Objection.  Hearsay, and move to

11    strike.

12            THE COURT:  Overruled.

13   Q.  Do you know who L-1 is?

14   A.  Yes.

15   Q.  Who is L-1?

16   A.  L-1, when I was home, he was the big homey for G Shop.

17   Q.  Do you know if L-1 had a relationship about with at any

18   point?

19   A.  Not that I know of.

20   Q.  Going back to Gucci, do you know from 2008 to 2010 whether

21   he sold any drugs?

22   A.  I seen him a couple of times.

23   Q.  Whereabouts?

24   A.  On Lutheran street with J-Mark.

25   Q.  You mentioned J-Mark.  Who is J-Mark?

1835

1    A.  J-Mark was another known Blood member.

2            MR. NAWADAY:  If we can please pull up Government

3    Exhibit 220.

4    Q.  Do you see Government Exhibit 220, Mr. Evans?

5    A.  Yes, I do.

6    Q.  What is it?

7    A.  It is a picture of J-Mark.

8            MR. NAWADAY:  Your Honor, I don't know if this is a

9    good time to take the morning break.

10           THE COURT:  It is.  It's 11:15, so let's take our

11   morning break.  Please be in the jury room at 11:30.  Please do

12   not discuss the case.

13           (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

e8jnchr2                          Evans - direct

 1              (Jury not present)

 2              THE COURT:  Mr. Evans, you may step down.

 3              (Witness not present)

 4              (Recess)

 5              THE COURT:  Yes, sir.

 6              MR. BAUER:  Your Honor, we renew our objection about

 7    the statement that we expect defense counsel will want to

 8    elicit regarding Burden's statement to David Evans.  However,

 9    to the extent your Honor is going to allow them to inquire

10    about that statement of this witness from Burden, the statement

11    of Burden to this witness, we would ask that there be a

12    limiting instruction that that statement does not come in for

13    the truth but is merely as impeachment evidence, if any.

14              MR. GOLTZER:  No objection.

15              THE COURT:  OK.  I think that would be appropriate.

16              Whenever he's ready, he can be brought out.

17

18

19

20

21

22

23

24

25

E8j9chr3                          Evans - direct

1            DAVID EVANS, resumed

2            (Jury present)

3            THE COURT:  Everyone please be seated.

4            Mr. Nawaday.

5    DIRECT EXAMINATION CONTINUED

6    BY MR. NAWADAY:

7    Q.  Mr. Evans, please ask you to keep your voice up.

8    A.  Yes, sir.

9    Q.  Before the break we were talking about Gucci.  And I think

10   you said when we were talking about Gucci and whether you knew

11   he sold drugs, that you remember seeing him on Lutheran with

12   J-Mark?

13   A.  Yes.

14   Q.  What do you remember seeing?

15   A.  Basically same thing.  Hand-to-hand, cussy walk up, he give

16   him what he give him.  He walks off.

17   Q.  What did you mean by that you saw him with J-Mark?

18   A.  Basically hanging together.  Chilling.

19   Q.  About how many times have you seen Gucci do a hand-to-hand

20   to a crack cocaine customer between 2008 and 2010?

21   A.  Just a couple of times.

22   Q.  Moving on to the person you identified as Reckless.  Did

23   you know Reckless by any other names?

24   A.  Ashy Larry.

25   Q.  Ashy Larry?

1    A.  Yes.

2    Q.  Did you know -- why did you call him Ashy Larry?

3    A.  I guess he was calling hisself that.  When I first met him

4    his name was Ashy Larry.

5    Q.  Do you know why he called himself Ashy Larry?

6    A.  No.

7    Q.  Was he an Ashy Bandit?

8    A.  No.

9    Q.  Between 2008 and 2010 have you ever seen him sell drugs?

10   A.  Yes.

11   Q.  And describe what you saw and about how many times you saw

12   it?

13   A.  Basically cussies walk up to him.  Hand-to-hand.  Give him

14   the money.  Walk off.

15   Q.  Around what time period was this?

16   A.  2009, 2010.

17   Q.  Did you ever see him work with anyone else when he was out

18   there?

19   A.  No.

20   Q.  Where was this that you saw him sell?

21   A.  Dubois Street.

22   Q.  I'd like to go through some photographs with you,

23   Mr. Evans.  First starting with Government Exhibit 204.  Do you

24   recognize that?

25   A.  Yes.  That's L-1.

E8j9chr3                        Evans – direct

1   Q.  Did you know L-1 by any other names?

2   A.  No.

3   Q.  And I think you said he had some rank?

4   A.  Yes.

5   Q.  And what was that rank and around when was it?

6   A.  2007 to 2008.  He was the big homey for G-Shine.

7   Q.  And G-Shine is a Blood set?

8   A.  Yes.

9   Q.  Were you G-Shine?

10  A.  Yes, I was.

11  Q.  And during the time period you knew L-1, where did he

12  typically hang out?

13  A.  Across town on William Street.

14  Q.  Have you ever seen any of the defendants, Bow Wow,

15  Reckless, or Gucci, with L-1?

16  A.  I seen Gucci a couple of times.

17  Q.  With L-1?

18  A.  Yes.

19  Q.  How about Reckless?

20  A.  No.

21  Q.  How about Bow Wow?

22  A.  No.

23          MR. NAWADAY:  Ms. McInerney, if you can please pull up

24  Government Exhibit 206.

25  Q.  Do you recognize that?

1840

1   A.  Yes, I do.

2   Q.  Who is that?

3   A.  That's a picture of Kev Gotti.

4   Q.  Did you know Kev Gotti by any other names?

5   A.  I know his real name is Kevin.

6   Q.  And how do you know Kev Gotti?

7   A.  Basically I grew up with Kev Gotti.

8   Q.  Back in 2008 and 2010 how often did you see Kev Gotti?

9   A.  Everyday.

10  Q.  Do you know if he was Blood?

11  A.  Yes, he was.

12  Q.  Do you know if he had any rank in the Bloods?

13  A.  No.

14  Q.  Have you ever seen Kev Gotti with any of Bow Wow, Reckless,

15  or Gucci?

16  A.  No.

17  Q.  Have you ever seen Kev Gotti with guns?

18  A.  Yes.

19  Q.  How often?

20  A.  Often.

21      Every time I bumped into him on the streets he had a

22  gun on him.

23  Q.  Have you ever seen Reckless with a gun?

24  A.  Yes.

25  Q.  How many times?

1    A.  Just once.

2    Q.  Around when was that?

3    A.  I think it was like 2009, 2010.

4    Q.  How did it come about that you saw him with a gun?

5    A.  We was on Lander Street.  He was out there just showing it

6    off.

7           MR. GREENFIELD:  Objection.

8           THE COURT:  Sustained.

9    Q.  Where did you see Reckless with a gun?

10   A.  On Lander Street.

11   Q.  What did you see?

12          MR. GREENFIELD:  Ask that it be stricken.

13          THE COURT:  Overruled.

14   Q.  Mr. Evans if you could please speak up.  What did you see?

15   A.  Basically he was out there.  He was just showing it off.

16   Flashing it.  That's it.

17   Q.  Was he alone or with other people?

18   A.  He was by hisself.

19   Q.  When you were out on Lander and you saw Reckless flashing a

20   gun and showing it off, what were you doing out there at the

21   time?

22   A.  I was out there selling drugs, drinking, smoking.

23   Q.  Before you pleaded guilty to your cooperation agreement did

24   you have to tell -- had you told the government about all of

25   your crimes at that point?

1    A.  Yes.

2    Q.  And today when you testified, we didn't go through all of

3    your crimes, did we?

4    A.  No.

5    Q.  We didn't go through all the details of all of your crimes?

6    A.  No.

7    Q.  And if defense counsel asks you any questions about your

8    crimes, are you willing to answer them?

9    A.  Yes.

10            MR. NAWADAY:  No further questions.

11            THE COURT:  Mr. Goltzer.

12            MR. GOLTZER:  Thank you, Judge.

13   CROSS-EXAMINATION

14   BY MR. GOLTZER:

15   Q.  Good morning.

16            Good morning.

17   A.  How are you doing?

18   Q.  You grew up with Gotti?

19   A.  Yes.

20   Q.  How old were you when you met him?

21   A.  Eight, nine.

22   Q.  And you saw him everyday?

23   A.  Yes.

24   Q.  Where would you see him everyday in 2010?

25   A.  Up towards Carpenter and First.

E8j9chr3                         Evans - cross

1    Q.  Is that the spot at 260 First?

2    A.  Yes.

3    Q.  Where he lived?

4    A.  Yes.

5    Q.  And would you have occasion to smoke with him?

6    A.  Yes.

7    Q.  Smoke what?

8    A.  Marijuana.

9    Q.  Any PCP?

10   A.  No.

11   Q.  What about drinking?

12   A.  Yes.

13   Q.  How often would you and Gotti drink together?

14   A.  Every Friday, Saturday.

15   Q.  Gotti liked to drink?

16   A.  Yes.

17   Q.  He drank a little too much too, didn't he?

18   A.  Yes.

19   Q.  Did he have a problem?

20   A.  Yes.

21   Q.  Did you ever tell him he had a problem?

22   A.  No, I did not.

23   Q.  But you noticed he had a problem?

24   A.  Yeah.

25   Q.  What was his problem?  With alcohol?

E8j9chr3                          Evans - cross

1    A.  Drinking.  Drinking a lot.

2    Q.  What's a lot?

3    A.  A lot.  Two or three bottles.

4    Q.  Per day?

5    A.  When I chilled with him Fridays, Saturdays, yes.

6    Q.  Two or three bottles of what, sir?

7    A.  Hennessey, vodka, brandy.

8    Q.  We're talking hard liquor?

9    A.  Yes.

10   Q.  Not beer?

11   A.  No.

12   Q.  Not wine?

13   A.  No.

14   Q.  So would it be fair to say that Gotti would get up in the

15   morning and he would drink until he passed out?

16   A.  No.

17   Q.  How did it work?  How often -- do you know when he started

18   drinking?

19   A.  Basically started drinking after the sun goes down.

20   Q.  And he would drink until when, if you know?

21   A.  Me, I would sit there, wait with him, probably until one,

22   two in the morning.  Then I would go home.

23   Q.  You signed your cooperation agreement on September 9, 2011;

24   is that correct?

25   A.  Yes.

E8j9chr3                        Evans - cross

1    Q.  And you were also interviewed by a fellow -- an officer

2    named Bunt on September 9, 2011; is that correct?

3    A.  Yes.

4    Q.  And you recall that interview?

5    A.  Not really.

6    Q.  Wasn't that the day they brought you into custody to sign

7    the agreement?

8    A.  That's the day I pleaded guilty.

9    Q.  That was the day you pled guilty.  How long after you were

10   brought into custody was that?

11   A.  Six, seven days later.

12   Q.  Okay.  And right after you were brought into custody, you

13   were asked some questions about the Joker killing; is that

14   right?

15   A.  Yes.

16   Q.  And you actually had a conversation with your good friend

17   who you grew up with, Mr. Gotti, about the Joker killing,

18   didn't you?

19   A.  No.

20   Q.  Didn't he tell you that -- do you remember that or no?

21   A.  Me and Gotti never had a conversation about Joker.

22   Q.  Did you tell Bunt on September 11 -- September 9, 2011 that

23   Kevin Burden or Kevin Gotti told you that J-Mark, Mallory, and

24   L-1 shot Joker?

25   A.  No.

E8j9chr3                          Evans - cross

1   Q.  Did you say that Kevin Gotti told you that shooting him was

2   a Bloods issue?

3   A.  Shooting Kev Gotti?

4   Q.  Shooting -- no.  Shooting Joker.

5   A.  No.

6   Q.  When you were interviewed by Bunt, Bunt was taking notes,

7   wasn't he?

8   A.  Yes.

9   Q.  And if anything was unclear, he would ask you again,

10  wouldn't he?

11  A.  Yes, he would.

12  Q.  How long were you cooperating with the Newburgh police

13  authorities prior to the time that you were taken into custody?

14  A.  A year.

15  Q.  And you were on the street while you were cooperating?

16  A.  Yes, I was.

17  Q.  Did you ever ask Gotti about the Joker situation?

18  A.  No, I did not.

19  Q.  And you never discussed it with him?

20  A.  No, I did not.

21  Q.  Are you sure?

22  A.  I'm positive.

23  Q.  And Bunt never asked you about it?

24  A.  He asked me questions about it, but not saying that I -- I

25  told him anything because I don't know nothing about that.

E8j9chr3                    Evans - cross

1   Q.  When Bunt was asking you questions about it, sir, did you

2   see him taking notes as you answered?

3   A.  Yes, I did.

4   Q.  Have you had a chance to review those notes?

5   A.  No, I haven't.

6           MR. GOLTZER:  May we have a brief sidebar.

7           THE COURT:  Sure.

8           (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    (At the sidebar)

2        MR. GOLTZER:  I know we're getting toward the end of

3    the trial and we have some time problems.  And I wanted to

4    suggest that I'm looking at 3507-27, which the court ruled

5    would be admissible.  The witness has denied it.

6        So I'm wondering if the government is willing to

7    stipulate that this appears in Detective Bunt's notes because

8    Bunt is the witness who we told the government we would not

9    call because he was starting a vacation.  And I think it's only

10   fair, in view of that, that I be permitted to, rather than go

11   through stipulations, confront him with this, confront him with

12   the notes.

13       MR. BAUER:  May I just talk to him for one second.

14       (Pause)

15       MR. NAWADAY:  Your Honor it appears to us -- and this

16   is what Mr. Goltzer is saying, although I do appreciate

17   taking -- there is a time issue and taking that into

18   consideration.

19       MR. GOLTZER:  That's why I'm raising it at sidebar and

20   not just jumping in where angels fear to tread.

21       MR. NAWADAY:  We should be allowed, however your Honor

22   rules on the admissibility of this statement, to question

23   Mr. Evans about this statement as well.

24       MR. GOLTZER:  Of course.

25       MR. BAUER:  I think it's clear to us that he's talking

1    about the shooting where J-Mark shot L-1.  I think Bunt just

2    got confused.

3            MR. GOLTZER:  No, no, no.  I'm relying on this.  You

4    know I'm relying on this.  You objected to this.  And if you

5    want to ask him that, that's fine.  But this is what the notes

6    say.  And if you want to argue that Bunt got confused, we'll go

7    to the jury with it later.

8            THE COURT:  But it appears that the government also

9    has an argument as to what this statement means.

10           MR. GOLTZER:  That's great.  They can do what they

11   want.  But I'd like to be able to have a stipulation that this

12   is what the notes say.

13           MR. NAWADAY:  The same language we have had before?

14           MR. GOLTZER:  I can do that now in front of the jury

15   and then I'll continue to question him and show it to him and

16   you can question him and do what you want.

17           MR. BAUER:  Can I ask that the last part of him being

18   on crutches be in the stipulation too?

19           MR. GOLTZER:  Sure.

20           MR. BAUER:  The whole page.

21           MR. GOLTZER:  Absolutely.  Great.

22           MR. NAWADAY:  Can we just have the introductory

23   language that we've been requesting.

24           MR. GOLTZER:  Yes, no question.

25           MR. NAWADAY:  These are --

E8j9chr3                          Evans - cross

1              MR. GOLTZER:  The notes.

2              MR. NAWADAY:  That Bunt took notes; that they're not

3     meant to be verbatim; but they were meant to accurately

4     reflect --

5              MR. STRAZZA:  I have that language for you.

6              MR. NAWADAY:  -- what Mr. Evans said and he said in

7     sum and substance and just read this.

8              MR. GOLTZER:  Okay.  That's perfect.

9              (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (In open court)

2          MR. GOLTZER:  Your Honor, may I orally publish a

3   stipulation to the jury that has not been reduced to writing

4   and have it deemed in evidence?

5          THE COURT:  Very well.

6          MR. GOLTZER:  Thank you.

7          It is hereby stipulated and agreed by and between the

8   United States of America by Preet Bharara, the United States

9   Attorney for the Southern District of New York, Andrew Bauer

10  and Kan M. Nawaday, Assistant United States Attorneys, of

11  counsel, and Raymond Christian, the defendant, by and through

12  the consent of his attorneys, David Greenfield and Anthony

13  Strazza; Tyrell Whitaker, the defendant, by and through the

14  consent of his attorneys, George Goltzer and Ying Stafford; and

15  Glenn Thomas, the defendant, by and through the consent of his

16  attorneys, Don Buchwald and Joshua Dratel that:

17         On September 9, 2011 David Evans met with government

18  agents, one of whom took notes during the meeting.  Those notes

19  were not intended to be a verbatim transcript but were intended

20  to summarize the substance of Mr. Evans' statements accurately.

21  According to those notes, the notes reflect the following, and

22  I'm going to read it verbatim.  Okay, government?

23         MR. NAWADAY:  Yes.

24         MR. GOLTZER:  "Kevin Burden, Kevin Gotti, told F that

25  J-Mark and L-1 shot him, both of them.  F said Kev Gotti, who

1   was his good friend, said shooting was Bloods-related.  Kev

2   Gotti was on crutches.  And F asked why."

3        And that's the end of the stipulation, your Honor.

4        THE COURT:  Very well.

5   BY MR. GOLTZER:

6   Q.  Now, let me show you -- if I may approach the witness?

7        THE COURT:  You may.

8   Q.  -- these notes.  Have you ever seen them before?

9   A.  Nope.

10  Q.  Having heard the stipulation, do you still deny having a

11  conversation with Burden to the effect that Joker was shot --

12  A.  This conversation wasn't about Joker getting shot.  This

13  was about Kev Gotti getting shot.

14  Q.  So you deny that that has to do with Joker?

15  A.  Yes.

16  Q.  Now, when was the last time you met with the government in

17  preparation for your testimony?

18  A.  A week ago.

19  Q.  And how long was that meeting?

20  A.  Couple hours.

21  Q.  How long was it before -- how many times did you meet with

22  the government before the cooperation agreement was signed in

23  September of 2011?

24  A.  Probably over 20, 30 times.

25  Q.  And those 20 or 30 meetings, how many hours did they

E8j9chr3                          Evans - cross

1   encompass, if you know?

2   A.  A lot.

3   Q.  The cooperation agreement that you signed covered certain

4   crimes of yours?

5   A.  Yes.

6            MR. GOLTZER:  May I have those notes back, please.

7   Q.  While you were cooperating with the government for the

8   year, did you make any tapes for them?

9   A.  No.

10  Q.  Were you asked to make any tapes for them?

11  A.  No.

12  Q.  Did you suggest that you make any tapes for them?

13  A.  No.

14  Q.  Even on the phone?

15  A.  Even on the phone.

16  Q.  During the same interview when you say you were talking

17  about the shooting of L-1, were you asked about Joker and the

18  gun that was used to kill him?

19  A.  No.

20  Q.  Did you tell them about a gun that Joker -- that was used

21  in the Joker homicide?

22  A.  No.

23  Q.  Did you tell them that somebody was arrested with a gun

24  from the Joker homicide?

25  A.  No.

E8j9chr3                          Evans - cross

1           MR. GOLTZER:  Your Honor, we have a further

2    stipulation.  I will skip the preamble, but it is stipulated

3    that for the same purposes notes were taken and at the top of

4    the same page it says, "Bunt.  9-9-11.  D who was arrested with

5    gun has prior gun was Joker murder gun."

6    Q.  Do you remember talking about the Joker murder gun?

7    A.  No.

8    Q.  You don't dispute that that's in the notes right above the

9    discussion of the shooting, do you?

10   A.  I know I didn't say that.

11   Q.  I beg your pardon?

12   A.  I didn't say that.

13   Q.  You never said what's in the notes that Bunt took?

14   A.  No.

15   Q.  How many times did you meet with Bunt?

16   A.  A lot.

17   Q.  And Bunt was somebody that questioned you quite a bit?

18   A.  Yes.

19   Q.  Bunt was somebody that you spent hours with?

20   A.  Yes.

21   Q.  Bunt was the head of the Bloods investigation in Newburgh?

22   A.  Yes, he was.

23   Q.  Bunt was somebody who told you that he wanted to get

24   accurate information from you?

25   A.  Yes.

E8j9chr3                          Evans - cross

1    Q.  Bunt was somebody who during your meetings would go over

2    the information with you again and again to make sure he got it

3    right?

4    A.  Yes.

5    Q.  Bunt appeared to you to be a thorough police person?

6    A.  Yes.

7    Q.  Bunt seemed to be thoroughly professional?

8    A.  Yes.

9    Q.  Bunt seemed to be somebody who tried to avoid mistakes?

10   A.  Yes.

11   Q.  Can you explain how his notes ended up being that way when

12   you said you never had that conversation?

13   A.  I can't explain that.

14   Q.  Don't even want to try?

15           MR. NAWADAY:  Objection.

16   Q.  Do you?

17           THE COURT:  Sustained.

18   Q.  You were a member of the Bloods -- you're still a member of

19   the Bloods?

20   A.  No, I'm not.

21   Q.  Gave it up?

22   A.  Yes.

23   Q.  When?

24   A.  2010.

25   Q.  You dropped your flag, as they say?

E8j9chr3                              Evans - cross

1    A.  I became a plate.

2    Q.  What does that mean?

3    A.  Basically I wasn't Blood material.

4    Q.  You were food?

5    A.  Yes.

6    Q.  You were going to have somebody do something to you?

7    A.  Yes.

8    Q.  But before that you attended meetings?

9    A.  Yes.

10   Q.  Before that you knew Danielle Williams?

11   A.  Yes.

12   Q.  You were close to her?

13   A.  Yes.

14   Q.  You were close to Double O?

15   A.  Yes.

16   Q.  Double O, in fact, was the head of the bloods?

17   A.  Yes, he was.

18   Q.  Double O was the top-ranking Blood in all of Newburgh?

19   A.  Yes.

20   Q.  And as part of that enterprise case they indicted how many

21   Bloods, if you know?

22   A.  Seventy some Bloods.

23   Q.  Seventeen?

24   A.  Like 72, 73 Bloods.

25   Q.  72?

E8j9chr3                          Evans - cross

1    A.  Yes.

2    Q.  So they took down virtually the whole -- more than one set?

3    A.  Yes.

4    Q.  It was part of a task force that was sent to Newburgh to

5    take down the Bloods?

6    A.  Yes.

7    Q.  And you were a part of that investigation?

8    A.  Yes.

9    Q.  And you were part of the investigation along with other

10   informants to take down 72 or 73 Bloods?

11   A.  Yes.

12   Q.  And Bow Wow wasn't charged in that, was he?

13   A.  No, he wasn't.

14   Q.  And Reckless wasn't charged in that, was he?

15   A.  No, he wasn't.

16   Q.  And Gotti wasn't charged in that, was he?

17   A.  No, he wasn't.

18   Q.  Gucci.  I'm sorry.  Gucci wasn't charged in that, was he?

19   A.  No, he wasn't.

20   Q.  They were not charged with being a member of the Bloods

21   enterprise as a criminal venture, were they?

22   A.  No.

23   Q.  Now, being a member of the Bloods is something that is

24   formal?  You formally become a member of the Bloods?

25   A.  Yes.

E8j9chr3                          Evans - cross

1    Q.  And you go through some kind of a ceremony?

2    A.  Yes.

3    Q.  How does that work?  What's the ceremony?

4    A.  Basically when you become Blood you go around to all the

5    other Blood members and basically they ask you questions like

6    why you want to become Blood, and that's it.

7    Q.  The point being, if I want to become a Blood I have to put

8    on a red tie, right?

9    A.  No.

10   Q.  But if I want to become a member of the Bloods and I'm

11   acceptable to the organization or the gang, it's going to be

12   known that I'm a Blood?  You're going to introduce me around,

13   right?

14   A.  Yes.

15   Q.  So during the years that you were a member of the Bloods

16   you would meet the other Bloods?

17   A.  Yes.

18   Q.  And you were never introduced to Bow Wow as a Blood?

19   A.  No.

20   Q.  So as far as you know Bow Wow was not a Blood?

21   A.  Yes.

22   Q.  Is that correct?

23   A.  Yes, it is.

24   Q.  He was a kid who would hang out on the street?

25   A.  Yes.

E8j9chr3                          Evans - cross

1    Q.  Now, you indicated before that people who knew people in

2    the Bloods or were friends or from the neighborhood, they could

3    deal a little bit of drugs, right?

4    A.  Yes.

5    Q.  But those folks who were just associated and not members of

6    the Bloods, they weren't people who were under orders, if you

7    will; is that right?

8    A.  Yes, it is.

9    Q.  Now, if I had rank in the Bloods and you didn't, if I told

10   you that I wanted you to hurt somebody, could you say no?

11   A.  No, I couldn't.

12   Q.  If I were not a member of the Bloods, could I say no?

13   A.  Yes.

14   Q.  If I were not a member of the Bloods -- in other words, you

15   have to take the oath basically?

16   A.  Yes.

17   Q.  You have to say I want to be a Blood, I want to abide by

18   the rules, right?

19   A.  Yes.

20   Q.  And if I don't take that oath and I'm not brought up as a

21   Blood I'm not part of that life?

22   A.  Yes.

23   Q.  I don't go to meetings?

24   A.  Nope.

25   Q.  I don't have to follow orders?

1    A.  No.

2    Q.  Is that right?

3    A.  That's true.

4    Q.  Now, I want you to go through your plea agreement with you,

5    okay.  And I'm not going to ask you all the details about your

6    crimes.  But let's go through it.

7           You signed the agreement, which is in evidence, on

8    September 9, 2011; is that correct?

9    A.  Yes.

10   Q.  And it covered several pleas that you took to different

11   crimes as part of being a member of this Bloods enterprise,

12   right?

13   A.  Yes.

14   Q.  The same enterprises that Bow Wow was not a member of?

15   A.  Yes.

16   Q.  Let's go through the crimes that you pled guilty to that

17   were in the indictment.  Let's just go through them.

18          Count One that -- to which you pled guilty charged you

19   with engaging in the affairs of the enterprise; is that

20   correct, through the commission of racketeering offenses?

21   A.  Yes.

22   Q.  And you admitted your guilt, right?

23   A.  Yes, I did.

24   Q.  And for your racketeering crimes there was a potential

25   maximum penalty of life in the penitentiary, right?

E8j9chr3                        Evans - cross

1   A.  Yes, there was.

2   Q.  And you understood that to mean that life in the

3   penitentiary in the federal system meant you would die in jail?

4   A.  Yes.

5   Q.  And unless whoever was the president wanted to commute your

6   sentence or give you a pardon, you were in for the rest of your

7   life?

8   A.  Yes.

9   Q.  Count Two charged you with a conspiracy to commit

10  racketeering offenses; is that correct?

11  A.  Yes, it is.

12  Q.  And that meant that you had agreed with other people to

13  commit those offenses?

14  A.  Yes.

15  Q.  With some or all of those other 72 or 73 people?

16  A.  Yes.

17  Q.  And the penalty for that offense was an additional life

18  sentence potentially; is that correct?

19  A.  Yes.

20  Q.  But that particular crime, as the first count, didn't have

21  a particular minimum, right?

22  A.  Yes.

23  Q.  You could be sentenced to any sentence that the Court

24  decided to give you?

25  A.  Yes.

E8j9chr3                          Evans - cross

1    Q.  From nothing up to life?

2    A.  Yes.

3    Q.  Of course, you were aware and it was explained to you that

4    there were advisory sentencing guidelines in the federal

5    system?

6    A.  Yes.

7    Q.  And the federal sentencing guidelines for racketeering

8    enterprise where there were murders or racketeering conspiracy

9    where there were murders were close to a life sentence?

10   A.  Yes, they was.

11   Q.  Now the third count that you pled to was a conspiracy or an

12   agreement to commit the racketeering murder of somebody named

13   Tyrik Legette; is that correct?

14   A.  Yes.

15   Q.  And that carried a maximum possible sentence of ten years?

16   A.  Yes.

17   Q.  And, in fact, you had agreed with other people to kill

18   Tyrik Legette; is that correct?

19   A.  No, it's not.

20   Q.  So you pled to something you didn't do?

21   A.  I pled guilty to it.  But we didn't talk about it.  It

22   wasn't meant for him to get stabbed.

23   Q.  So did you plead guilty to something you weren't guilty of?

24   A.  I pled guilty to it.  I was guilty of it.

25   Q.  If you didn't do it, how could you be guilty of it?

E8j9chr3                              Evans - cross

1    A.  Because I was there.  I had my parts in that murder.

2    Q.  Well what was the part that you took in the murder?

3    A.  I just punched him, kicked him.

4    Q.  You punched him and kicked him?

5    A.  Yes.

6    Q.  What were other people doing, if anything, while you

7    punched him and kicked him?

8    A.  Other people was punching and kicking him, while other

9    people stabbed him.

10   Q.  Was he beaten to death and stabbed?

11   A.  Yes, he was.

12   Q.  So you knew he was going to die?

13   A.  Yes, I did.

14   Q.  So you are guilty.  Is that right?

15   A.  Yes.

16   Q.  So you pled guilty to Count Four which charged you with the

17   actual murder of Tyrik Legette; is that true?

18   A.  Yes.

19   Q.  And that carried a mandatory life sentence; is that

20   correct?

21   A.  Yes.

22   Q.  That meant that unless you got the letter from the

23   government, you were going to die in jail no matter what

24   happened because no judge could go below life, right?

25   A.  Yes.

E8j9chr3                        Evans - cross

1   Q.  And before you pled to that you were actually facing a

2   possible death penalty for that and the Attorney General had to

3   give them permission not to seek it; isn't that true?

4   A.  Yes.

5   Q.  And they went to Washington and they said to the Attorney

6   General, if you know, let's not execute him; let's make him a

7   cooperator.  Right?

8   A.  I guess so.  I don't know.

9   Q.  So you were basically, by making deals with the government,

10  you were possibly saving your life?

11  A.  Yes.

12  Q.  And no matter what happens in this courtroom, whether you

13  get the letter or not, you're not going to die over this?

14  A.  Don't know.  It's up to the judge.

15  Q.  The judge can't sentence you to death.  You're not charged

16  with that, right?

17  A.  I got charged with a lot.

18  Q.  You are charged with a lot?

19  A.  Yeah.

20  Q.  Now the Fifth Count that you pled guilty to was another

21  conspiracy to murder members of the Crips?

22  A.  Yes.

23  Q.  Did you agree to murder members of the Crips?

24  A.  Yes, I did.

25  Q.  Count Six charged you with conspiring or agreeing with

1    other people to distribute more than 280 grams of crack; is

2    that right?

3    A.  Yes, it is.

4    Q.  280 grams of crack is about ten ounces; is that right?

5    A.  Yes, it is.

6    Q.  Because there are 28.3 grams in an ounce, as you know?

7    A.  Yes.

8    Q.  And that particular crime that you're charged with carries

9    a maximum possible penalty of life with no parole in the

10   federal penitentiary, right?

11   A.  Yes.

12   Q.  And it has a mandatory minimum sentence of ten years?

13   A.  Yes.

14   Q.  And you are aware that if you don't get the letter that the

15   government talked about, you have to get least ten years for

16   that, right?

17   A.  Yes.

18   Q.  And that has to be on top of or consecutive to the other

19   sentences you get for the other crimes; is that right?

20   A.  Yes, it is.

21   Q.  Now, Count Seven charged you with a marijuana distribution

22   for a number of years, right?

23   A.  Yes.

24   Q.  And that carries a possible sentence of five years, right?

25   A.  Yes, it does.

E8j9chr3                        Evans - cross

1   Q.  Marijuana is not as serious at the crack, right?

2   A.  Yes.

3   Q.  That's the least of your problems?

4   A.  Yes.

5   Q.  Now, Count Eight, which you pled guilty to, charged you

6   with conspiring to distribute heroin, right, some amount of

7   heroin?

8   A.  Yes.

9   Q.  And that carries a possible maximum sentence of 20 years;

10  is that correct?

11  A.  Yes, it is.

12  Q.  Counts Nine and Ten each charged you with conspiracies to

13  rob and attempted robberies of folks at 270 First Street in

14  Newburgh; is that correct?

15  A.  Yes, it is.

16  Q.  And that was back in the 2007s, 2008s, right?

17  A.  Yes, it was.

18  Q.  You pled guilty to that?

19  A.  Yes, I did.

20  Q.  That carries a possible maximum of 20 years in the

21  penitentiary; is that correct?

22  A.  Yes, it is.

23  Q.  Counts Eleven and Twelve charged you with other robberies

24  and conspiracies to commit robberies, right?

25  A.  Yes.

1   Q.   That's another 20?

2   A.   Yes, it is.

3   Q.   More than you can do, right?

4   A.   Yeah.

5   Q.   Now, Count Thirteen charged you with using, carrying, and

6   brandishing a firearm during and in relation to a crime of

7   violence; is that correct?

8   A.   Yes, it is.

9   Q.   And that carried -- that's the robberies that you had

10  earlier admitted to; is that correct?

11  A.   Yes.

12  Q.   Now, the potential maximum penalty for carrying a firearm

13  in relation to a crime of violence is life with no parole,

14  correct?

15  A.   Yes, it is.

16  Q.   And it carries a mandatory minimum; is that correct?

17  A.   Yes.

18  Q.   Of at least ten years, right?

19  A.   Yep.

20  Q.   Which has to be consecutive to the other crimes you're

21  sentenced for?

22  A.   Yes.

23  Q.   Which has to be consecutive to the minimum on the drug

24  crime?  Right?

25  A.   Yes.

E8j9chr3                              Evans - cross

1   Q.  So, so far we're looking at a maximum -- a mandatory

2   minimum of 20 years and several life -- possible life terms and

3   20-year sentences to go with that?

4   A.  Yes.

5   Q.  Count Fourteen charges you with another gun; is that right?

6   A.  Yes.

7   Q.  In connection with crimes of violence, right?

8   A.  Yes.

9   Q.  And that also carries a possible maximum sentence of life

10  in the penitentiary; is that right?

11  A.  Yes, it does.

12  Q.  And because it's a second or subsequent gun count it

13  carries a further mandatory minimum sentence, doesn't it?

14  A.  Yes, it does.

15  Q.  How much is that mandatory minimum sentence?

16  A.  Twenty-five.

17  Q.  That's 25 years more on top of the other 20?

18  A.  Yes.

19  Q.  Count Fifteen charges you with being someone who was

20  previously convicted of felony in possession of a firearm, and

21  that's another possible ten-year maximum sentence; is that

22  correct?

23  A.  Yes, it is.

24  Q.  Now let's go back up to the point in time before you signed

25  the agreement, okay.  Is that right?

E8j9chr3                          Evans - cross

1   A.  Yes.

2   Q.  Now, before you signed the agreement you have a lawyer?

3   A.  Yes.

4   Q.  And your lawyer -- I'm not going to go into the specifics

5   of conversations -- but he shows you what you're charged with?

6   A.  Yes.

7   Q.  You go to court.

8   A.  Yes.

9   Q.  You're given copies of the indictment.

10  A.  Yes.

11  Q.  And it is made known to you that there are different

12  options available to you as somebody who has been accused of a

13  federal crime; is that right?

14  A.  Yes.

15  Q.  Option number one, you can go to trial?

16  A.  Yes.

17  Q.  Option number two, take a plea, right?

18  A.  Yes.

19  Q.  Option number three, try to get a cooperation agreement?

20  A.  Yes.

21  Q.  You explored your options, correct?

22  A.  Yes, I did.

23  Q.  You decided you didn't want to go to trial?

24  A.  Yes.

25  Q.  You don't want to do what they're doing?

1   A.  No.

2   Q.  You didn't think you'd win?

3   A.  Nope.

4   Q.  You knew you'd lose?

5   A.  Yes.

6   Q.  You knew you'd go away forever, right?

7   A.  Yes.

8   Q.  Not for you?

9   A.  No.

10  Q.  Okay.  Number two, you could take a plea and not cooperate,

11  right?

12  A.  Yes.

13  Q.  You didn't want to spend a substantial number of years in

14  prison?

15  A.  No.

16  Q.  You wanted a better way out for you?

17  A.  Yes.

18  Q.  You decided to cooperate?

19  A.  Yes.

20  Q.  So you let the government know that you wanted to come in

21  and be a potential cooperator?

22  A.  Yes.

23  Q.  You let the Newburgh police department know that?

24  A.  Yes.

25  Q.  Because you knew you were going to be charged with crimes,

1   right?

2   A.  Yes.

3   Q.  They allowed you to be an active cooperator on the street,

4   right?

5   A.  Yes, they did.

6   Q.  Before you were formally charged?

7   A.  Yes.

8   Q.  So they put off charging you in that indictment with the 72

9   or 73 people, right?

10  A.  Yes, they did.

11  Q.  So that you could be what is commonly known in street

12  parlance as a snitch?

13  A.  Yes.

14  Q.  Or a rat?

15  A.  Yes.

16  Q.  Or a tattletale, as I like to say, right?

17  A.  Yes.

18  Q.  Now all you had to do was keep your nose clean and not use

19  drugs, right?

20  A.  Yes.

21  Q.  Couldn't do it?

22  A.  Nope.

23  Q.  Why not?

24  A.  It's hard.

25  Q.  What was so hard about it?

E8j9chr3                          Evans - cross

1    A.  It's hard smoking for years and years and just trying to

2    quit.  It's hard.

3    Q.  But you knew it could cost you life in prison?

4    A.  Yes.

5    Q.  You were told specifically if you go out there and use

6    drugs we're not signing you up.  Weren't you told that?

7    A.  Yes.

8    Q.  Weren't you told if you go out there and you commit other

9    crimes we're not signing you up?

10   A.  Yes.

11   Q.  So you went out there and you did commit other crimes?

12   A.  Yes.

13   Q.  What other crimes did you commit?

14   A.  Basically smoked marijuana.  That was it.

15   Q.  Didn't use any other drugs?

16   A.  No.

17   Q.  But they still signed you up?

18   A.  Yes.

19   Q.  So when they told you all bets are off, you didn't know

20   whether they really meant it or not?

21   A.  They never said that.

22   Q.  But you got your agreement in spite of violating the

23   promise that you made to them not to do that?

24   A.  Yes.

25   Q.  Now, you went through proffer sessions before you signed

E8j9chr3                          Evans - cross

1    the agreement, right?

2    A.  Yes.

3    Q.  They didn't buy what's known as a pig in a poke, did they?

4    A.  No, they did not.

5    Q.  They didn't give you an agreement and say okay now talk to

6    us?

7    A.  No.

8    Q.  They didn't give you an agreement and say okay now tell us

9    the truth?

10   A.  No.

11   Q.  In fact, you went through an extensive series of interviews

12   with representatives of law enforcement before September of

13   2011?

14   A.  Yes.

15   Q.  Right?

16   A.  Yes.

17   Q.  And before you could get an agreement you and the

18   representatives of whatever government you were talking to had

19   to agree on what the truth was?

20   A.  Yes.

21   Q.  So before you signed the agreement, you knew what you were

22   going to be asked to testify about?

23   A.  Yes.

24   Q.  Before you signed the agreement, you knew who you were

25   going to be asked to testify about?

E8j9chr3                              Evans - cross

1    A.  Yes.

2    Q.  And you were then handed this document that's in evidence

3    which had these fifteen or sixteen monstrous guilty pleas,

4    right?

5    A.  Yes.

6    Q.  And did you think you were getting a good deal?

7    A.  At that point in time, yeah.

8    Q.  Pleading guilty to all these life sentences?

9    A.  Yes.

10   Q.  The reason you thought you were getting a good deal is you

11   were told that the reason you were going to plead guilty to

12   everything you ever told them about was that it would make you

13   a better witness in front of a jury like this?  That's what you

14   were told?

15   A.  No.

16   Q.  Wasn't it explained to you that the government didn't want

17   to be appearing to hide anything so you would plead guilty to

18   everything to make you more credible?

19   A.  No.

20   Q.  They never told you that?

21   A.  No.

22   Q.  Did anybody tell you that?

23   A.  No.

24   Q.  Did you ask why do I have to plead guilty to fifteen or

25   sixteen crimes if I'm cooperating with you for the past year

E8j9chr3                          Evans - cross

1    and you're giving me a break?

2    A.  No.

3    Q.  Did you ever ask them?

4    A.  No, I did not.

5    Q.  Did you ever ask your lawyer to ask them why was that

6    happening?

7              MR. NAWADAY:  Objection.

8              THE COURT:  Sustained.

9    Q.  So now you testified against Double O?

10   A.  Yes.

11   Q.  How many times?

12   A.  Twice.

13   Q.  And you testified against Justice or whatever his name was?

14   A.  Yes.

15   Q.  And you're going to get credit for that and the judge will

16   find out about it?

17   A.  Yes.

18   Q.  You're hoping for all of your crimes to receive a sentence

19   of time served?

20   A.  Yes.

21   Q.  And have you over the course of the last three or four

22   years that -- three years that you've been in the MCC been

23   keeping track of what happens to other cooperators as they're

24   sentenced?

25   A.  Yeah.

1   Q.  You've talked to inmates about it?

2   A.  Yes, I did.

3   Q.  And you've watched guys go home after they got their

4   letter?

5   A.  Yes.

6   Q.  You've seen people accused and who were convicted of

7   murders go home?

8   A.  Yes.

9   Q.  You've seen people who were convicted of multiple murders

10  get less than ten years in prison?

11  A.  Yes.

12  Q.  You've seen people who dealt drugs all their lives get less

13  than ten years in prison?

14  A.  Yes.

15  Q.  And you've seen a lot of people get time served?

16  A.  Yes.

17  Q.  And that's something that you think you have a realistic

18  possibility of getting?

19  A.  Yeah.

20  Q.  And that's something that you're hoping to get?

21  A.  Yes.

22  Q.  You think that's a proper sentence for all of the crimes

23  you've committed?

24  A.  Yeah.

25  Q.  You don't think you deserve more than that?

1    A.  No.

2    Q.  Because you're a good citizen now?

3    A.  If you want to say that.

4    Q.  Are you?

5    A.  Yeah.

6    Q.  Okay.  I have nothing further.  Thank you.

7              THE COURT:  Mr. Buchwald or Mr. Greenfield.

8    CROSS-EXAMINATION

9    BY MR. BUCHWALD:

10   Q.  Good afternoon, Mr. Evans.

11   A.  How are you doing today?

12   Q.  Just a few questions.  You were a member of the Bloods from

13   when to when?

14   A.  From 2006 to 2010.

15   Q.  2006 to 2010.  And when in 2010 did you cease being a

16   member?

17   A.  Like August 2010.

18              MR. BUCHWALD:  Nothing further.

19              MR. STRAZZA:  No questions.

20              THE COURT:  Any redirect?

21              MR. NAWADAY:  Yes, your Honor.

22   REDIRECT EXAMINATION

23   BY MR. NAWADAY:

24   Q.  Mr. Evans, you were asked some questions about a

25   conversation you had with Detective Bunt.  Do you remember

1   those questions?

2   A.  Yes.

3   Q.  And a stipulation was orally read in about what those --

4   some notes from that conversation of Detective Bunt said.  Do

5   you remember that?

6   A.  Yes.

7   Q.  And you said something like oh, that -- that conversation

8   wasn't about Joker; it was about something else?

9   A.  Yes.

10  Q.  Can you explain what that conversation you remember

11  happening was about with Kevin Burden?

12  A.  Basically Kev end up telling me about how J-Mark shot him

13  and it was him and L-1 that plotted it out.

14  Q.  And at the time that Kev Gotti told you this, was he on

15  crutches or anything?

16  A.  No, he wasn't.

17  Q.  Now, you were also asked about your knowledge or lack of

18  knowledge with respect to Bow Wow and Reckless about their

19  membership in the Bloods.  Do you remember those questions?

20  A.  Yes.

21  Q.  When did you stop becoming a Blood or when did you become a

22  plate, as you put it?

23  A.  2010, August.

24  Q.  So is it fair to say that your knowledge of people's gang

25  affiliation with the Bloods kind of ends around then?

E8j9chr3                           Evans - redirect

1    A.  Yes.

2    Q.  You were also asked some questions about your meetings with

3    the government before you got your cooperation agreement.  Do

4    you remember those questions?

5    A.  Yes.

6    Q.  And you met with the government a lot, right?

7    A.  Yes.

8    Q.  And what did you have to do in those meetings?

9    A.  Basically tell them the truth about everything I know.

10   Q.  Did you have to tell them about your own crimes?

11   A.  Yes, I did.

12   Q.  Were you under investigation for crimes at that point?

13   A.  No, I was not.

14   Q.  Was there any guarantee you would get a cooperation

15   agreement?

16   A.  No, there wasn't.

17   Q.  And by the way, you were asked, you know, whether during

18   those meetings you were -- the government was helping you

19   decide what the truth was.  Did anyone ever tell you, you know,

20   what to say in those meetings?

21   A.  No, not at all.

22   Q.  Was anyone from the government out with you committing

23   crimes when -- the crimes you told them about?

24   A.  No.

25   Q.  And during those meetings did you only talk about these

E8j9chr3                        Evans - redirect

1    defendants?

2    A.  No.

3    Q.  You said you talked about a lot of people, right?

4    A.  Yes.

5    Q.  And if called to testify you would have to testify against

6    those people too, right?

7    A.  Yes.

8    Q.  Also you were asked questions about how you don't believe

9    that Bow Wow and -- withdrawn.

10            By the way, as far as you understand will the outcome

11   of this case have any effect on your sentence?

12   A.  No.

13            MR. NAWADAY:  No further questions.

14            THE COURT:  Anything further?

15   RECROSS EXAMINATION

16   BY MR. GOLTZER:

17   Q.  Are there hundreds of crimes that you committed during your

18   lifetime that you will not be asked to plead guilty to?

19   A.  I pleaded guilty to all the crimes.

20   Q.  Not the hundreds of bikes you stole and cars?

21   A.  I pleaded guilty to that too.

22   Q.  In state court?

23   A.  No.  In federal court.

24   Q.  And what happened?

25   A.  Basically they told me the judge will take that all into

E8j9chr3                          Evans - recross

1    consideration at her time.

2    Q.  Well those aren't part of this plea agreement?

3    A.  No, it's not.

4    Q.  Separate pleas?

5    A.  Yes.

6    Q.  And you're looking to get the same time served for all of

7    those crimes?

8    A.  Yes.

9           MR. GOLTZER:  Thank you.

10   Q.  By the way, were there any other crimes you pled guilty to

11   that you haven't been sentenced yet?

12   A.  No.

13   Q.  Just the hundreds of cars?

14   A.  If you want to say that, yes.

15   Q.  Do I want to say that?  Is that what happened?

16   A.  Yes.

17   Q.  Thank you.

18          THE COURT:  Anything further?

19          MR. NAWADAY:  No, your Honor.

20          THE COURT:  Sir, you may step down.

21          (Witness excused)

22          THE COURT:  Government want to call its next witness

23   please.

24          MR. NAWADAY:  Judge, the government calls Barbara

25   Morreale.

1    THE COURT:  Ms. Morreale, please step up into the

2    witness box and remain standing.

3             Please face the courtroom deputy.

4             Please sit down.  I'm sorry.  You have to say yes.

5    She asked a question.

6             THE WITNESS:  Yes.

7             You can adjust the microphone.  Just bring it close to

8    your face.  And I want you to begin by stating your full name

9    and spelling your first name and your last name for the record,

10   okay.

11    BARBARA MORREALE,

12        called as a witness by the Government,

13        having been duly sworn, testified as follows:

14             THE COURT:  Thank you.

15             Mr. Bauer.

16             MR. BAUER:  Thank you, your Honor.

17   DIRECT EXAMINATION

18   BY MR. BAUER:

19   Q.  Is it pronounced Morreale or Morreale?

20   A.  Morreale.

21   Q.  Ms. Morreale, how old are you?

22   A.  I'm 34.

23   Q.  Where did you grow up?

24   A.  I grew up -- I grew up, upstate.

25   Q.  What towns?

1    A.  Gilboa, New York.  Grand Gorge, Roxbury, Margaretville.

2    And then I came to Newburgh.

3    Q.  Approximately when did you come to Newburgh?

4    A.  I came to Newburgh I was approximately 18 years old.

5    Q.  And when -- what year was that, roughly?

6    A.  '99.

7    Q.  How far did you go in school?

8    A.  I went to college at Mount St. Mary's.

9    Q.  So you graduated high school?

10   A.  I graduated high school.

11   Q.  Did you finish college at Mount St. Mary's?

12   A.  No, I did not.

13   Q.  Now where do you live?  By that I only mean what city do

14   you live in now.

15   A.  I live in New Windsor, New York.

16   Q.  What do you do for a living?

17   A.  I clean homes, housekeeping.

18   Q.  Have you held other jobs in the past?

19   A.  Yes.

20   Q.  What types of jobs?

21   A.  I've worked at Duck Town Deli.  I've worked at Wal-Mart.

22   I've had several jobs.

23   Q.  Ms. Morreale, have you been subpoenaed to testify here

24   today?

25   A.  Um --

1   Q.  Did you receive a subpoena from the Court saying that you

2   have to testify here today?

3   A.  No, I did not.

4   Q.  You never got a subpoena?  Okay.

5           So are you here voluntarily?

6   A.  Um -- I have to be here.

7   Q.  Okay.  Now in response to being told that you had to be

8   here did you tell government agents that you were concerned

9   about your -- about getting yourself in trouble by testifying

10  here?

11  A.  Yes, I did.

12  Q.  Have you reviewed an order relating to your testimony?

13  A.  I'm sorry.  I didn't hear you.

14  Q.  Have you reviewed an order that was signed by the court

15  with regards to your testimony?

16  A.  Yes.

17  Q.  And that order requires you to testify here?

18  A.  Yes.

19  Q.  Did that order provide you any protections, however?

20  A.  Um, yes.

21  Q.  What type of protection?

22  A.  Um, I can't think off the top of my head.  I would have to

23  reread my paper, but.

24  Q.  Let me ask you this.  Does the order protect you from

25  getting yourself in trouble by testifying here on the witness

E8j9chr3                          Morreale – direct

1   stand?

2   A.  Yes, it does.

3   Q.  But does it protect you if you lie on the witness stand?

4   A.  No, it does not.

5   Q.  Ms. Morreale, have you ever used drugs in your life?

6   A.  Yes, I have.

7   Q.  What drugs?

8   A.  Marijuana.

9   Q.  And how long have you smoked marijuana?

10  A.  I've smoked marijuana a few years.

11  Q.  Focusing on December 2010 were you smoking marijuana at

12  that time?

13  A.  I was.

14  Q.  Have you ever used any other drugs?

15  A.  I have tried a couple -- another drug.

16  Q.  Which one?

17  A.  I have tried cocaine.

18  Q.  How many times?

19  A.  Once.

20  Q.  When was that?

21  A.  Um, in the year '99.

22  Q.  Have you ever been arrested for a drug-related offense?

23  A.  I have.

24  Q.  When was that?

25  A.  2003.

E8j9chr3                    Morreale - direct

1    Q.  And what were you arrested for?

2    A.  I was arrested for controlled substance, I believe.

3    Q.  For selling?

4    A.  Uh-huh.  I had possession -- a possession charge.

5    Q.  Possession with the intent to distribute?

6    A.  Yeah, I think so.

7    Q.  What drug?

8    A.  Cocaine.

9    Q.  And were you actually selling that cocaine that you had?

10   A.  Yes.

11   Q.  Were you selling by yourself or with other people?

12   A.  A little bit of both.

13   Q.  And the cocaine that you had at the time of your arrest,

14   where were you bringing it?

15   A.  I was bringing it back to another town.

16   Q.  From where?

17   A.  From Newburgh to Kingston.

18   Q.  Okay.  How long did you sell drugs for?

19   A.  I did it on and off maybe a year or two.

20   Q.  And besides that drug-related arrest have you ever been

21   arrested for anything else?

22   A.  I have be arrested before for petty larceny and nothing

23   else.

24   Q.  And that was for stealing something?

25   A.  Mm-hmm.

E8j9chr3                         Morreale - direct

1   Q.  What did you steal?

2   A.  Perfume.

3   Q.  Did you get prosecuted for that?

4   A.  Yes.  I did weekends in Ulster County.

5   Q.  You got sentenced to doing weekends?

6   A.  Mm-hmm.

7   Q.  For how long?

8   A.  I think it might have been 32 weekends.

9           MR. BAUER:  Ms. McInerney, can we pull up Government

10  Exhibit 204.

11  Q.  Ms. Morreale, I'm going to show you photographs that are

12  already in evidence.  They're going to appear on the screen

13  before you.

14          I want you to take a look at this photograph.  Do you

15  recognize the individual in this photo?

16  A.  Yes.

17  Q.  Who is it?

18  A.  L-1.

19  Q.  Do you know L-1 by any other names?

20  A.  Francis.

21  Q.  Francis?  Anything else?

22  A.  No -- James.

23  Q.  James.  How do you know L-1?

24  A.  I know him through a few people.

25  Q.  When did you first meet him?

1   A.   I met him I would like to say maybe 2008 I lived on Grand

2   Street.

3   Q.   And you were introduced to him by who?

4   A.   I was introduced to him through his cousin and a mutual

5   friend of ours.

6   Q.   Now back then or after you met him, did L-1 ever come to

7   your house?

8   A.   Yes.

9   Q.   For what purpose?

10  A.   He used to come and smoke with me and check and make sure

11  the kids would have ate or wanted something to eat.

12  Q.   So he'd come smoke with you; smoke what, marijuana?

13  A.   Mm-hmm.

14  Q.   And he -- or he'd want something to eat, you said?

15  A.   He would come check and see if my kids wanted anything to

16  eat.

17  Q.   Was L-1 part of any gangs?

18  A.   I believe he was a Blood member but I'm unsure.

19  Q.   Did you know what L-1 did for a living?

20  A.   Ran around the streets.  I don't think he ever had a real

21  job.

22  Q.   Do you know if he ever sold drugs?

23  A.   Yeah.

24  Q.   What drugs did he sell?

25  A.   Probably sold a little bit of everything; dope, crack.

E8j9chr3                          Morreale - direct

1    Q.  How do you know that?

2    A.  I was friends with him.  I used to see him with it.

3    Q.  Did he ever show you any of the drugs?

4    A.  I have seen the drugs here and there, yes.

5    Q.  Did he ever talk to you about his drug customers?

6    A.  Not really.

7    Q.  Did you ever see him out on the street selling drugs?

8    A.  Yes.

9    Q.  What streets?

10   A.  I used to see him on Liberty and Clinton, William Street,

11   Broadway and William.

12   Q.  Ms. Morreale, are you familiar with a gang known as the

13   Ashy Bandits?

14   A.  Yes.

15   Q.  Was L-1 an Ashy Bandit?

16   A.  I don't think so.

17   Q.  Did you ever see him with members of the Ashy Bandits?

18   A.  Yes.

19   Q.  Where?  Where did you see him with members of the Ashy

20   Bandits?

21   A.  Lander and Chambers.

22   Q.  When was this?  Approximately what year?

23   A.  Maybe '08.

24   Q.  Do you remember the names of any of those Ashy Bandits who

25   you saw him with?

E8j9chr3                          Morreale - direct

1    A.  I don't recall.

2    Q.  But you knew they were members of the Ashy Bandits?

3    A.  Yeah.

4    Q.  Now, Ms. Morreale, I'd like to draw your attention to the

5    early evening of December 14, 2010.  Where were you living back

6    then?

7    A.  I was living on 53 Chambers Street.

8            MR. BAUER:  Ms. McInerney, can we pull up Government

9    Exhibit 263.

10   Q.  Do you recognize the building in this photograph?

11   A.  Yes, I do.

12   Q.  What is it?

13   A.  It's my house.

14   Q.  The one --

15   A.  My old apartment.

16   Q.  Does it accurately reflect what it looked like back then?

17   A.  Yeah.

18   Q.  How long did you live there?

19   A.  A few months.  Maybe eight months to a year.  Maybe.

20   Q.  And that included December 2010?

21   A.  Yeah.

22   Q.  And you don't live there now though, right?

23   A.  No.

24   Q.  Why not?

25   A.  I moved away.  The street was trouble.

E8j9chr3                          Morreale - direct

1   Q.  Did anything happen to your actual apartment?

2   A.  My water boiler had broke -- had bursted and our apartment

3   was flooded with water.

4   Q.  Now, looking at this building you said you lived there.

5   Did you live in an apartment in that building?

6   A.  Yes.

7   Q.  What floor?

8   A.  I lived in the second floor.

9   Q.  Do you know which window was yours out --

10  A.  The first three that are in the row.

11  Q.  The first two -- on the right side of the photo?

12  A.  Yeah.

13  Q.  On the right -- on the right of the tree?

14  A.  The right of the tree, the first three windows above it.

15  Q.  The first three?

16  A.  Mm-hmm.

17  Q.  Okay.

18          MR. BAUER:  Ms. McInerney, can we pull up Government

19  Exhibit 260.

20  Q.  Do you recognize this building?

21  A.  Yeah.

22  Q.  What is it?

23  A.  That was my friend, Tarrence, house.

24  Q.  Where is that house?

25  A.  That's Chambers Street across from my house.

E8j9chr3                          Morreale – direct

1   Q.  Do you remember what number?

2   A.  Fifty maybe.

3   Q.  Had you been inside that building before?

4   A.  I had.

5   Q.  How would you describe that house?

6   A.  I would describe it as small apartment.  You would walk and

7   there would be a little hallway and a bedroom, the living room,

8   the kitchen off of the living room.  And I believe there might

9   have been another bedroom in the back.

10          (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   Q.  You said that you had been there before?

2   A.  Yes.

3   Q.  You were visiting your friend Tarrence?

4   A.  Uh-huh.

5   Q.  Do you know Tarrence by any other names?

6   A.  Cocky D.

7   Q.  When you would go there, what would you do with Tarrence?

8   A.  I would watch them play cards and drink.

9   Q.  You say them, you would watch them play cards.

10  A.  Yeah, he would have a couple of friends over and they would

11  be playing cards.

12  Q.  Do you remember the names of any of those friends?

13  A.  I remember a couple.  I remember Snoop; Sans, Row, and

14  Mike.

15  Q.  What did Tarrence do for a living?

16  A.  I think Tarrence may have been worked in carpentry or

17  something.  He also was selling drugs.

18  Q.  Was he selling drugs out of that house on Chambers Street?

19  A.  Yes.

20  Q.  When you were there, would customers come?

21  A.  Yes.

22  Q.  What drug was he selling?

23  A.  Probably crack and dope.

24  Q.  Getting back to December 14, 2010, those early evening

25  hours, where were you around dinner time that night?

E8jnchr4                          Morreale - direct

1    A.  I was in my house.

2    Q.  What were you doing?

3    A.  I was getting my kids fed and ready for bed.

4    Q.  So when you were there with your kids, was anyone else

5    there?

6    A.  No, it was me and my children.

7    Q.  Around that time did you have any visitors?

8    A.  Yes.

9    Q.  Who came to your apartment that night?

10   A.  L-1 had came to my house.

11   Q.  At that point was he still coming over your house and

12   visiting you regularly?

13   A.  He wasn't really stopping by that much, but he was coming

14   here and there.

15   Q.  On that night how long did he stay?

16   A.  He stayed a very few minutes.

17   Q.  Why didn't he stay longer?

18   A.  He asked me if he could come in and do something.  I told

19   him I was putting my children to bed and then he left.

20   Q.  He said he wanted to do something.  Did he explain what he

21   wanted to do?

22   A.  He didn't.  He just told me that he had some business, that

23   he needed to use a place in the house and to do something.

24   Q.  But you didn't let him do that?

25   A.  No, I did not let him in.

1    Q.   Did you see where he went?

2    A.   He went down the street off of Chambers to Broadway.

3    Q.   Did you see where he went there?

4    A.   To the Chinese spot called Panda on Broadway.

5    Q.   Is that near the corner of Broadway and Chambers?

6    A.   It's the corner of Chamber and Broadway.

7    Q.   Fast forwarding a few hours, to just after midnight, I

8    guess turning into December 15, 2010, were you still at your

9    apartment?

10   A.   Yes, I was.

11   Q.   Where physically in your apartment were you?

12   A.   I was laying beneath the windows that were shown on the

13   picture.

14   Q.   OK.  Why don't we pull up 263 again, please.  You were

15   laying under one of these windows?

16   A.   Yeah.  I was probably towards the middle one or the third

17   one over by the tree.

18   Q.   Why were you there under the window?

19   A.   We heard a lot of gunshots.

20   Q.   I am going to get to those in a second.  Before that did

21   you sit by that window?

22   A.   Yes, I used to smoke outside the middle window.

23   Q.   So was that a spot that you would --

24   A.   Yeah, it was like my little hangout spot.  I used to sit

25   there and hang out.

E8jnchr4                    Morreale - direct

1   Q.  When you would sit there, would you look out onto Chambers

2   Street?

3   A.  I would look out the window and smoke, yeah.

4   Q.  Would you smoke just cigarettes or something else?

5   A.  No, I would smoke marijuana and cigarettes.

6        MR. BAUER:  Ms. McInerney, can we now pull up

7   Government Exhibit 275, the 360 view.  Can we see the other

8   side of the street.

9   Q.  275 is that another angle of your house at 53 Chambers?

10  A.  Yes.  You mentioned gunshots, and we are going to get to

11  it, but I would like to break that down.  While you were

12  sitting there under the window, did you see out the window?

13  A.  Yeah.

14  Q.  There is that tree there.  In December were there leaves on

15  that tree, or had they fallen off by then?

16  A.  No, they fell off.

17  Q.  Did it obstruct your view at all?

18  A.  No.  The tree doesn't have much leaves.  Even if it was

19  full it doesn't.

20  Q.  Did you see anybody outside Tarrence's house?

21  A.  Yes, I did.

22  Q.  Who did you see out there?

23  A.  I saw Joker and him and a couple of his friends, M.A. and

24  Reese.

25  Q.  You saw Joker, you saw MA --

E8jnchr4                         Morreale - direct

1    A.  And Reese.

2    Q.  -- and you saw Reese?

3    A.  Yes.

4    Q.  Joker, do you know him by any other names?

5    A.  No, I don't.

6    Q.  Had you ever met him before?

7    A.  That was my first time that I have seen him around.

8    Q.  How did you know it was him?

9    A.  I didn't know that was him.  That was his name in the

10   newspaper.  I never really knew who he was.

11   Q.  You didn't know what Joker did for a living?

12   A.  No.

13   Q.  You saw some people hanging outside the house.  Was anyone

14   inside the house?

15   A.  I didn't get to see that there was people inside the house,

16   but I'm pretty sure there was because the people were outside

17   of it.

18   Q.  At some point did Joker or anybody else leave the outside

19   of the house?

20           MR. BUCHWALD:  Objection to the leading.

21   A.  Joker did not leave the front of the house.

22           THE COURT:  Was there an objection?

23           MR. BUCHWALD:  Yes.  Leading.

24           THE COURT:  Overruled.

25   Q.  So you are sitting there looking out the window, and what,

E8jnchr4                          Morreale - direct

1   if anything, did you see?

2   A.   Of anything that I seen while I was looking out the window?

3   Q.   Yes.

4   A.   I seen Joker and his friends outside, and then I had heard

5   something and then I seen a group of people come around the

6   corner.

7   Q.   What corner?

8   A.   Around the corner from the opposite side of my house.

9           MR. BAUER:   Ms. McInerney, can we rotate it I guess

10  270 degrees.

11  A.   About where the Jeep is from that corner.

12  Q.   Is that the corner of Chambers and First?

13  A.   Yes, it is.

14  Q.   You said you saw a group of people coming down there?

15  A.   Uh-huh.

16  Q.   Do you remember approximately how many?

17  A.   Around six to eight.

18  Q.   And do you remember what they looked like?  How they were

19  dressed?

20  A.   They were all around the same height.  They were all

21  dressed in black.  Their faces were covered.

22  Q.   All right.  And what did they do?

23  A.   They lined the three people up that there were outside

24  against the building and had one of them knock on the door, and

25  when they knocked on the door and they went to go open the

1  door, they had all pushed themselves all the way into inside

2  the house.

3  Q.  When they lined them up, did you see if they had anything

4  with them?

5  A.  They had a gun out and they had pushed the guy towards the

6  door to make him knock on the door.

7  Q.  There are six on eight people there, right?

8  A.  Uh-huh.

9  Q.  Could you see if they all had guns, or did you only see

10  some guns?

11  A.  I couldn't see if they all had guns.  I just had seen when

12  he grabbed one of the guys and made him to go to knock on the

13  white door.

14  Q.  Ultimately you said they forced them into the house?

15  A.  They all were inside the house.

16  Q.  And that includes all the robbers?

17  A.  Uh-huh.

18  Q.  And it includes --

19  A.  Joker remained outside by himself.

20  Q.  How long was the group inside?

21  A.  They were inside quite a while.  I would think maybe ten to

22  fifteen minutes.

23  Q.  And when they were inside, what, if anything, did you see

24  or hear?

25  A.  I didn't get to see anything, but I heard several gunshots.

E8jnchr4                          Morreale - direct

1   Q.  When you say several gunshots, how many, if you can

2   approximate?

3   A.  Maybe nine to thirteen.

4   Q.  Nine to thirteen.  You said Joker was outside?

5   A.  Joker remained outside.

6   Q.  What did you see Joker doing?

7   A.  I saw Joker trying to use his telephone and holding on to

8   the doorknob, putting force with his foot and his hand to keep

9   the door closed, to keep everybody inside.

10  Q.  You said he was trying to use his cell phone?

11  A.  I think he was trying to call the police.  He was on his

12  phone and holding the door with the other hand.

13  Q.  One hand had the phone --

14  A.  The other hand had the door.

15  Q.  The other hand had the door.

16          Could you see what was happening with the door?

17  A.  I couldn't really see.  The door just kept opening back and

18  forth like a little crack.

19  Q.  Just a little crack?

20  A.  Yeah, you couldn't really get to see who was on other side

21  of the door.  It was just opening back and forth a little bit.

22  Q.  When it was was opening back and forth, what was Joker

23  doing with it?

24  A.  Joker was still trying to hold the door closed, like keep

25  them inside, but they were trying force themselves out.

1   Q.  Could you hear what they were saying, if anything?

2   A.  I really couldn't hear what they were saying.  They were

3   all just, I just heard a whole bunch of yelling.  I couldn't

4   really hear what anybody was saying.

5   Q.  At some point, did the door open?

6   A.  The door did open.

7   Q.  Can you explain to the jury what you saw that led to the

8   door opening?

9   A.  Joker was holding the door with his foot in his one hand,

10  and he was trying to keep the people inside.  The people were

11  trying to come out.  And in the meantime, while he was trying

12  to hold the door, somebody had put a gun outside the door and

13  shot Joker.  I heard a gunshot, I saw the smoke come off his

14  face, and then he ran down First Street.

15  Q.  I'm sorry.  Let's take that one at a time.  You saw the

16  door open?

17  A.  I saw the door open a little bit.

18  Q.  Then you saw something reach outside the door?

19  A.  Uh-huh.

20  Q.  You said you saw a gun?

21  A.  I didn't see the gun nor Joker get shot.  I'm assuming that

22  he got shot in his face because I saw the smoke and heard a

23  loud scream.

24  Q.  You saw the smoke?

25  A.  I saw smoke coming off of his face.

E8jnchr4                        Morreale - direct

1   Q.  Then you heard a scream?

2   A.  Uh-huh.

3   Q.  Joker scream?

4   A.  It was Joker screaming.  It sounded like a pig squealing.

5   Q.  Like a pig squealing?  Then you said Joker ran to First

6   Street?

7   A.  Yeah.

8   Q.  Looking at this video here, looking at 275, he ran on

9   Chambers to First Street?

10  A.  Yes.

11  Q.  Then where did he --

12  A.  He ran to across the street.

13  Q.  He ran across the street?

14  A.  Uh-huh.

15  Q.  Did you watch him run?

16  A.  Yes, I did.

17  Q.  Ms. Morreale, did you ever see L-1 again after that night?

18  A.  No, I did not.

19  Q.  Did you ever talk to L-1 about the guys who lived at

20  Tarrence's house?

21  A.  We had spoke about it before.

22  Q.  What, if anything, did he say?

23  A.  He was just asking me if they were selling drugs over

24  there, if they were getting money.

25  Q.  When was this?

E8jnchr4                         Morreale – direct

1    A.  I'm not sure.  A little bit before the incident may have

2    happened.

3    Q.  What else, if anything, did he say?

4    A.  I'm sorry.  What?

5    Q.  What else, if anything, did he say at the house?

6          MR. BUCHWALD:  Can we get a time frame.  I'm sorry.

7    Q.  While you were living at that house for eight to twelve

8    months?

9    A.  He just was curious who was getting money over there and

10   what drugs they were selling, things like that.

11         MR. BAUER:  Your Honor, it's 12:45.

12         This is a good time for me to stop.

13         THE COURT:  OK.

14         THE COURT:  So let's take our luncheon break.  Please

15   be back in the jury room no later than 2 o'clock.  We'll get

16   started on time then.  Please do not discuss the case.

17         (Continued on next page)

18

19

20

21

22

23

24

25

1            (Jury not present)

2            THE COURT:  Ms. Morreale, you may step down, but I

3       need to be back here also before 2 o'clock.

4            (Witness not present)

5            THE COURT:  Anything for me?

6            MR. BUCHWALD:  Yes, your Honor.

7            THE COURT:  OK.

8            MR. BUCHWALD:  As your Honor is probably aware, we

9       have been discussing stipulations to cover the agent's

10      testimony.  There were some inconsistencies with respect to

11      Mr. Baynes' testimony.  The prosecutors and myself have worked

12      out a stipulation with respect to the Baynes inconsistencies

13      where we have agreed on four matters, but there's one matter

14      that we disagree on.  I am leaving it to your Honor as to what

15      is inconsistent, and then we will read the stipulation based on

16      how your Honor rules.

17           THE COURT:  OK.

18           MR. BUCHWALD:  I will just show the government.

19           (Counsel conferred)

20           MR. BUCHWALD:  If I might hand up, your Honor, the one

21      in dispute is item No. 3.

22           Let me give your Honor a chance to read it.

23           THE COURT:  OK.

24           MR. BUCHWALD:  What happened here, your Honor, I think

25      it is page 801 of the transcript.  On cross-examination, I

1    asked Mr. Baynes in substance, maybe you can find the exact

2    language.

3             THE COURT:  I am at 801.

4             MR. BUCHWALD:  Yes.  On 801 starting at line 12.

5        "Do you deny having told prosecutors that you believed

6    that Bash was the one who shot Joker?"

7             He responded, "I said Bash or Bow Wow."

8             In the 3500 material for Baynes, at 3501-7, pages 4

9    and 8 there appears, if your Honor has 3501-7.

10            THE COURT:  OK.

11            MR. BUCHWALD:  At page 4, not quite halfway down,

12   there is, "I thought Bash was the shooter, Quay Quay told me it

13   was Bow Wow."

14            Then again at page 8, the second item from the bottom

15   of the page, "Quay Quay said he saw Bow Wow shoot the guy.  I

16   thought Bash did it."

17            So I was asking him at page 801 what he thought.  This

18   goes to the fact that he thought it was Bash.  What we have

19   proposed in the stipulation is to recite exactly what I have

20   just reported to you.  The government believes that if that is

21   done, the fair response should be, "I thought Bash did it.

22   Quay Quay told me it was Bow Wow."

23            I mean the question I was putting to him is what did

24   you think.  He kept saying that he thought it was Bash and Bow

25   Wow, and that is contradicted by the 3500, which was that he

1     thought it was Bash.

2              MR. GOLTZER:  I, of course, would object to anything

3     attributed to Quay Quay having to do with Bow Wow, which is not

4     necessary and unduly prejudicial to Mr. Whitaker.

5              MR. NAWADAY:  Your Honor, first we take issue that

6     this is a prior inconsistent statement.  Baynes says, "I

7     believe I said it was Bash or Bow Wow."

8              To the extent your Honor rules that there is some

9     inconsistency with the 3500, we believe that the full

10    statement, prior statement should come in which, as

11    Mr. Buchwald set forth is "I thought Bash was the shooter.

12    Quay Quay told me it was Bow Wow."

13             In response to Mr. Goltzer's objection, of course, we

14    can have a limiting instruction that any of these prior

15    inconsistent statements that come in only come in for

16    impeachment purposes and not for their truth.

17             MR. GOLTZER:  *Bruton v. United States* stands the

18    proposition that there are certain instructions that jurors

19    just can't follow.  This would be one of them.

20             MR. BUCHWALD:  The part of that, "Quay Quay told me it

21    was Bow Wow isn't responsive to my question."

22             I was asking him, What did you think, and he kept

23    saying he thought it was either Bash or Bow Wow.  But that

24    isn't what he said in the 3500.  In the 3500 he said he thought

25    it was Bash.  Quay Quay told him it was Bow Wow.  So the

E8jnchr4                    Morreale – direct

inconsistency is that he's claiming now to have thought it was

Bash or Bow Wow, when in the past he said he thought it was

Bash.

          MR. GOLTZER:  I agree with Mr. Buchwald and join his

application and oppose the government's.

          THE COURT:  I think the way the stipulation is drafted

and would rule that that would be admissible.

          MR. BUCHWALD:  Thank you.

          THE COURT:  I do have a 1 o'clock, so you want to

gather up your notes.  It is a criminal matter, not that civil

lawyers are any better.

          (Luncheon recess)

```
 1                    A F T E R N O O N   S E S S I O N

 2                         (2:00 p.m.)

 3              THE COURT:  Is the government's witness just outside

 4     the door?

 5              MR. NAWADAY:  She is, your Honor.  Should we have her

 6     come in, your Honor?

 7              THE COURT:  No need.  I just want to make sure that

 8     she's here and ready to go.

 9              THE COURT:  Can I see the parties at sidebar for a

10     minute.

11              (At sidebar)

12              THE COURT:  I have not heard the 911 tape.

13              MR. BAUER:  It is coming in right now.

14              THE COURT:  It's coming in.  I ask because I also

15     don't know who is in the gallery and I don't know whether

16     Mr. Henry's family is here.  I imagine or I assume that some of

17     the folks there are Mr. Henry's family.

18              If so, do they know that the tape is going to be

19     played, and have they heard it before?  I wouldn't want them to

20     react in front of the jury is my concern.

21              MR. BAUER:  All relevant questions.  The answer is yes

22     to all of them.

23              THE COURT:  OK.

24              MR. BAUER:  We told them it was going to be played

25     during the trial.  We had a session where actually not the son
```

E8jnchr4                        Morreale - direct

1    but his wife came in and listened to it already.  So she's

2    heard it.  She didn't react particularly during our session.  I

3    can talk to her briefly to try to contain her reactions.  I

4    have no reason to think she will.

5            MR. GOLTZER:  Those folks are here for Whitaker?

6            MR. BUCHWALD:  Some of these people.

7            THE COURT:  I just want to make sure that the

8    government does whatever it can to insure that the jury is not

9    exposed to any reaction to the tape, which would be perfectly

10   natural.  I just want to make sure that the defendants get a

11   full and fair trial.

12           MR. BAUER:  That is fair.  I will just say something

13   briefly to them.

14           On the subject of the 911 call, our plan was to play

15   it once from second zero, it's 34 seconds, which is through the

16   screaming, the shots, and then the people talking right

17   afterwards.  Then I would like to ask to play just that last

18   part of the people talking, because it's kind of hard to hear,

19   twice.  I won't play the screaming again twice.  It is a six-

20   or seven-second part of it.  Rather than raise that for the

21   first time, since you had called the sidebar, I figured I would

22   raise it now.  That was my plan.

23           THE COURT:  Is there going to be any objection to its

24   admission?

25           MR. GOLTZER:  We object to it.

E8jnchr4                          Morreale - direct

1           MR. BAUER:  There was a stipulation to it.

2           THE COURT:  As long as it's coming in, obviously you

3    can do whatever you want with it.  I would ask obviously that

4    you be as careful as possible.

5           MR. BAUER:  OK.

6           MR. DRATEL:  Thank you, your Honor.

7           (In open court)

8           THE COURT:  The jury is here.  Can we get the witness

9    on the stand, please.

10          (Witness present)

11          THE COURT:  Please step forward and back on to the

12   witness stand.

13       (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1        (Jury present)

2            THE COURT:  Everyone please be seated.

3            Mr. Bauer.

4            MR. BAUER:  Thank you, your Honor.

5   Q.  Ms. Morreale, I had just a couple more questions for you.

6            First, you had said that from your window at 53

7   Chambers you saw the path that Joker ran after he had been

8   shot, right?  I didn't ask you about anyone else.  Did you see

9   anybody else exit the house.

10  A.  I believe that everybody had ran the same direction, like

11  behind him.

12  Q.  When you say everybody, does that include the robbers?

13  A.  Some of them had scattered, a couple of them had followed

14  behind him, and I'm not really positive where the rest of them

15  went.  I wasn't aware of where all of them went.  I saw a

16  couple of people follow behind Joker when he had ran.

17  Q.  OK.  My last question, Ms. Morreale.  I couldn't help but

18  notice during your testifying before that you were crying?

19  A.  Yes, I was.

20  Q.  Why were you crying?

21  A.  I guess just fear, being a little bit scared that I have to

22  come here and testify and I have my children at home.

23            MR. BAUER:  No further questions, your Honor.

24            THE COURT:  Cross-examination.

25            MR. GOLTZER:  No questions.

1             MR. GREENFIELD:  No questions either.

2             THE COURT:  Mr. Buchwald.

3    CROSS EXAMINATION

4    BY MR. BUCHWALD:

5    Q.  Good afternoon, Ms. Morreale.  Am I correct that the first

6    time that you were interviewed at all by law enforcement

7    authorities concerning the events of December 15, 2010 was in

8    February of this year?

9    A.  Yes.

10   Q.  Correct?

11   A.  Yes.

12            MR. BUCHWALD:  I have nothing else.

13            THE COURT:  Redirect?

14            MR. BAUER:  No, your Honor.

15            THE COURT:  Ms. Morreale, you may step down.

16            THE WITNESS:  Thank you.

17            (Witness excused)

18            MR. BAUER:  Your Honor, at this time the government

19   would like to read what I think is its last stipulation.

20            Is that OK?

21            THE COURT:  Yes.

22            MR. BAUER:  It's been premarked as Government Exhibit

23   903.

24            It reads, it is hereby stipulated and agreed to by the

25   parties that:

1       1.  If called to testify, an employee of the 911

2  emergency call system of Newburgh, New York, would testify that

3  Government Exhibit 281 is a compact disk containing a true and

4  correct recording of a telephone call placed to the 911

5  emergency call system from a telephone number with assigned

6  call No. 845-597-3721, the 3721 number, on December 15, 2010 at

7  approximately 12:24 a.m. in Newburgh, New York.

8       2.  If called to testify, Jason Henry, the 20-year-old

9  son of Jeffrey Henry, would testify based on a review of the

10 contents of his cell phone telephone number that the phone

11 number used by his father Jeffrey Henry at the time of his

12 death in December 2010 was 845-597-3721, the 3721 number."

13      Signed and dated August 18, 2014 by the parties.

14      The government would move to admit Exhibit 281, which

15 is the compact disk containing the 911 call as well as the

16 stipulation, 903.

17      THE COURT:  Very well.

18

19      (Government's Exhibits 281 and 903 received in

20 evidence)

21      MR. BAUER:  They are admitted, your Honor?

22      THE COURT:  They are.

23      MR. BAUER:  At this time the government would ask

24 permission to play that 911 call, and in particular from that

25 CD starting at the zero second mark going until approximately

1     the 35-second mark.

2              (Audio played)

3              MR. BAUER:  Then, your Honor, just to focus

4     specifically at the time after that that last shot, I think it

5     starts at the 28-second mark, if we could just play that one

6     more time.

7              (Audio played)

8              MR. BAUER:  That is all.

9              Thank you, your Honor.

10             THE COURT:  Yes.

11             Would the government please call its next witness.

12             MR. BAUER:  The government now calls Ramone McDermott.

13      RAMONE McDERMOTT,

14         called as a witness by the Government,

15         having been duly sworn, testified as follows:

16     DIRECT EXAMINATION

17     BY MR. BAUER:

18     Q.  Mr. McDermott, you might want to pull the microphone a

19     little closer to your mouth.  There you go.

20             Good afternoon, Mr. McDermott.  How old are you?

21     A.  21.

22     Q.  When did you turn 21?

23     A.  January 9, 2014.

24     Q.  Where were you born?

25     A.  Kingston, Jamaica.

e8jnchr4                           McDermott - direct

1    Q.   How long did you live in Jamaica?

2    A.   Until I was I think 15.

3    Q.   15?

4    A.   Yes.

5    Q.   So was that until the late 2000s?

6    A.   Yes.

7    Q.   Do you remember what year you came to the United States?

8    A.   Yes.

9    Q.   What year is that?

10   A.   2008.

11   Q.   When you came here did you come here legally or illegally?

12   A.   Legally.

13   Q.   Using what type of travel document?

14   A.   A work permit.

15   Q.   Is that permit still active now?

16   A.   Yeah -- no.

17   Q.   So now are you here legally or illegally?

18   A.   Illegally.

19   Q.   When you came to the U.S., where did you go?  What state?

20   A.   New York.

21   Q.   Where in New York did you go originally?

22   A.   Schenectady.

23   Q.   How long did you stay in Schenectady for?

24   A.   For a little over six months.

25   Q.   Where did you go after that?

e8jnchr4                           McDermott - direct

1   A.  Newburgh.

2   Q.  Was that in '08 or '09 that you came to Newburgh?

3   A.  2009.

4   Q.  How long did you live in Newburgh for?

5   A.  Until I got arrested.

6   Q.  And when was that?  When did you get arrested?

7   A.  January 31, 2011.

8   Q.  After that you were incarcerated?

9   A.  Yes.

10  Q.  You are still incarcerated now?

11  A.  Yes.

12  Q.  What were you arrested for?

13  A.  Robbery and assault.

14  Q.  What law enforcement agency arrested you?

15  A.  The City of Newburgh.

16  Q.  Have you since pled guilty to any charges stemming from

17  that arrest?

18  A.  Yes.

19  Q.  What charge?

20  A.  Assault.

21  Q.  Is that a felony?

22  A.  Yes.

23  Q.  When was that approximately that you pled guilty?

24  A.  January 30, 2012.

25  Q.  Have you been sentenced yet?

1   A.  No.

2   Q.  You are awaiting sentence?

3   A.  Yes.

4   Q.  Mr. McDermott, growing up, how far -- what grade -- did you

5   go in school?

6   A.  The 10th.

7   Q.  Tenth grade?

8   A.  Yes.

9   Q.  Did you finish the tenth grade?

10  A.  No.

11  Q.  Did you go to school in Jamaica or here in the U.S.?

12  A.  Jamaica.

13  Q.  Did you attend any school here in the United States?

14  A.  Yes.

15  Q.  What for?

16  A.  To get my GED.

17  Q.  Have you gotten your GED?

18  A.  No.

19  Q.  Have you ever used illegal drugs, Mr. McDermott?

20  A.  Yes.

21  Q.  What drugs?

22  A.  Marijuana.

23  Q.  Did you start smoking marijuana while you were in Jamaica?

24  A.  Yes.

25  Q.  Did you continue it when you came to the U.S.?

e8jnchr4                        McDermott - direct

1    A.  Yes.

2    Q.  When you were in the U.S. how often did you smoke

3    marijuana?

4    A.  Four, five times a day.

5    Q.  Four or five times each day?

6    A.  Yes.

7    Q.  Is that an estimate?

8    A.  Yes.

9    Q.  Have you ever held any legitimate jobs here in the U.S.?

10   A.  Yes.

11   Q.  What legitimate jobs have you had?

12   A.  Rephrase that question for me.

13   Q.  Have you earned money by committing crimes?

14   A.  Yes.

15   Q.  Have you ever earned money by when you weren't committing a

16   crime?

17   A.  No.

18   Q.  What crimes did you commit that earned you money?

19   A.  Selling weed and stolen clothes.

20   Q.  What's that?

21   A.  Selling weed and stolen clothes.

22   Q.  Selling weed and stolen clothes?

23   A.  Yes.

24   Q.  Stolen clothes, what do you mean by that?  Did you steal

25   clothes?

e8jnchr4                           McDermott - direct

1   A.  No.  I would get it from somebody else that stole it.

2   Q.  What would you do with the clothes once you got them?

3   A.  I would sell it to somebody else.

4   Q.  Did you know they were stolen when you got them?

5   A.  Yes.

6   Q.  Did you know where they were stolen from?

7   A.  Most of the times.

8   Q.  What types of stores were they stolen from?

9   A.  It was stolen from Woodbury, Macy's, T.J.Maxx.

10  Q.  Woodbury, that is a reference to Woodbury Common, the

11  outlet mall?

12  A.  Yes.

13  Q.  Would someone give you those stolen clothes or would you

14  buy them from someone?

15  A.  I would buy them from someone.

16  Q.  Then you sold it to other people?

17  A.  Yes.

18  Q.  Where was that?

19  A.  In the City of Newburgh.

20  Q.  When did you start doing that?

21  A.  In 2009.

22  Q.  2009?

23  A.  Yes.

24  Q.  Did you do it up until the time of your arrest in January

25  of 2011?

1   A.  Yes.

2   Q.  How much money were you making doing this?

3   A.  Sometimes I would make four, sometimes I would make eight

4   hundred.

5   Q.  Is that each day?  Each week?

6   A.  Each week.

7   Q.  Did you ever steal anything yourself?

8   A.  Yes.

9   Q.  What did you steal?

10  A.  Colognes.

11  Q.  Where did you steal the cologne from?

12  A.  A.J. Wright's.

13  Q.  Were you arrested for that?

14  A.  Yes.

15  Q.  What happened to that case?

16  A.  It got thrown out.

17  Q.  Mr. McDermott, you mentioned earlier that you were most

18  recently arrested in January 2011 for a robbery, is that right?

19  A.  Yes.

20  Q.  You pled guilty to assault in connection with that?

21  A.  Yes.

22  Q.  Is that in state court or federal court?

23  A.  State.

24  Q.  Why did you plead guilty to that crime?

25  A.  Because I stabbed somebody.

e8jnchr4                         McDermott - direct

1   Q.  That's my next question.  What did you do as part of that

2   robbery and assault.  Can you tell the jury?

3   A.  Yes, I stabbed somebody.

4   Q.  Were you by yourself or with other people?

5   A.  I was with someone else.

6   Q.  And who were you robbing?

7   A.  We was robbing a drug dealer.

8   Q.  Was that in Newburgh?

9   A.  Yes.

10  Q.  During the course of that robbery you stabbed the person

11  you were trying to rob?

12  A.  Yes.

13  Q.  How many other people were you with?

14  A.  Three.

15  Q.  Have you been sentenced yet?

16  A.  No.

17  Q.  I asked you that.  The crime you pled guilty to, does it

18  carry any maximum sentence?

19  A.  Yes.

20  Q.  What is that?

21  A.  Five to 25.

22  Q.  So five is the minimum and 25 is the maximum?

23  A.  Yes.

24  Q.  So, after pleading guilty, the lowest you can get is five

25  years?

Case 1:12-cr-00626-ER   Document 169   Filed 09/16/14   Page 187 of 310
1922
e8jnchr4                          McDermott - direct

1   A.  Yes.

2   Q.  At the time of your plea did the judge indicate any

3   particular sentence that he was inclined to give you?

4   A.  Yes.

5   Q.  Which is what?

6   A.  Seven.

7   Q.  Seven years?

8   A.  Yes.

9   Q.  When you pled guilty, did you do so pursuant to a

10  cooperation agreement with the government, either the state or

11  the federal government?

12  A.  No.

13  Q.  To this date have you entered any formal written agreement

14  to cooperate with the government?

15  A.  No.

16  Q.  Mr. McDermott, you have been subpoenaed to testify here

17  today, right?

18  A.  Yes.

19  Q.  In response to that subpoena, did you consider asserting

20  your Fifth Amendment rights to protect yourself so you wouldn't

21  get in trouble for testifying here today?

22  A.  Yes.

23  Q.  Has the court issued an order with regards to your

24  testimony?

25  A.  Yes.

1   Q.  What do you understand that that order requires you to do?

2   A.  To provide truthful information.

3   Q.  What, if any, protection does the order give you?

4   A.  That I can't get in trouble.

5   Q.  What about if you lie on the witness stand, does that order

6   protect from you that?

7   A.  No.

8   Q.  If you testify truthfully here today, are you expecting or

9   hoping that the government will do anything for you?

10  A.  Yes.

11  Q.  What are you expecting or hoping?

12  A.  Expecting a letter to my sentencing judge and immigration.

13  Q.  Sentencing judge and immigration, do what for them?

14  A.  I am expecting a letter.

15  Q.  A letter?

16  A.  Yes.

17  Q.  From the federal government?

18  A.  Yes.

19  Q.  One of those letters will go to your sentencing judge?

20  A.  Yes.

21  Q.  And the other one will go to --

22  A.  Immigration.

23  Q.  Did the government make any representations to you as to

24  what you would need to do in order to receive those letters?

25  A.  Yes.

1    Q.  What was that?

2    A.  Provide truthful information.

3    Q.  What is your understanding of what will go in those

4    letters?

5    A.  That I was of help to the federal government.

6    Q.  As a witness in this trial?

7    A.  Yes.

8    Q.  The fact that you met with the government prior to your

9    testimony, would that go in your letter as well?

10   A.  Yes.

11   Q.  What is your understanding as to what that letter might do

12   for you with regards to your sentencing judge?

13   A.  It might have the judge consider lowering, giving me the

14   lesser time.

15   Q.  Lesser sentence to go down to five years?

16   A.  Yes.

17   Q.  Will the judge be required to give you a lower sentence if

18   he gets that letter?

19   A.  No.

20   Q.  What about the immigration authorities?  What are you

21   hoping that the letter will do for that?

22   A.  They will consider letting me stay in America.

23   Q.  Consider letting you stay here?

24   A.  Yes.

25   Q.  Because otherwise what is your expectation as to what is

1    going to happen to you?

2    A.  I will be deported.

3    Q.  Did the government promise you that they would be able to

4    arrange to have you stay in the U.S.?

5    A.  No.

6    Q.  Did they make any promises as to what your sentence will be

7    or whether you will be able to stay in the U.S.?

8    A.  No.

9    Q.  What is your understanding of what happens if you lie on

10   the witness stand today with regards to those letters.

11   A.  I won't get any letter.

12   Q.  Let's talk about your marijuana selling, Mr. McDermott.

13   When did you first start selling marijuana.

14   A.  In 2010.

15   Q.  Where was it that you sold marijuana?

16   A.  260 First Street.

17              (Continued on next page)

18

19

20

21

22

23

24

25

E8j9chr5                          McDermott - direct

1   Q.  Is that a house?

2   A.  Yes.

3   Q.  In Newburgh?

4   A.  Yes.

5   Q.  Were you selling marijuana there up until the time of your

6   arrest in January 2011?

7   A.  Yes.

8           MR. BAUER:  Ms. McInerney, can we pull up Government

9   Exhibit 268, please.

10  Q.  Mr. McDermott I'm showing you a photograph that's already

11  in evidence.  It's there on the screen in front of you.  Do you

12  see that?

13  A.  Yes.

14  Q.  Do you recognize that house?

15  A.  Yes.

16  Q.  What house is it?

17  A.  That's 260 First Street.

18  Q.  That's the house that you sold marijuana out of?

19  A.  Yes.

20  Q.  Did it look the same as it does in the picture back in

21  2010?

22  A.  No.

23  Q.  What's different?

24  A.  Yes.

25  Q.  What is different?

E8j9chr5                          McDermott - direct

1   A.  The windows are boarded up.

2   Q.  The windows are boarded up?

3   A.  Yes.

4   Q.  Okay.  Did you live at that house, Mr. McDermott?

5   A.  No.

6   Q.  How was it that you came to sell marijuana out of that

7   house?

8   A.  I know the guy that was selling marijuana out of the house.

9   Q.  You knew the guy who was selling?

10  A.  Yes.

11  Q.  Who was his name?

12  A.  Pablo.

13  Q.  Pablo?

14  A.  Yes.

15  Q.  So how did it come to be that because you knew Pablo that

16  you had started selling?

17  A.  I told him that I was gonna pay him for two days out of the

18  week to sell marijuana out of the house.

19  Q.  Mr. McDermott, I think you're doing a good job of leaning

20  into the microphone, maybe an inch or two back so we can hear.

21          So you said you'd pay him in order to sell marijuana

22  out of the house for two days a week?

23  A.  Yes.

24  Q.  Were they a set two days?

25  A.  Yes.

E8j9chr5                          McDermott - direct

1   Q.  What days of the week were they?

2   A.  Mondays and Wednesdays.

3   Q.  When you sold marijuana out of that house on Mondays and

4   Wednesdays, was anybody else selling marijuana out of the

5   house?

6   A.  No.

7   Q.  How long was your day to sell marijuana?

8   A.  Until twelve -- until twelve the next morning.

9   Q.  Was it 24 hours?

10  A.  Yes.

11  Q.  Midnight to midnight?

12  A.  Yes.

13  Q.  Did you pay Pablo for this?

14  A.  Yes.

15  Q.  How much did you pay him?

16  A.  $500.

17  Q.  Per week?

18  A.  Yes.

19  Q.  Why is it that you wanted to sell marijuana out of this

20  particular house?

21  A.  Because they already got the customers already.

22  Q.  What do you mean?

23  A.  People already know that weed is being selled out of that

24  house.

25  Q.  Looking at the photograph Government Exhibit 268, can you

1    just explain briefly to the jury how it works when customers

2    would come to the house and how you would serve them?

3    A.  Yes.

4    Q.  Go ahead.

5    A.  The customer would come up the steps.  And he'd come in the

6    hallway.  And then I would open the slot.  And ask them what

7    they want.  They would tell me.  And I would serve the weed

8    through the slot.

9    Q.  You say a slot.  What kind of a slot?

10   A.  It's like a -- I would say like a -- like a circle in

11   the -- like a circle hole in the door.

12   Q.  Circle hole in the middle of the door?

13   A.  Yes.

14   Q.  Do you know if it was put in especially for that house?

15   A.  Yes.

16   Q.  When the customers come, would you open the door or would

17   you just go through the slot?

18   A.  I would open the slot.

19   Q.  How often would customers come to 260 First Street?

20   A.  Very regular.

21          MR. GOLTZER:  It's hard to hear, Judge.

22   Q.  Did you say very regularly?

23   A.  Yes.

24   Q.  So what does that --

25          THE COURT:  Mr. McDermott, perhaps if you don't lean

E8j9chr5                          McDermott - direct

1   into the microphone whenever you speak.  Just keep your head

2   where it is.

3   Q.  Were you selling a particular type of marijuana,

4   Mr. McDermott?

5   A.  Yes.

6   Q.  What kind?

7   A.  Regular.

8   Q.  Regular?  Did regular marijuana go by any other names?

9   A.  Chee.

10  Q.  Chee?

11  A.  Yes.

12  Q.  Anything else?

13  A.  Dirt.

14  Q.  When you say regular or dirt or chee what do you mean?

15  A.  Means low graded.

16  Q.  Lower grade?

17  A.  Yes.

18  Q.  So there's higher grade marijuana?

19  A.  Yes.

20  Q.  Where were you getting the regular marijuana that you sold?

21  A.  From the Bronx.

22  Q.  How much would you buy each time you went?

23  A.  Four or five pounds.

24  Q.  What would it look like when you bought it?

25  A.  It be compressed into brick.

1   Q.  And what size packages of marijuana were you selling?

2   A.  Nickels and dimes.

3   Q.  Does that refer to how much you charged for them?

4   A.  Yes.  Five dollars and ten dollars.

5   Q.  Did Pablo sell marijuana himself?

6   A.  No.  He asked somebody else to sell it for him.

7   Q.  Were those other people selling out of 260 First Street?

8   A.  Yes.

9   Q.  On the same days you were selling or on different days?

10  A.  Different days.

11  Q.  Who were those people?

12  A.  T.

13  Q.  T?  Anyone else?

14  A.  And Poppy.

15  Q.  And Poppy?

16  A.  Yes.

17  Q.  And they sold for Pablo?

18  A.  Yes.

19  Q.  Whose house was that, 260 First Street?

20  A.  Pablo was renting it out.

21  Q.  And who lived there?

22  A.  Poppy lived there and Kevin Burden.

23  Q.  Poppy lived there.  How about T?  Did T live there?

24  A.  T lived in the Bronx.

25  Q.  Did T stay there sometimes though?

E8j9chr5                      McDermott - direct

1   A.  Yes.

2   Q.  You said Kevin Burden?

3   A.  Yes.

4   Q.  Do you know him by any other names?

5   A.  Gotti.

6   Q.  Did anyone else live in this house on any of the floors?

7   A.  Yes.

8   Q.  Who was that?

9   A.  Kevin Burden's cousin.

10  Q.  What was the cousin's name?

11  A.  I'm not sure.

12  Q.  Was -- were they male or female?

13  A.  Female.

14  Q.  And did she live there by herself or with other people?

15  A.  She lived there with someone else.

16  Q.  Who is that?

17  A.  J-Mark.

18  Q.  Do you know J-Mark by any other names?

19  A.  Mallory.

20  Q.  What was Mallory's relationship to the cousin?

21  A.  That was his girl.

22  Q.  Mr. McDermott, looking around the courtroom today do you

23  recognize anyone from Newburgh?

24  A.  Yes.

25  Q.  Can you point them out and by describing an article of

1   clothing they're wearing and where they're sitting?

2   A.   That's Raymond Christian.  They called him Reckless.   In

3   the white, in the white shirt right there.

4            MR. BAUER:  Your Honor, noting that Mr. McDermott has

5   pointed out defendant Christian.

6            THE COURT:  The record will so reflect.

7   Q.   Do you recognize anyone else, anybody else from Newburgh?

8   A.   That's Bow Wow with the, I think, a gray shirt on.  And

9   that's Gucci with the brown shirt.

10           MR. BAUER:  Your Honor, let the record reflect that

11  Mr. McDermott identified defendants Whitaker and Thomas.

12           THE COURT:  Very well.  The record will so reflect.

13  Q.   Do you know Bow Wow's true name?

14  A.   No.

15  Q.   How about Gucci's?

16  A.   No.

17  Q.   How do you know Reckless?

18  A.   I know Reckless because everybody talks about him and I met

19  him one time in the Heights when I was walking with my brother.

20  Q.   You met him when you were walking in the Heights with your

21  mother?

22  A.   With my brother.

23  Q.   With your brother?

24  A.   Yes.

25  Q.   When was that, approximately?

E8j9chr5                              McDermott - direct

1    A.  That was in 2010.

2    Q.  In the Heights.  Do you remember what streets?

3    A.  It was Carson and South Lander.

4    Q.  Have you seen Reckless on any other occasion?

5    A.  Yeah, I seen him -- seen him on First Street before.

6    Q.  Did he ever come to the house on First Street?

7    A.  Not that I know of.

8    Q.  Have you ever seen him talking to Gotti?

9    A.  Yes.

10   Q.  Where was that?

11   A.  It was on First Street.

12   Q.  Was it near the house, 260 First Street?

13   A.  Close by.

14   Q.  Have you ever seen Reckless commit any crimes?

15   A.  No.

16   Q.  Let's move on to Gucci.  Have you ever spoken to Gucci?

17   A.  Yes.

18   Q.  When did you first meet him?

19   A.  He came to the weed spot.

20   Q.  Do you remember what year that is?

21   A.  That was 2010.

22   Q.  And has he been to the weed spot since that first time you

23   met him?

24   A.  Yes.

25   Q.  When he came, what would he do?

E8j9chr5                          McDermott - direct

1    A.  Smoke, chill.

2    Q.  Would he come talk to you?

3    A.  If I'm there, yeah, we'd talk.

4    Q.  Would he talk to anyone else?

5    A.  Gotti.

6    Q.  Anyone else besides Gotti?

7    A.  No.

8    Q.  Would he come to talk to J—Mark?

9            MR. DRATEL:  Objection.  He said no.

10           THE COURT:  Overruled.

11           THE WITNESS:  If he's there.

12   Q.  Would he talk to J—Mark if he's there?

13   A.  If he's there.

14   Q.  Have you seen Gucci in other parts of Newburgh?

15   A.  Yes.

16   Q.  Where?

17   A.  On Benkard and South Lander.

18   Q.  Have you ever seen Gucci sell drugs?

19   A.  No.

20   Q.  Have you ever seen him with a gun?

21   A.  Yes.

22   Q.  Where have you seen him with a gun?

23   A.  In the weed spot.

24   Q.  On one occasion or more than one occasion?

25   A.  More than one occasion.

E8j9chr5                          McDermott - direct

1   Q.  When was this?

2   A.  In 2010.

3   Q.  Was it the same gun or a different gun when you saw him on

    these multiple occasions?

5   A.  Same.

6   Q.  Same gun.  Can you describe the gun?

7   A.  It was the same gun he got arrested with.

8   Q.  Do you know what kind of gun?

9   A.  It was a revolver.

10  Q.  Do you remember what color or colors it was?

11  A.  Like a black with some silver on it.

12  Q.  Have you seen Gucci since your arrest in January 2011?

13  A.  Yes.

14  Q.  Where was that?

15  A.  In Orange County jail.

16  Q.  When was that, approximately?

17  A.  In the end of 2011.

18  Q.  And did you talk to him?

19  A.  Yes.

20  Q.  What did he say?

21  A.  He said he was going home.

22  Q.  He was going home, like leaving jail?

23  A.  Yes.

24  Q.  Did you talk about why he had been arrested?

25  A.  No -- he said that he -- he said that he got arrested for a

1    gun and they got nothing on him so he going home.

2    Q.  He got arrested for a gun and then what?

3    A.  They have no evidence so he's going home.

4    Q.  No evidence of what?

5    A.  Of -- that the gun is working.

6    Q.  That the gun was working.

7            And back then -- back when you were on the street, did

8    you ever -- besides seeing Gucci with guns, did you ever talk

9    to Gucci about guns?

10   A.  One time.

11   Q.  What did he say?

12   A.  He said he keep his -- his ratchet on him.

13   Q.  Keep his ratchet on him?

14   A.  Yeah.

15   Q.  Have you ever heard that term "ratchet" before?

16   A.  Yes.

17   Q.  Have you ever used it before?

18   A.  (No response).

19   Q.  The word?

20   A.  Yeah, I used it before.

21   Q.  What does it mean?

22   A.  It means a gun.

23   Q.  And when he said that, did he have a gun with him?

24   A.  Yes.

25   Q.  That same -- the same gun you talked about earlier?

E8j9chr5                        McDermott - direct

1    A.   Yes.

2    Q.   Moving on to Bow Wow.  When did you first meet him?

3    A.   2010.

4    Q.   And how did you come to meet him?

5    A.   He's always at the weed spot with Gotti.

6    Q.   That's the one here in Government Exhibit 268?

7    A.   Yes.

8    Q.   You said he's always there.  How often would he come to 260

9    First Street in 2010?

10   A.   Everyday.

11   Q.   When he came there, what would he do?

12   A.   He would -- sometime chill with Gotti, sometimes he bag his

13   crack up.

14   Q.   You said he'd bag his crack up?

15   A.   Yes.

16   Q.   Would you see him do that?

17   A.   Yes.

18   Q.   How much crack was he bagging up, if you know?

19   A.   Four or five grams.

20   Q.   You never sold crack before, did you?

21   A.   No.

22   Q.   But you've seen crack before?

23   A.   Yes.

24   Q.   How did you know that it was crack that Bow Wow was bagging

25   up?

E8j9chr5                          McDermott - direct

1   A.  Because I seen crack before.

2   Q.  Did Bow Wow say anything about the crack?

3   A.  Only if his phone ring he would say he gonna serve a cutty.

4   Q.  He'd say he was about to serve a cutty?

5   A.  Yes.

6   Q.  What's a cutty?

7   A.  A customer.

8   Q.  When Bow Wow was bagging up, was he by himself or with

9   other people?

10  A.  He's always with Gotti.

11  Q.  Where in the house would he be bagging up with Gotti?

12  A.  In the kitchen.

13  Q.  What did Bow Wow do with the crack after he bagged it up?

14  A.  He would put it in his pocket and leave.

15  Q.  You said that his phone would ring sometimes and he'd

16  mention a cutty?

17  A.  Yes.

18  Q.  Did you ever see him serving crack to a customer?

19  A.  Two times.

20  Q.  Where was that?

21  A.  Outside.  Outside 260 First Street.

22  Q.  Have you ever seen Bow Wow with any other drugs?

23  A.  Weed.

24  Q.  Was that when he was smoking it or selling it?

25  A.  Smoking it.

E8j9chr5                         McDermott - direct

1   Q.  Have you ever seen Bow Wow with ecstasy?

2   A.  Yes.

3   Q.  When was that?

4   A.  It was back in 2010.

5   Q.  Do you know how he got the ecstasy?

6   A.  Yes.

7   Q.  Can you explain it for the jury.

8   A.  It was Bow Wow and Gotti.  They had -- they had robbed this

9   dude in the hallway for a little bit over 150 pills, ecstasy

10  pills.

11  Q.  You said Gotti and Bow Wow robbed an ecstasy dealer in the

12  hallway.  Is that the hallway of 260 First Street?

13  A.  Yes.

14  Q.  And do you know what the ecstasy dealer was doing at that

15  house?

16  A.  They called them over there.

17  Q.  Do you remember who called him?

18  A.  Yes.

19  Q.  Who?

20  A.  Bow Wow.

21  Q.  And were you there when the ecstasy dealer came?

22  A.  Yes.

23  Q.  Where were you in the house?

24  A.  I was in between the kitchen and the living room.

25  Q.  And they were in the hallway, you said?

E8j9chr5                          McDermott - direct

1   A.  Yes.

2   Q.  And what did they do to him?

3   A.  They strong-armed him.

4   Q.  What does that mean, to strong-arm him?

5   A.  They beat him up.

6   Q.  So does that mean no gun was used?

7   A.  No.

8   Q.  And then after the robbery what, if anything, did you see

9   him and Gotti do with the ecstasy?

10  A.  They split it.

11  Q.  Did you see J-Mark at tall during this robbery?

12  A.  No.

13  Q.  Have you ever seen Bow Wow with a gun?

14  A.  No.

15  Q.  Let me ask you, Mr. McDermott.  Each of the defendants,

16  were they members of any gangs in Newburgh?

17  A.  Yes.

18  Q.  So starting with Bow Wow, was he a member -- what gang was

19  he a member of?

20  A.  The Bloods.

21  Q.  How about Gucci?

22  A.  The Bloods.

23  Q.  What about Reckless?

24  A.  I'm not sure.

25  Q.  What about Kev Gotti?

E8j9chr5                        McDermott – direct

1   A.  Bloods.

2   Q.  What about J-Mark?

3   A.  He's also a Blood.

4   Q.  What about you?

5   A.  I'm not a gang member.

6   Q.  Were you ever present in the weed spot when there would be

7   a gathering of members of the Bloods?

8   A.  Yes.

9   Q.  How about in 2010?

10  A.  Yes.

11  Q.  What was happening during this gathering?

12  A.  Sometimes Gotti would talk about people not doing what they

13  supposed to do.

14          MR. DRATEL:  Objection, your Honor.

15          THE COURT:  Overruled.

16  Q.  When we're saying it's a gathering, was it a meeting or

17  just an informal gathering?

18  A.  To me it looked like a meeting.

19  Q.  How many people would be there?

20  A.  Ten or more.

21  Q.  Did Pablo know the meetings were happening there?

22  A.  Yes.

23          MR. DRATEL:  Objection.

24          THE COURT:  Overruled.

25  Q.  Did Pablo know that Gotti was living at that house?

1   A.  Yes.

2   Q.  What type of arrangement, if anything, did Pablo and Gotti

3   have in terms of Gotti living and hosting Blood meetings in his

4   house?

5   A.  I don't know.

6   Q.  Did Gotti pay Pablo?

7   A.  No.

8           MR. DRATEL:  Objection.

9   Q.  As far as you know did Gotti pay Pablo?

10  A.  No.

11  Q.  And by that I mean did he pay him to live there?

12  A.  No.

13  Q.  And did he pay him to host the Blood meetings there?

14  A.  No.

15  Q.  Do you know if any money was exchanged between Gotti and

16  Pablo?

17  A.  No.

18  Q.  Well did Pablo ever give Gotti money?

19  A.  Yes.

20  Q.  Why is that?

21  A.  I don't know.

22          MR. BAUER:  I'm going to pull up a few photographs

23  here for you now, Mr. McDermott.  Let's start with Government

24  Exhibit 204, Ms. McInerney.

25  Q.  I'm going to pull up these photographs, if you can tell us

1   if you recognize these people.  Starting with 204, do you know

2   this person?

3   A.  Yes.

4   Q.  Who is it?

5   A.  L-1.

6   Q.  Do you know if he's a member of any gangs?

7   A.  Blood.

8   Q.  Do you know if he sells drugs?

9   A.  No.

10  Q.  No, you don't know?

11  A.  No.

12  Q.  Have you ever seen him with a gun?

13  A.  No.

14          MR. BAUER:  205, please, Ms. McInerney.

15  Q.  Do you know who that is?

16  A.  Yes.

17  Q.  Who is that?

18  A.  That's Rashawn.

19  Q.  Rashawn.  Do you know him by any other names?

20  A.  Bash.

21  Q.  Do you know what gang he's a part of, if any?

22  A.  Bloods.

23  Q.  Have you ever seen him with a gun?

24  A.  Yes.

25  Q.  Where have you seen him with a gun?

E8j9chr5                       McDermott - direct

1    A.   Renwick and South Lander.

2    Q.   What was he doing when he had that gun?

3    A.   We had an argument a couple weeks before.

4    Q.   So what did he do with the gun when you saw him?

5    A.   He looked like he wanted to I guess I would say shoot me.

6    Q.   Did he shoot though?

7    A.   No.

8    Q.   What was the argument over?

9    A.   A female.

10         MR. BAUER:  Government Exhibit 206, Ms. McInerney,

11   please.

12   Q.   Who is that?

13   A.   Kevin Burden.

14   Q.   Have you ever seen Kevin Burden with a gun?

15   A.   Yes.

16   Q.   How many times?

17   A.   Multiple times.

18   Q.   What did you see when you saw Gotti with a gun?

19   A.   J-Mark would bring the gun to him.

20   Q.   What would Gotti do with it?

21   A.   He would take it downstairs in the basement.

22         MR. BAUER:  Government Exhibit 208, Ms. McInerney.

23   Q.   Do you recognize that person?

24   A.   Yes.

25   Q.   Who is that?

E8j9chr5                          McDermott - direct

 1   A.  Baby E.

 2   Q.  Do you know what gang he's a part of?

 3   A.  Blood.

 4          MR. BAUER:  Government Exhibit 210, please,

 5   Ms. McInerney.

 6   Q.  Do you know who that is?

 7   A.  Snelly.

 8   Q.  And what's his gang affiliation?

 9   A.  Bloods.

10          MR. BAUER:  Government Exhibit 213, please.

11   Q.  Who is that?

12   A.  That's Poppy.

13   Q.  Poppy?

14   A.  Yes.

15   Q.  Was he one of the people who you said was selling at 260

16   First Street?

17   A.  Yes.

18   Q.  And he used to sell marijuana?

19   A.  Yes.

20   Q.  Did you ever see him sell anything else?

21   A.  No.

22          MR. BAUER:  Okay.  214.

23          I'm sorry.  Moving on.  We'll move ahead to 216.

24   BY MR. BAUER:

25   Q.  Do you know who that is?

1    A.  Banks.

2    Q.  You call him Banks?

3    A.  Yes.

4    Q.  Do you know him by any other names?

5    A.  No.

6    Q.  Have you ever seen him sell drugs?

7    A.  No.

8    Q.  Have you ever seen him with a gun?

9    A.  No.

10         MR. BAUER:  217, please.

11   Q.  Who is that?

12   A.  That's me.

13   Q.  What's that white thing on your head?

14   A.  I had got stabbed.

15   Q.  You had gotten stabbed?

16   A.  Stabbed in my --

17   Q.  In your ear?

18   A.  Yes.

19   Q.  Pointing to your ear.

20         Is that part of your robbery and assault?

21   A.  Yes.

22         MR. BAUER:  Government Exhibit 220, please.

23   Q.  Who is that?

24   A.  J-Mark.

25   Q.  Have you ever seen him sell drugs?

1948

1    A.  No.

2    Q.  Have you ever seen him -- well, you said you saw him giving

3    guns to Gotti, right?

4    A.  Yes.

5    Q.  Have you ever seen him with guns any other times?

6    A.  No.

7    Q.  Mr. McDermott, I'm going to draw your attention to just

8    after midnight on Wednesday, December 15, 2010.  Where were

9    you?

10   A.  (No response).

11   Q.  Just after midnight?

12   A.  260 First Street.

13   Q.  And what were you doing?

14   A.  Usual.

15   Q.  Usual?  That was a Wednesday.  Was that one of the days you

16   were selling marijuana out there?

17   A.  Yes.

18   Q.  What time did you get to the house?

19   A.  A little bit before twelve.

20   Q.  Do you remember anything out of the ordinary happening

21   after you got there?

22   A.  Yes.

23   Q.  Tell us what happened.

24   A.  Bow Wow showed up.

25   Q.  Approximately how long after midnight did he show up?

E8j9chr5                         McDermott – direct

 1   A.  Like ten minutes.

 2   Q.  Is that an estimate?

 3   A.  Yes.

 4   Q.  Was he by himself or with other people?

 5   A.  By himself.

 6   Q.  Do you remember what he was wearing?

 7   A.  Yes.

 8   Q.  What was he wearing?

 9   A.  Wearing a Hollister sweater.

10   Q.  What did you say?

11   A.  He was wearing a Hollister sweater.

12   Q.  Hollister sweater or sweatshirt?

13   A.  Sweatshirt.

14   Q.  What color was the sweatshirt?

15   A.  Like a dark blue.

16   Q.  Dark blue?

17   A.  Black.

18   Q.  Black or dark blue?

19   A.  Black.  Like a dark blue looking black.

20   Q.  So it's dark, either dark black or blue?

21           MR. GOLTZER:  Objection to leading, characterizing.

22           THE COURT:  Yes.  Don't lead, Mr. Bauer.

23           MR. BAUER:  I was just trying to -- sorry.  I will not

24   lead.

25   Q.  Were there any other colors on that sweatshirt besides the

E8j9chr5                              McDermott - direct

1    dark color?

2    A.  Red.

3    Q.  Red?  Was it equal parts red and whatever dark color you

4    said or --

5    A.  No.

6    Q.  Can you describe it a little more?

7    A.  More -- it was mostly dark.

8    Q.  And where was the red?

9    A.  Like right here.

10   Q.  Gesturing to your left chest area?

11   A.  Yes.

12   Q.  What else was he wearing besides that sweatshirt?

13   A.  Blue jeans.

14   Q.  Blue jeans?

15   A.  Yes.

16   Q.  How about on his feet?

17   A.  ACG boots.

18   Q.  ECG boots.  What are ECG boots?

19   A.  They Nikes.

20   Q.  Nike?

21   A.  Yes.

22   Q.  How about anything else?  Was he wearing anything else on

23   his body?

24   A.  Yes.

25   Q.  What?

1    A.  Mask.

2    Q.  He was wearing a mask on his head?

3    A.  No.  Over his face, covered his nose.

4    Q.  Okay.  So just can you describe the mask?  Was it one of

5    the masks that you pull down over your head or strap on the

6    back?

7    A.  Strap in the back.

8    Q.  Now was there anything peculiar or noticeable about the

9    clothes he was wearing?

10   A.  Yes.

11   Q.  What's that?

12   A.  It had blood on it.

13   Q.  And when you say that it had blood on it, how would you

14   describe that?

15   A.  Like a splatter.

16   Q.  A blood splatter?

17   A.  Yes.

18   Q.  Now where on his clothes were the -- was the blood?

19   A.  On the lower.

20   Q.  You're gesturing to your sweatshirt?

21   A.  Yes.

22        MR. GOLTZER:  Can't hear him.

23   Q.  I'm sorry.  You're gesturing to the lower part of a shirt

24   and you said the word "lower."

25        Is that right?

E8j9chr5                           McDermott - direct

1   A.  Yes.

2   Q.  So the lower sweatshirt area?

3   A.  Yes.

4   Q.  In the front -- you said in the front of the sweatshirt?

5   A.  Yes.

6   Q.  Anywhere else on his body?

7   A.  His pants.

8   Q.  On his pants, the whole part of the pants or only part of

9   it?

10  A.  No.  Just the front part of it.

11  Q.  The front part?

12  A.  Yes.

13  Q.  And you're gesturing to your thighs.  So there was blood on

14  the thighs?

15  A.  Yes.

16  Q.  Was there blood on the lower part of the jeans?

17  A.  No.

18  Q.  So you said he came to the house.  Where were you when he

19  came to the house?

20  A.  I was between -- I was in the hallway.

21  Q.  Which hallway?

22  A.  Like when you come through the first door, between there.

23  Q.  Is that where you would serve your customers from?

24  A.  No.

25  Q.  So what did he do when he came to the house?

1    A.  I opened the door for him.

2    Q.  And then what happened?

3    A.  Then he came inside.

4    Q.  When he came inside did he say anything to you?

5    A.  No.

6    Q.  Did he -- did you say anything to him?

7    A.  Yes.

8    Q.  What did you say?

9    A.  I asked him what happened.

10   Q.  What did he say?

11   A.  He didn't say nothing.

12   Q.  What did he do then?

13   A.  Asked me for a garbage bag.

14   Q.  Asked you for a garbage bag?

15   A.  Yes.

16   Q.  Did you get him a garbage bag?

17   A.  Yes.

18   Q.  From where?

19   A.  The kitchen.

20   Q.  Did you see what he did after you gave him the garbage bag?

21   A.  No.

22   Q.  Well, where did he go after you gave him the garbage bag?

23   A.  He went downstairs.

24   Q.  And after he went downstairs, did he come back up?

25   A.  No.

E8j9chr5                        McDermott - direct

1    Q.  Did you hear him leave?

2    A.  No.

3    Q.  Was there an exit from the house on the downstairs, the

4    basement area?

5    A.  Yes.  Two.

6    Q.  Mr. McDermott, later that day, did you see anyone else at

7    the weed spot?

8    A.  Yes.

9    Q.  Well, did you see Gotti --

10   A.  Yes.

11   Q.  -- who lived there?

12          Did you see J-Mark?

13   A.  I seen Gucci.

14   Q.  You saw Gucci.

15          Who was he with when you saw him?

16   A.  Gotti.

17   Q.  What were they doing?

18   A.  They was talking about something.

19   Q.  Approximately what time of the day was this?

20   A.  Around midday.

21   Q.  Around midday?

22   A.  Yes.

23   Q.  Sometime around noon, give or take?

24   A.  Yes.

25   Q.  Was that, just to be clear, was that approximately then

E8j9chr5                           McDermott - direct

1    twelve hours after Bow Wow came?  Is that what you mean?

2    A.  Yes.

3    Q.  And where were they, Gucci and Gotti?

4    A.  They were in the living room.

5    Q.  And where were you?

6    A.  I was in the passageway between the kitchen and the living

7    room.

8    Q.  Could you hear what they were saying?

9    A.  Yes.

10   Q.  Did they, as far as you know, know you were listening?

11   A.  No.

12   Q.  What, if anything, did Gucci say?

13   A.  He was telling Gotti, he was saying Gotti that I told -- I

14   told Reckless not to shoot -- shoot the dude and he still shoot

15   him.

16   Q.  So Gucci said that he told Reckless --

17            MR. DRATEL:  Objection, your Honor, with respect to

18   the repetition.

19            THE COURT:  The objection is overruled.

20   Q.  So Gucci said that he told Reckless what?

21   A.  Not to shoot the dude.

22   Q.  Not to shoot the dude?

23   A.  Yes.

24   Q.  But then what happened?

25   A.  He still did.

E8j9chr5                        McDermott - direct

1   Q.  Did you know what dude he was referring to?

2   A.  No.

3   Q.  After that conversation happened where did everybody go?

4   A.  Everybody left.

5   Q.  By "everybody" I meant Gotti and Gucci.

6       They left?

7   A.  Yes.

8   Q.  Did you come to find out who the dude was?

9   A.  Yes.

10      MR. DRATEL:  Objection, your Honor.

11      THE COURT:  Overruled.

12      MR. BAUER:  Ms. McInerney, can you pull up Government

13  Exhibit 221.

14  Q.  Do you recognize this person?

15  A.  Yes.

16  Q.  Who is it?

17  A.  Joker.

18  Q.  Do you know him by any other names?

19  A.  I called him -- I called him Bigga Dude.

20  Q.  Bigga Dude?

21  A.  Because he's -- he's always -- he's bigger than me so I

22  called him Bigga Dude.

23  Q.  So you talked to him before?

24  A.  Yeah.  A couple of times I talked to him.

25  Q.  Where was that?

E8j9chr5                          McDermott - direct

1    A.   I -- most of the time I see him in the restaurant by City

2    Terrace and First.  Sometimes he'd be -- like he be on Chambers

3    Street.

4    Q.   Do you know what he did to make money, Joker?

5    A.   Yes.

6    Q.   What?

7    A.   He sell drugs.

8    Q.   Do you know what kind of drugs?

9    A.   What -- I'm not really sure.

10   Q.   Do you know where he sold drugs?

11   A.   On Chambers Street.

12   Q.   Have you ever heard any of the defendants talking about

13   Joker?

14   A.   Gotti.

15   Q.   Well, okay.  How about any of these three defendants?

16   A.   Bow Wow.

17   Q.   Was Bow Wow talking to Gotti about Joker?

18   A.   Yes.

19   Q.   When was that?

20   A.   That was before -- that was before -- that was like a

21   couple days before Bow Wow came with the blood on his clothes.

22   Q.   Where was that?

23   A.   260 First Street.

24   Q.   So Gotti was there.  Was anyone else there?

25   A.   Yes.  A couple of people were there.

E8j9chr5                          McDermott - direct

1   Q.  Were those people members of the Bloods?

2   A.  Yes.

3   Q.  Was it part of or connected to a Bloods meeting, this

4   conversation?

5   A.  No.  It was just like a side conversation.

6   Q.  Where were Gotti and Bow Wow at the time?

7   A.  In the living room.

8   Q.  Where were you?

9   A.  Where I always be at, in between the living loom and the

10  kitchen, just in case the door.

11  Q.  So when the Bloods have these meetings at 260 First Street

12  were you allowed to attend those meetings?

13  A.  No.

14  Q.  Where would you stay during the meetings?

15  A.  I would stay in between the kitchen and living room by the

16  door.

17  Q.  Could you hear what was going on in the meetings?

18  A.  Yes.

19  Q.  For this meeting, the one where Bow Wow and Gotti talked

20  about Joker, who was present at that meeting?

21  A.  J-Mark was there and Snelly.

22  Q.  How about Gucci?  Was Gucci there?

23  A.  I'm not sure if he was there.

24  Q.  What about Reckless?

25  A.  No.  He was never there.

E8j9chr5                         McDermott - direct

1            MR. DRATEL:  I'm sorry.  I didn't hear that.

2            THE COURT:  Say that again.

3            THE WITNESS:  I said no, he's never there.

4   Q.  So what were Gotti and Bow Wow talking about with regards

5   to Joker?

6   A.  Gotti asked Bow Wow if he seen shun.

7   Q.  If he seen shun?

8   A.  Yes.

9   Q.  And what did Bow Wow say to that?

10  A.  He said:  What are you talking about?

11  Q.  What did Gotti say?

12  A.  Gotti said Joker.

13  Q.  And then what did Bow Wow say?

14  A.  Bow Wow said:  But I'm gonna keep my eye out for him.

15  Q.  Did Gotti say anything else?

16  A.  He said:  Yeah, because he got a lot of money down there.

17  Q.  When is the last time you saw Joker?

18  A.  Back in 2010.

19  Q.  Going back to what you heard Gucci saying midday on

20  December 15, 2010.  Did you talk with anyone else that day

21  about the events that night involving Bow Wow?

22  A.  Snelly.

23  Q.  I'll ask you about Snelly in a second.  Did you ever talk

24  to Gotti about it?

25  A.  Yes.

1    Q.  When was that?

2    A.  Like after Gucci left.

3    Q.  What did Gotti say to you?

4           MR. GOLTZER:  Objection.

5           THE COURT:  Overruled.

6    Q.  What did Gotti say to you?

7    A.  He said you better not say nothing.

8    Q.  Did he say what would happen to you if you said anything?

9    A.  He said he'd get me peter-rolled.

10   Q.  He'd get you peter-rolled?

11   A.  Yes.

12   Q.  Have you ever heard that term before?

13   A.  Yes.

14   Q.  Do you know what it means?

15   A.  It means he'd get me killed.

16   Q.  He would get you killed?

17   A.  Yes.

18   Q.  Have you heard that term used before -- I think I just

19   asked you that.

20          Who have you heard use that term before?  What type of

21   people?

22   A.  Gang members.

23   Q.  A particular gang?

24   A.  Bloods.

25   Q.  Did you know what he was referring to when he said to not

E8j9chr5                            McDermott - direct

1    say anything?

2    A.  Yes.

3    Q.  What was he referring to?

4    A.  He was referring to me giving Bow Wow the garbage bag.

5    Q.  And then after that day did Gotti say anything else about

6    the night Bow Wow showed up with the bloody clothes?

7    A.  No.

8    Q.  You mentioned that you talked to Snelly about it?

9    A.  Yes.

10   Q.  Snelly, the one in Government Exhibit 210 that we looked at

11   earlier?

12   A.  Yes.

13   Q.  When was that?

14   A.  That was later on in the day.

15   Q.  December 15 or another day?

16   A.  Yes.

17   Q.  December 15.  Okay.

18             Where did you see Snelly?

19   A.  On Lander Street.

20   Q.  Was anyone else there?

21   A.  Yes.

22   Q.  Who?

23   A.  Bigga.

24   Q.  What time of day was it?

25   A.  Like in the evening.

E8j9chr5                         McDermott - direct

1    Q.  And what, if anything, happened to you when you saw Snelly

2    and Bigga?

3    A.  Snelly told me I better keep my mouth shut.

4    Q.  Prior to Snelly telling you that, did he do anything to

5    you?

6    A.  Yes.

7    Q.  What did he do to you?

8    A.  He shot at me.

9    Q.  Did he hit you?

10   A.  No.

11   Q.  Did he hit anything that you were wearing?

12   A.  My shirt.

13   Q.  So he shot at you and it hit your shirt?

14   A.  Yes.

15   Q.  Where on your shirt?

16   A.  Right here.

17   Q.  Pointing to the left side?

18   A.  Yes.

19   Q.  How many shots did he shoot at you?

20   A.  One.

21   Q.  How far away from you was he?

22   A.  I was feets away from him.

23   Q.  Feets?

24   A.  Yes.  Feets.

25   Q.  Like how many feet, approximately?

E8j9chr5                          McDermott - direct

1  A.  I would say ten feet.

2  Q.  Okay.  Did you see what kind of gun it was?

3  A.  Yes.

4  Q.  What kind of gun?

5  A.  A .357.

6  Q.  And then Snelly told you you better not say anything?

7  A.  Yes.

8  Q.  What did you do after that, after Snelly shot at you?

9  A.  I left.

10  Q.  How did you feel after Snelly shot at you?

11  A.  I was -- I was scared.

12  Q.  Did you still go to the weed spot the same amount after

13  that?

14  A.  No.

15  Q.  Did -- what does that mean?  Did you stop going altogether

16  or just less?

17  A.  I just go less.

18  Q.  Did you keep paying Pablo even though you didn't go?

19  A.  Yes.

20          MR. BAUER:  Your Honor, one moment.

21          (Pause)

22          MR. BAUER:  No further questions, your Honor.

23          THE COURT:  Cross-examination.

24          Mr. Goltzer.

25          MR. GOLTZER:  Thank you.

1    CROSS-EXAMINATION

2    BY MR. GOLTZER:

3    Q.  Did you ever lie in an attempt to get yourself out of

4    trouble?

5    A.  Not that I remember.

6    Q.  Are you sure?

7    A.  Yes.

8    Q.  When you got arrested for the assault case or the robbery

9    case that put you in front of a judge and caused you to plead

10   guilty, that was on January 30 of 2011; is that right?

11   A.  31st.

12   Q.  I stand corrected.  January 31st, 2011?

13   A.  Yes.

14   Q.  Were you in the company of the police officers who arrested

15   you?

16   A.  Yes.

17   Q.  And they took you down to a police office?

18   A.  They took me to the station.

19   Q.  They took you down to a police station?

20   A.  Yes.

21   Q.  And they sat you down in a chair and did something called

22   reading you your Miranda warnings, right?

23   A.  Yes.

24   Q.  And they told you that you had a right to a lawyer; is that

25   right?

E8j9chr5                      McDermott - cross

1   A.  Yes.

2   Q.  And you understood that?

3   A.  Yes.

4   Q.  They told you you had a right to remain silent?

5   A.  Yes.

6   Q.  And you said you understood that, right?

7   A.  Yes.

8   Q.  They told you that anything you said could and would be

9   used against you in a court of law, right?

10  A.  Yes.

11  Q.  And you understood that?

12  A.  Yes.

13  Q.  And they told you that if you wanted to stop questioning at

14  any time to have a lawyer, you could do that, right?

15  A.  Yes.

16  Q.  And you understood that?

17  A.  Yes.

18  Q.  And they told you if you could not afford a lawyer, they

19  would get one for you?

20  A.  Yes.

21  Q.  And then they asked you if you still wanted to talk to

22  them, right?

23  A.  Yes.

24  Q.  And you told them that, indeed, you did?

25  A.  Yes.

E8j9chr5                         McDermott - cross

1   Q.  And you lied?

2   A.  No.

3   Q.  Well, you told them that you were with three people; is

4   that right?

5   A.  Yes.

6   Q.  And you told them that the three people were giving you a

7   ride to a weed spot; is that right?

8   A.  I'm not sure.

9   Q.  Well did you tell them that three people were giving you a

10  ride to a weed spot so that you could buy a bag of weed?

11  A.  (No response).

12  Q.  Didn't you tell the police you were going to the weed spot

13  to buy a bag of weed?

14  A.  I'm not sure.

15  Q.  Well --

16          MR. GOLTZER:  May I approach the witness?

17          THE COURT:  You may.

18          MR. GOLTZER:  3503-20.

19  Q.  Would you please read the highlighted portion to yourself.

20  And let me know when you're finished reading it, sir.

21          Have you read that?

22  A.  Yes.

23  Q.  Does that help you to remember or refresh your recollection

24  with respect to whether Day Day and three other guys were going

25  to take you to a weed spot to buy a bag of weed?

E8j9chr5                      McDermott - cross

1   A.  Yes.

2   Q.  And isn't that what you told the police?

3   A.  Yes.

4   Q.  That was part of what you told the police?  You told them

5   other things as well?

6   A.  Yes.

7   Q.  And that statement that they were taking you there to buy a

8   bag of weed was absolutely false, wasn't it?

9   A.  We was going to buy weed at first.

10  Q.  You bought five pounds of weed at a time; is that right?

11  A.  Yes.

12  Q.  You would drive down to the Bronx or take a train?

13  A.  Drive.

14  Q.  And whose car would you drive to the Bronx?

15  A.  Rental.

16  Q.  Who?

17  A.  It would be a rental car.

18  Q.  You would pay money to buy a rental car, right?

19  A.  Yes.

20  Q.  How often would you go to the Bronx to buy your four or

21  five pounds of weed?

22  A.  Once a week.

23  Q.  So you were selling four or five pounds of weed a week?

24  A.  Yes.

25  Q.  You were paying somebody $500 for the privilege of selling

E8j9chr5                          McDermott - cross

1    out of 260 First Street, right?

2    A.  Yes.

3    Q.  How much would you pay for this low-grade weed per pound?

4    A.  Sometimes -- all depends -- all depends if it's really

5    brown I would get it for 7.  If it's green I would get it for

6    950.

7    Q.  You weren't doing this as a charitable venture, were you?

8    A.  No.

9    Q.  You were doing this to make a profit, weren't you?

10   A.  Yes.

11   Q.  And you were making a profit every week?

12   A.  Yes.

13   Q.  And how much of a profit were you making?

14   A.  Off of -- off every quarter pound I would make $500.

15   Q.  You would make $500 off a quarter?

16   A.  Yes.

17   Q.  You would make $2,000 per pound?

18   A.  Yes.

19   Q.  You would make $10,000 a week?

20   A.  Basically.

21   Q.  It's a great country, isn't it?

22           MR. BAUER:  Objection.

23           THE COURT:  Sustained.

24   Q.  How many weeks did you make $10,000 a week?

25   A.  Not every week.

E8j9chr5                          McDermott - cross

1    Q.  How often did you make $10,000 a week?

2    A.  Maybe a good month, if it's one of those good months I get

3    maybe one week out of the month where I make it.

4    Q.  Did you ever find a week when you lost money?

5    A.  Most weeks.

6    Q.  Most weeks you lost money?

7    A.  Yes.

8    Q.  Aren't you being modest?  Did you make over a hundred

9    thousand dollars selling pot?

10   A.  I wasn't counting.

11   Q.  You weren't paying taxes either?

12   A.  No.

13   Q.  Never occurred to you to pay an income tax on any of that

14   money, did it?

15   A.  It's illegal.

16   Q.  To pay taxes?

17   A.  No.

18   Q.  It's also illegal to pay -- not to pay taxes?

19   A.  It's illegal to pay tax on drug money.

20   Q.  Is that your understanding?

21   A.  Yes.

22   Q.  Did you seek legal advice in that regard?

23   A.  No.

24   Q.  Did you go to an accountant and ask him if you were not

25   entitled to pay taxes or required to pay taxes on that money?

1   A.  No.

2   Q.  Do you know what income tax evasion is?

3   A.  No.

4   Q.  Did you ever hear the notion that it's a felony not to pay

5   your taxes?

6   A.  Yes.

7   Q.  And that's the felony you committed when you didn't pay

8   taxes on your weed profits, right?

9   A.  (No response).

10  Q.  Are you confused by that question or are you not sure that

11  you were supposed to pay taxes?

12  A.  I never seen drug dealers pay tax before.

13  Q.  Have you ever seen the United States government ask

14  somebody who was guilty of dealing pot to the tune of $10,000 a

15  week to payback taxes?

16  A.  No.

17  Q.  That's because these folks haven't asked you to take a

18  nickel out of your pocket, have they?

19  A.  No.

20  Q.  Now, the fact that you were making that kind of money

21  selling pot and buying four to five pounds of pot a week,

22  that's your testimony now, right?

23  A.  Yes.

24  Q.  Is it still your testimony that you needed three people to

25  drive you somewhere to buy a bag of weed?

E8j9chr5                        McDermott - cross

1   A.  Well, I pleaded guilty to that already.

2   Q.  Was that my question.

3           Did you understand my last question?

4   A.  No.

5   Q.  You just told this jury that "we were going to buy a bag of

6   weed," is that correct?

7   A.  I told the police that brought me to Newburgh.

8   Q.  And didn't you just tell this jury that, in fact, you were

9   going to buy a bag of weed?

10  A.  That's what the paper stated.

11  Q.  Is that what you said to this jury ten minutes ago, "we

12  were really going to buy a bag of weed"?

13  A.  That's what it said on the paper that I said.

14  Q.  Is that what you said to this jury?  That it was really

15  true?  You were going to buy weed?  Didn't you say that?

16  A.  I said -- I said what the paper said.

17  Q.  Well what the paper said wasn't true, was it?

18  A.  It's in black and white.

19  Q.  Does that mean it's true?

20  A.  If it's in black and white.

21  Q.  You mean if it's in black and white, it's true?

22  A.  If it's in black and white, it's written by the

23  department -- the Newburgh -- the City of Newburgh police

24  department, it's true.

25  Q.  Okay.  So whatever the Newburgh police department wrote on

E8j9chr5                          McDermott - cross

1    that piece of paper is true?

2    A.  Well, if it has -- if they say I said it.

3    Q.  You did say it, didn't you?

4    A.  I probably -- I'm not sure.  I probably did.

5    Q.  And if you said it, it was a lie, wasn't it?  Or was it

6    true?  Because it was in black and white?

7    A.  Most of it was true.

8    Q.  Was it true that you went to buy a bag of weed?

9    A.  At first.

10   Q.  So you didn't know that anybody was going to commit a

11   robbery?

12   A.  Not until we got to the location.

13   Q.  It came as a complete surprise to you?

14   A.  No.

15   Q.  Wasn't it planned?

16   A.  Not until we got to the location.

17   Q.  Didn't you know it was going to happen before that?

18   A.  Outside of the location.

19   Q.  So when you were outside of the location you guys decided

20   not to buy a bag of weed but rather to rob the place; is that

21   right?

22   A.  Yes.

23   Q.  Well let's get back to my original question.  As somebody

24   who was buying four to five pounds of weed a week and making up

25   to $10,000 a week, were you somebody who needed three people to

E8j9chr5                          McDermott - cross

1    give you a ride to this location to buy a bag of weed?

2    A.  Yes.

3    Q.  Because out of the four or five pounds that you bought

4    every week, you couldn't have enough leftover to roll yourself

5    a couple of joints?

6    A.  I served regular weed he sells -- and the guy sells exotic.

7    Q.  So you wanted to rob some good stuff?

8    A.  Yes.

9    Q.  And how many guns were there?

10   A.  Only one.

11   Q.  Only one?

12   A.  Yes.

13   Q.  What did you have?

14   A.  A knife.

15   Q.  And what did you do with the knife during the attempted

16   robbery?

17   A.  I stabbed somebody.

18   Q.  Didn't stab him in the hand?

19   A.  No.

20   Q.  Where did you stab him?

21   A.  I'm not sure.

22   Q.  You stabbed him in the head, didn't you?

23   A.  I wasn't looking.

24   Q.  You didn't know you stabbed him in the head?

25   A.  I got stabbed so I was holding my.

E8j9chr5                        McDermott - cross

1   Q.  Did you know where you stabbed him?

2   A.  I wasn't sure but I know I stabbed him.

3   Q.  Are you sure you had a knife?

4   A.  Yes.  I know.  I'm sure I had a knife.

5   Q.  Are you sure the knife was in your hand?

6   A.  Yes.

7   Q.  Are you sure you picked the knife up over your head like

8   this?

9           MR. GOLTZER:  Indicating I'm holding a knife in a

10  stabbing position, Judge.

11  Q.  Did you do that?

12  A.  Yes.

13  Q.  And did you bring your hand down?

14  A.  Yes.

15  Q.  On another human being?

16  A.  Yes.

17  Q.  And you stabbed him somewhere, right?

18  A.  Yes.

19  Q.  You found out you stabbed him in the head?

20  A.  After I went to court I found out.

21  Q.  Were you trying to kill him?

22  A.  No.

23  Q.  You know you hurt him?

24  A.  Yeah, I'm aware of that.

25  Q.  And your case went on for about a year before you pled

1    guilty?

2    A.  Yes.

3    Q.  And you had originally told the police, "We went there and

4    I gave the guy the money and he gave me the weed."

5          Did you tell the police that?

6    A.  I'm not sure.

7          MR. GOLTZER:  May I approach the witness again?

8          THE COURT:  You may.

9    Q.  Mr. McDermott, would you please read the highlighted part

10   to yourself.

11         Let me know when you've finished that, Mr. McDermott.

12         Have you read that?

13   A.  Yes.

14   Q.  Are you aware, Mr. McDermott, that when you were being

15   questioned by the police on the day that you were arrested,

16   they were taking down everything you said word for word?

17   A.  (No response).

18   Q.  Weren't you given a copy of the statements that you made to

19   the police as part of your state case?

20   A.  Yes.

21   Q.  And you read it, right?

22   A.  No, I didn't read it.

23   Q.  Your lawyer didn't show it to you?

24   A.  Yes.

25   Q.  He did, right?

E8j9chr5                          McDermott - cross

1    A.  I didn't read it.

2    Q.  I'm sorry?

3    A.  But I didn't read it.

4    Q.  Did he read it to you?

5    A.  Yes.

6    Q.  And he told you what you said?

7    A.  Yes.

8    Q.  And this helps you remember that he told you what you said,

9    right?

10   A.  Yes.

11   Q.  And what you told the police was, and I quote.  They asked

12   you:  In your own words can you tell me what happened, right?

13   A.  Yes.

14   Q.  And you said, "Day Day and three other guys were going to

15   take me to go buy a bag of weed."

16          We already agreed you told them that, right?

17   A.  Yes.

18   Q.  And then you said, "We went there and I gave the guy the

19   money and he gave me the weed."

20          You told them that?

21   A.  Yes.

22   Q.  And then you told them, "Day Day and two other guys started

23   stabbing the guy that I got the weed from.  I saw the guy that

24   was the guy who sold me the weed start smashing the window.  I

25   saw Day Day pull out a gun and I ran out through the door, the

E8j9chr5                         McDermott - cross

1    door the guy already smashed."

2              Did you say that?

3    A.  Yes.

4    Q.  And then you said to them, "The guy swung at me and started

5    to try and stab me so I got scared and pulled the knife out of

6    my pocket and stabbed him in his head."

7              Did you say that?

8    A.  The paper says that.

9    Q.  Well, you said it, didn't you?

10   A.  I'm not sure.

11   Q.  Do you deny it?

12   A.  No.  I did not.

13   Q.  "I dropped and the knife outside on the sidewalk."

14             Did you say that?

15   A.  Yes.

16   Q.  "I ran down the street."

17             Did you say that?

18   A.  Yes.

19   Q.  "I saw the red car that I was driven in coming up Broadway.

20   I told them I got stabbed and had to go to the hospital.  And I

21   got in the car."

22             Did you say that?

23   A.  Yes.

24   Q.  "They told me that they had to pick someone up on Galloway

25   first."

E8j9chr5                          McDermott - cross

1              Did you say that?

2    A.   Yes.

3    Q.   Then they asked you to describe the other folks you were

4    with; is that correct?

5    A.   Yes.

6    Q.   Did you lie in an effort to get yourself out of that?

7    A.   No.

8    Q.   When you stood before the judge a year later and you pled

9    guilty you were placed under oath?

10   A.   Yes.

11   Q.   And you told the judge I knew there was a planned robbery,

12   right?

13   A.   Yes.  Outside the location.

14   Q.   And you admitted to being part of a planned robbery, didn't

15   you?

16   A.   Yes.

17   Q.   And you admitted committing assault in the first degree,

18   didn't you?

19   A.   Yes.

20   Q.   You had a year to go over the facts of your case, right?

21   A.   Yes.

22   Q.   And you decided to enter a guilty plea, right?

23   A.   Yes.

24   Q.   Because they were going to set the case down for trial and

25   you weren't going to win, right?

E8j9chr5                    McDermott - cross

1   A.  (No response).

2   Q.  Did you think you were going to win?

3   A.  I wouldn't have known if I was going to win.  I already

4   pled guilty.

5   Q.  And the deal you made involved a plea to something called

6   assault in the first degree in violation of the New York Penal

7   Law, right?

8   A.  Yes.

9   Q.  And the judge, unlike this courthouse, made you a promise,

10  right?

11  A.  Yes.

12  Q.  They don't make promises here.  You know that?

13          MR. BAUER:  Objection, your Honor.

14          THE COURT:  Overruled.

15          MR. GOLTZER:  Withdrawn.

16  BY MR. GOLTZER:

17  Q.  The promise he made to you was that he would cap your

18  sentence at seven years, right?

19  A.  Yes.

20  Q.  You were 18 years of age at the time, right?

21  A.  Yes.

22  Q.  And you were eligible for something called youthful

23  offender treatment?

24  A.  Yes.

25  Q.  And youthful offender treatment is special treatment given

1   to somebody who is under 19 years of age so that he's not left

2   with a criminal record.

3           You understand that, right?

4   A.  Yes.

5   Q.  But the judge said he wasn't going to do that, right?

6   Because the prosecution was recommending against it?

7   A.  I'm not sure.

8   Q.  But you knew that if you ended up with a felony for assault

9   in the first degree not only would you go to jail but you were

10  going to be sent out of the United States forever?

11  A.  Yes.

12  Q.  Because that's what's known as an aggravated felony; is

13  that right?

14  A.  Yes.

15  Q.  And an aggravated felony means that there's nothing anybody

16  can do to keep you here, unless the President or the Attorney

17  General of the United States gives you a special pass, right?

18  A.  I'm not sure about that.

19  Q.  But you knew you weren't getting it on your own, correct?

20  A.  Yes.

21  Q.  And you didn't want to do the seven years, did you?

22  A.  I wasn't worried about the time.

23  Q.  You weren't worried about doing seven years?

24  A.  No.

25  Q.  On the same day you pled guilty you told the prosecutor, "I

E8j9chr5                          McDermott - cross

1    can help you with the Joker murder," didn't you?

2    A.  No.

3    Q.  You first began to cooperate or try to cooperate with the

4    prosecution in January of 2012, didn't you?

5    A.  I'm not sure about the date.

6    Q.  It was right after you took your plea, wasn't it?

7    A.  I'm not sure about the date.

8    Q.  It was after you took your plea, wasn't it?

9    A.  I think so.

10   Q.  And it was before you got sentenced, wasn't it?

11   A.  (No response).

12   Q.  You haven't been sentenced yet.

13   A.  Yes.

14   Q.  And you want them to write two letters?

15   A.  Yes.

16   Q.  One letter to immigration, right?

17   A.  Yes.

18   Q.  So you can stay here?

19   A.  Yes.

20   Q.  When you came here in 2008, was it, you were fifteen years

21   old?

22   A.  Yes.

23   Q.  What kind of a working visa did you apply for?

24   A.  (No response).

25   Q.  At the age of fifteen?

E8j9chr5                          McDermott - cross

1    A.  Entertainment.

2    Q.  What?

3    A.  In entertainment.

4    Q.  Entertainment.  Are you a singer, a dancer, a guitar --

5    A.  Dancer.

6    Q.  What kind of dancing do you do?

7    A.  Regular dancing.

8    Q.  Regular dancing.  Is that the same as regular marijuana?

9            MR. BAUER:  Objection.

10           THE COURT:  Sustained.

11   Q.  Now, you never made a nickel as a dancer, did you?

12   A.  Yeah, I made money.

13   Q.  How much did you make as a dancer?

14   A.  It wasn't enough.

15   Q.  It wasn't $10,000 a month?

16   A.  No.

17   Q.  It wasn't $10,000 a week?

18   A.  No.

19   Q.  The United States let you in.  Is that what happened?

20   A.  Yes.

21   Q.  And it was based on your written application to them,

22   right?

23   A.  Yes.

24   Q.  And did you have help with the written application?

25   A.  Yes.

1   Q.  And who helped you?

2   A.  I had a manager.

3   Q.  You had a manager?  And you made statements on that

4   application to the effect that you were coming to the United

5   States for a particular period of time to do a particular

6   thing, right?

7   A.  Yes.

8   Q.  You didn't tell the United States of America I'm coming

9   here to go to Schenectady to do drugs, did you?

10  A.  No.

11  Q.  You didn't tell them that you were going to go to Newburgh

12  to make $10,000 a week and not pay your taxes, did you?

13  A.  No.

14  Q.  You didn't tell them that you were coming here to be a

15  criminal, did you?

16  A.  No.

17  Q.  You asked the United States for a chance, right?

18  A.  Yes.

19  Q.  You asked the United States for a chance to do the right

20  thing?  To work here?

21  A.  Yes.

22  Q.  Like many other immigrants who want to come here and do the

23  right thing for themselves and their family, right?

24  A.  Yes.

25  Q.  And you made a promise that you would, didn't you?

1   A.  (No response).

2   Q.  You filled out that application under oath, didn't you?

3   A.  (No response).

4   Q.  Don't you have to swear on those applications that what

5   you're saying is true?

6   A.  Not that I know of.

7   Q.  Whether you did or didn't, you broke your word to this

8   country by becoming a criminal, didn't you?

9   A.  Well I'm not sure about that.

10  Q.  You're not sure about what, that you broke your word or

11  that you're a criminal?

12  A.  (No response).

13  Q.  Are you going to answer the question?

14          Why don't we go to an easier question.

15          MR. GOLTZER:  With the Court's permission I'd like the

16  witness to stand.

17          THE COURT:  Can you stand, please.

18  Q.  Show us where the blood was.

19  A.  Right here.

20  Q.  You're indicating an area -- let's go to the top and stop.

21  Where was the blood?

22          Indicating an area just below your chest, around your

23  solar plexus, right?

24  A.  Yes.

25  Q.  Moving straight on down, how far?

E8j9chr5                          McDermott - cross

1    A.  Right here.

2    Q.  Indicating to your thigh area?

3    A.  Yes.

4    Q.  There was blood from your solar plexus -- you know what I

5    mean by solar plexus, right?

6    A.  Yes.

7    Q.  There was blood from your solar plexus all the way down to

8    your thigh area, right?

9    A.  Yes.

10   Q.  And when you were asked -- when you started to cooperate

11   with the authorities -- you can sit down.

12          When you were asked, you said that Bow Wow was covered

13   with blood, right?

14   A.  (No response).

15   Q.  And the blood was spattered.  You said he was covered with

16   blood and the blood was spattered.

17          Is that what you said?

18   A.  I said the blood was splattered on him.

19   Q.  Did you use the word "covered"?

20   A.  I said covered and splattered.

21   Q.  And covered and splattered.  So there was a lot of blood,

22   right?

23   A.  There was blood but --

24   Q.  A little blood?

25   A.  Splattered.

E8j9chr5                          McDermott – cross

1    Q.  Splattered.

2            And did you also describe the jacket that he wore as a

3    red and blue Hollister jacket?

4    A.  He wasn't wearing a jacket.

5    Q.  What?

6    A.  He wasn't wearing a jacket.

7    Q.  He was wearing a hoodie, right?

8    A.  Sweatshirt.

9    Q.  But it wasn't black?  It was red and blue, right?

10   A.  I said dark.

11   Q.  Did you say in an interview.

12           Bear with me and I will give you a number.

13           (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

E8jnchr6                           McDermott – cross

1        THE COURT:  While you find that, Mr. Goltzer, would it

2   be OK to take the break now?

3        MR. GOLTZER:  That's great.

4        THE COURT:  OK.  15 minutes, ladies and gentlemen.

5     (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1988

```
 1              (Jury not present)

 2              THE COURT:  Mr. McDermott, you can step down.

 3              (Witness not present)

 4              THE COURT:  Do we still finish today?

 5              Mr. Goltzer, Mr. Bauer, do we still finish today?

 6              MR. GOLTZER:  We are talking about that.

 7              MR. BUCHWALD:  We're talking.

 8              THE COURT:  OK.

 9              Are we ready?

10              MR. NAWADAY:  We are, your Honor.

11              THE COURT:  And the answer to my question?  Are we

12     going to finish today?

13              MR. GOLTZER:  With this witness.

14              THE COURT:  Are we going to finish today?

15              MR. BAUER:  Judge, here's our thought.  I am not sure

16     if I am speaking for everybody.

17              MR. GREENFIELD:  We have been talking about timing,

18     but let's wait for all the lawyers to be here.

19              THE COURT:  No.  We have to bring the jury out.

20              MR. BAUER:  We are prepared to rest as soon as

21     Mr. McDermott is done.  These stipulations are not done

22     unfortunately.

23              Some of defense counsel raised the possibility of

24     requesting, your Honor, that we take off tomorrow and do a

25     charge conference tomorrow and finalize the stipulations.
```

1          THE COURT:  That application is denied.

2          MR. BAUER:  That is our position as well.

3          What we were going to say, in order to make today more

4    efficient and make tomorrow more efficient, is that after we

5    rest that we let the jury go that you hold the charge

6    conference.  Mr. Nawaday is going to handle it for the

7    government.  I will take whichever representatives of the

8    various defense teams with me, we will have a meeting, and

9    we'll just iron out these stipulations.  We wanted them to be

10   read.  We don't like tomorrow for them to be read, but I think

11   that's the only way.  We will finalize them tomorrow morning.

12   They will start with their stipulations and then we can go into

13   jury addresses hopefully within 30 minutes or so.

14         THE COURT:  Let's bring out the jury.  I'm happy to do

15   that.  Obviously that is up to you folks, but we are not taking

16   tomorrow off.

17             (Witness present)

18           (Continued on next page)

19

20

21

22

23

24

25

1    　　　　(Jury present)

2    　　　　THE COURT:  Everyone please be seated.

3    　　　　Mr. Goltzer.

4    　　　　MR. GOLTZER:  Thank you, Judge.

5    Q.  The next question, sir, is whether you claim that Bow Wow

6    had been wearing a red and blue colored Hollister brand shirt,

7    sweatshirt on the night that you say he came in covered with

8    blood?

9    A.  I always said dark.

10   Q.  You never said that it was a red and blue colored Hollister

11   brand hooded sweatshirt?

12   A.  I never said blue.

13   Q.  Were you interviewed on March 20, 2012 at the United States

14   Attorney's Office in the presence of your lawyer, Detective

15   Steven Bunt, and an assistant United States Attorney by the

16   name of Mermelstein, among others?

17   　　　　By the way, you were interviewed several times by the

18   United States Attorney's office?

19   A.  Yes.

20   Q.  Those folks took notes?

21   A.  Yes.

22   Q.  They asked you questions?

23   A.  Yes.

24   Q.  If something was unclear, they asked you again?  They asked

25   you for clarification at times?

1    A.   Most of the times.

2    Q.   Most of the time, right?

3            Did you tell those folks on March 20, 2012, the night

4    of the Joker murder, Bow Wow had half a mask on, the mask

5    covered his nose and the bottom half of his face, Bow Wow was

6    also wearing a red and blue colored Hollister brand hooded

7    sweatshirt and red Nike brand ACG boots?

8            Did you tell them that?

9    A.   No.

10   Q.   You deny telling them that?

11   A.   I never said blue sweater.  I never said red Nike.

12   Q.   You never said it?

13   A.   No.

14   Q.   Then on July 31, 2012, were you interviewed again in the

15   presence of an assistant United States Attorney by the name of

16   Parvin Moyne and your attorney, Mary Ann Worth?  You were

17   interviewed in the presence of those two women, right?

18   A.   Yes.

19   Q.   Among other people?

20   A.   Yes.

21   Q.   3503-6, July 18.  Did you say to the United States

22   government agents and representatives, the mask covered his

23   mouth and nose, he had blood on the front of his pants and

24   shirt, the shirt was black?  Did you say that?

25   A.   I said dark, looking like a black.  Yes, sir.

E8jnchr6                         McDermott - cross

1    Q.  Did you say black?

2    A.  Yes, I said black.

3    Q.  Did you change your story --

4    A.  No.

5    Q.  -- from a blue -- may I finish the question?

6            Did you change your story from a red and blue hooded

7    sweatshirt to a black shirt?

8    A.  I never said blue.

9    Q.  Did you change your story?

10   A.  I did not change my story.  My story has always been a

11   dark, looking like a black.

12   Q.  You deny that?

13   A.  Yeah, I deny saying blue.

14   Q.  By the way, you were not invited to Bloods meetings?

15   A.  No.

16   Q.  You knew the Bloods, some of the Bloods?

17   A.  Yes.

18   Q.  And they knew where you hung out?

19   A.  Yes.

20   Q.  They never asked you to move away so you couldn't hear what

21   was going on?

22   A.  No.

23   Q.  They allowed you to listen in on all of their meetings?

24   A.  No.

25   Q.  But you did anyway?

E8jnchr6                          McDermott - cross

1   A.  Yes.

2   Q.  You don't think they knew you were there?

3   A.  I'm not sure.

4   Q.  Isn't it true that they knew exactly where you stood

5   waiting for drug customers, because that's where you say you

6   always stood?

7   A.  Yes.

8   Q.  So is it your testimony here today that they allowed you to

9   listen in on their secret Blood confidential meetings?

10  A.  No.

11  Q.  This fellow Snelly who you say shot at you, he hit your

12  shirt with a bullet?

13  A.  Yes.

14  Q.  Where in the shirt?

15  A.  The left side.

16  Q.  Left side?

17  A.  Yes.

18  Q.  How close to your skin?

19  A.  It wasn't close.

20          MR. GOLTZER:  With the Court's permission, could you

21  stand up.

22  Q.  What kind of shirt were you wearing?

23  A.  I was wearing a white T-shirt.

24  Q.  White T-shirt?

25  A.  Yes.

E8jnchr6                         McDermott - cross

1   Q.  When he shot at you, the hole went through your shirt?

2   A.  Yes.

3   Q.  Show the jury where the hole went.

4   A.  Like right here.

5   Q.  You don't view that as being close to your body?

6   A.  No.

7   Q.  Did you get the idea that Snelly was trying to kill you?

8   A.  No.

9   Q.  Is he like Anne Oakley?  He's such a good shot that he can

10  shoot through your shirt without hitting your body?

11          MR. BAUER:  Objection.

12          THE COURT:  Overruled.

13  Q.  Did you think he was such a good shot that he was aiming

14  for your shirt?

15  A.  No.

16  Q.  Didn't you get the idea that Snelly as a member of the

17  Bloods was trying to kill you?

18  A.  No.

19  Q.  Didn't you get the idea that the Bloods had turned you into

20  plate or food?

21  A.  I wasn't sure.

22  Q.  Do you know what I mean by plate or food?

23  A.  Yes.

24  Q.  What do I mean by plate or food?

25  A.  It means that they could kill me.

E8jnchr6                              McDermott - cross

1    Q.   There are a whole lot of Bloods in Newburgh, right?

2    A.   Yes.

3    Q.   There were a whole lot of Bloods in the area near your

4    spot, right?

5    A.   Yes.

6    Q.   If you think the Bloods could be trying to kill you, you

7    run away, don't you?

8    A.   Yes.

9    Q.   Where did you run?

10   A.   I didn't run.

11   Q.   Did you buy a vest?

12   A.   No.

13   Q.   Did you hire a bodyguard?

14   A.   No.

15   Q.   Are you brave or crazy or both?

16   A.   No.

17   Q.   But you're sure that there was a very real possibility that

18   the word had gone out to all those Bloods kill you?

19   A.   No.

20   Q.   And the fact that somebody you claim shot at you and hit

21   your shirt didn't give you that idea?

22   A.   No.

23   Q.   You thought he shot at you by accident?

24   A.   No.

25   Q.   When he told you to keep your mouth shut and shot you in

E8jnchr6                          McDermott - cross

1   the shirt, did you take that as a friendly gesture?

2   A.  No.

3   Q.  Why didn't you run away and set up shop somewhere else?

4   A.  I'm not sure.

5   Q.  Did you have family in Newburgh?

6   A.  Yes.

7   Q.  Who?

8   A.  I have brothers in Newburgh.

9   Q.  Did you tell them to run?

10  A.  No.

11  Q.  Did you have a mother or father in Newburgh?

12  A.  No.

13  Q.  Did you have children in Newburgh?

14  A.  No.

15  Q.  Your brothers weren't involved in your business?

16  A.  No.

17  Q.  Could you have gone to a different town with a new home?

18  A.  Yes.

19  Q.  Why didn't you?

20  A.  I don't know.

21  Q.  Isn't it because this never happened?  Snelly never shot at

22  you?

23  A.  It did happen.

24  Q.  Are you somebody who is not interested in your own

25  survival?

E8jnchr6                          McDermott - cross

1    A.  Yes, I am.

2    Q.  Are you somebody who wants to die?

3    A.  No.

4    Q.  Were you so wedded to that lovely home that you lived in

5    that you couldn't bear to tear yourself away?

6    A.  I stayed away for a little while.

7    Q.  How long?

8    A.  I wasn't going to the weed spot like I used to.

9    Q.  How long did you stay away?

10   A.  Like most of the time, I didn't go like every Monday and

11   Wednesday like I used to.

12   Q.  How long did you stay away?

13   A.  For like a couple of months.

14   Q.  Do you think that solved your problem with the Bloods?

15   A.  Can I answer the question before?

16   Q.  Sure.

17   A.  I meant a couple of days.

18   Q.  You stayed away for a couple of days?

19   A.  Yes.

20   Q.  So it was your thinking that if you stayed away for two

21   days no other Blood would try to shoot your shirt again, right?

22   A.  I thought if I wasn't seen as much as they used to see me.

23   Q.  It only took one Blood to see you to kill you, right?

24   A.  Well, I'm not sure what --

25   Q.  Did you strap up and get yourself a gun?

1998

E8jnchr6                          McDermott - cross

 1   A.  No.

 2   Q.  So you just left yourself there as a target, didn't you, at

 3   your old weed spot?

 4   A.  No.

 5   Q.  What did you do?

 6   A.  I just didn't go as much as I used to.

 7   Q.  You waited two days then you went back?

 8   A.  I never said two days.

 9   Q.  You were in the Orange County jail for about a year before

10   you began to cooperate or tried to cooperate?

11   A.  Yes.

12   Q.  While you were in the Orange County jail, you met some

13   folks that you knew, didn't you?

14   A.  Yes.

15   Q.  Who?

16   A.  Baynes.

17   Q.  Who?

18   A.  Baynes.

19   Q.  Baynes?

20   A.  Yes.

21   Q.  When were you in the Orange County jail with Baynes?

22   A.  In 2011.

23   Q.  Before you started to cooperate?

24   A.  Yes.

25   Q.  Do you know a guy named Mallory?

1   A.  Yes.

2   Q.  Did you ever see Mallory in 2011?

3   A.  I was incarcerated, so I didn't see him.

4   Q.  Do you know anybody that visited you who would visit him?

5   A.  No.

6   Q.  Do you know if Baynes knows Mallory?

7   A.  No.

8   Q.  You never saw Baynes with Mallory?

9   A.  No.

10  Q.  Ever?

11  A.  No.

12  Q.  Did you and Baynes have a chance to chat while you were in

13  jail together?

14  A.  Maybe twice.

15  Q.  You and he had a chance to talk together?

16  A.  Maybe twice.

17  Q.  Where was that?

18  A.  One time I went to court.

19  Q.  When was that?

20  A.  That was in 2011.

21  Q.  When in 2011?

22  A.  I think the third quarter of 2011.

23  Q.  What?

24  A.  The third quarter.

25  Q.  Did you talk about this case?

E8jnchr6                        McDermott - cross

1   A.  No.

2   Q.  Did you talk about the shooting of Joker?

3   A.  He only said --

4   Q.  Did you talk about the shooting of Joker?  Yes or no?

5   A.  Yes.

6   Q.  Did Baynes tell you what his intentions were with respect

7   to the shooting of Joker?  Did Baynes tell you he could help

8   himself and you could help yourself?

9   A.  No.

10  Q.  Did Baynes tell you he was going to cooperate with the

11  government?

12  A.  No.

13  Q.  Did Baynes talk to you about cooperating with the

14  government?

15  A.  No.

16  Q.  Were you aware of any efforts the government made to keep

17  you two apart?

18  A.  No.

19  Q.  When you were with him, you were by yourself?

20  A.  No.

21  Q.  Were you ever by yourself with Baynes?

22  A.  No.

23  Q.  Do you know who was with you when you were with Baynes?

24  A.  My codefendants.

25  Q.  Which ones?  What are their names?

E8jnchr6                        McDermott – cross

1   A.   Dequan Jones.

2   Q.   The guy you engaged in that weed purchase with back in

3   2011?

4   A.   Yes.

5   Q.   The guy you went to buy a bag of weed with?

6   A.   Yes.

7   Q.   The guy who surprised you inside the weed spot by pulling

8   out a gun?

9   A.   I don't know what you mean by surprised.

10  Q.   You didn't know about the robbery, did you?

11  A.   Outside of the location.

12  Q.   So you weren't surprised.  You just happened to be there a

13  couple of days before when you say Bow Wow was talking about

14  ripping Henry off?

15  A.   That basically was my day.

16  Q.   So because it was your day, they decided to speak in front

17  of you?

18  A.   It wasn't in front of me.

19  Q.   Where was it?

20  A.   By the door, like I used to be.

21  Q.   So, once again, you just happened to be in that location

22  where nobody could see you, but you could hear?  Is that the

23  way it was?

24  A.   It's not that nobody could see me.  Everyone know that I'm

25  always by the door.

E8jnchr6                    McDermott - cross

1    Q.  This house is more than ten feet long, right?

2    A.  Yes.

3    Q.  I mean, if I wanted to have a confidential conversation and

4    you were standing over there, I could walk over that way,

5    right?

6    A.  Yeah, but the door to the living room was close.

7    Q.  They could have walked out into the street?

8    A.  But they didn't.

9    Q.  Because you are such a nice fellow that everybody can trust

10   you with their confidential business?

11   A.  They didn't know I was listening.

12   Q.  Could they see you?

13   A.  They knew I was in the house.

14   Q.  Were you snooping on them?

15   A.  No.

16             MR. GOLTZER:  I have nothing further.

17             THE COURT:  Any other cross-examination?

18             MR. DRATEL:  Yes, your Honor.

19             THE COURT:  Mr. Dratel.

20   CROSS EXAMINATION

21   BY MR. DRATEL:

22   Q.  Good afternoon, Mr. McDermott.

23   A.  Good afternoon, sir.

24   Q.  When you were arrested, January 30, 2011, for that robbery,

25   you knew you were in some trouble, correct?

1    A.  Yes.

2    Q.  You knew that not only could you do a considerable amount

3    of jail time, but that your presence in the United States was

4    in jeopardy, right?

5    A.  Yes.

6    Q.  One of the reasons you want immigration help from the

7    United States is because you are afraid to go back to Jamaica,

8    not just don't want to go back to Jamaica, but you are afraid

9    to go back to Jamaica, correct?

10   A.  Yes.

11   Q.  The reason is because your father had an issue there, and

12   you are afraid that you might be killed or will be killed if

13   you have to return to Jamaica, right?

14   A.  Yes.

15   Q.  When you were arrested in January 2011 and the prospect of

16   being deported existed for you, it was really a matter of life

17   and death for you in a certain sense, right?

18   A.  Yes.

19   Q.  But at no time in that first year, and certainly not that

20   night when you were arrested, did you say, hey, I've got

21   information to trade about the Joker murder, right?  You didn't

22   say that, right?

23   A.  No.

24   Q.  In fact, though, the Joker murder had occurred only six

25   weeks earlier, right?

E8jnchr6                          McDermott - cross

1    A.  Yes.

2    Q.  So it was fresh in your mind, right?  On January 30, 2011

3    anything that would have happened on December 15, 2010, was

4    fresh in your mind, right?

5    A.  Yes.

6    Q.  A lot fresher than it is today, right?

7    A.  Back when I got arrested, I had a lot of stuff that I was

8    thinking about, so --

9    Q.  I'm just asking you a question about your memory.  Was it

10   better six weeks after December 15 or today, four and a half

11   years later?

12   A.  I'm not sure.

13   Q.  A year later, when you pled guilty, right before you pled

14   guilty, you offered the prosecutor in the state case

15   information on the Joker murder, right?  Right?

16   A.  Can you repeat that question again.

17   Q.  Sure.  Shortly before you pleaded guilty, maybe even the

18   same day that you pleaded guilty, but shortly before you

19   pleaded guilty in January of 2012, a year after your arrest,

20   you offered the prosecutor in your state case help on the Joker

21   murder, right?

22   A.  It was after.

23   Q.  But it was right around that time, right?

24   A.  Yes.

25   Q.  You said, I can help you; you volunteered that you had

E8jnchr6                          McDermott - cross

1   information on the Joker murder.  Right?

2   A.  Yes.

3   Q.  In the intervening period, in that year while you were in

4   jail, you just told us that you met with Anthony Baynes in the

5   third quarter of 2011, right?

6   A.  Yes.

7   Q.  In fact, Anthony Baynes told you who he said was involved

8   in the Joker murder, right?

9   A.  Yes.

10  Q.  So you took the information that you had acquired from

11  other people in that year and packaged it for the prosecutor in

12  2012, right?

13  A.  I only talked to one person.

14  Q.  But Baynes told you who was involved according to him?

15  A.  What he said was that he was the only one that was being

16  charged with it.

17  Q.  You also spoke to the government too, though.

18         MR. BAUER:  Judge, can we let the witness finish his

19  answer.

20         THE COURT:  You were finishing your response,

21  Mr. McDermott?

22  A.  What Baynes said was he was the only one that was being

23  charged with the murder.

24  Q.  But he also told you who he said was involved, right?

25  A.  Can I finish, please.

1          THE COURT:  You can finish.

2          MR. DRATEL:  I don't know if there is a question

3    pending.

4          THE COURT:  He wasn't finished answering.

5          MR. DRATEL:  OK.

6          THE COURT:  Finish answering, Mr. McDermott.

7    A.  He said he was the one that was being charged with the

8    murder and everybody else was out running scot-free, and he

9    only named like three people.

10   Q.  Right.  But he named Gucci, right?

11   A.  Yes.

12   Q.  He named Bow Wow, right?

13   A.  Yes.

14   Q.  And he named Bash, right?

15   A.  Yes.

16   Q.  Then you offer help shortly thereafter to the prosecutor in

17   the Joker murder, right?  Not before?

18   A.  That was months after.

19   Q.  By the way, also at some point before today and before this

20   year you had occasion to be and speak with Mr. Mallory, right,

21   at the Geo facility, right?  You met with him there, too?  You

22   were there at the same time?

23   A.  Yeah, but we didn't speak about anything.

24   Q.  Right.  But we don't have a recording of that, right?

25   A.  No, we didn't speak about anything.

E8jnchr6                           McDermott – cross

1    Q.  By the way, with respect to Mr. Mallory, in that initial

2    conversation you said that happened before the robbery with Bow

3    Wow and Mr. Burden, Kev Gotti, right?

4    A.  Yes.

5    Q.  In fact, you also had Mallory at that conversation, too,

6    the first time, right?

7    A.  No, I never put Mr. Mallory there.

8    Q.  Oh, OK.  You met with the prosecutors throughout the first

9    half of the -- when you started cooperating you met with the

10   prosecutors, right?  You met with the prosecutors and agents to

11   discuss what you knew?

12   A.  Yes.

13   Q.  So one of those times was July 18, 2012, right?

14   A.  I'm not sure about the date.

15   Q.  Let me show you what's been marked as 3503-6 and ask you if

16   it refreshes your recollection as to meeting with prosecutors

17   and others, agents, July 18, 2012.  I have highlighted a

18   portion, but if you want to look at any part of document, you

19   may.  That refreshes your recollection that you met with the

20   government July 18, 2012?  Keep that copy there.  OK.

21         Does that refresh your recollection that you had a

22   meeting July 18, 2012?

23   A.  Yes.

24   Q.  Sorry?

25   A.  Yes.

1   Q.  Thank you.  Did you not tell the government during that

2   meeting that you overheard a conversation between Gotti,

3   J-Mark, and Bow Wow talking about robbing Joker's place weeks

4   before it happened, right?  You told the government that?

5   A.  No, I said Bow Wow and Gotti.

6   Q.  They were taking notes, correct?

7   A.  I said J-Mark was there at the meeting, but he wasn't a

8   part of the conversation.

9   Q.  Now J-Mark was at a meeting but not a part of the

10  conversation.  You didn't tell the government that day that

11  J-Mark was in this conversation?

12  A.  No.

13  Q.  If you left him out now and put him in then, it wouldn't be

14  because you had occasion to meet with him at the Geo facility,

15  right?  That wouldn't be the reason?

16  A.  Repeat the question.

17  Q.  Withdrawn.  J-Mark also brought guns to the weed spot at

18  260 First Street to leave with Kev Gotti, correct?

19  A.  Yes.

20  Q.  They were hidden with Kev Gotti's clothes?

21  A.  Yes.

22  Q.  And J-Mark brought those guns there -- that's Mallory we

23  are talking about, right?

24  A.  Yes.

25  Q.  You also I think you testified here, you said that Mallory

1   was at the conversation that you claim happened the day after

2   when Gucci came by midday, right, on the 15th?

3   A.  Yeah, he was upstairs.

4   Q.  But he was there in the conversation?

5   A.  Not in the conversation.

6   Q.  Now he's not in the conversation either?  He was not in the

7   conversation?

8   A.  I never said he was in the conversation.

9   Q.  Are you saying he's in the conversation or not?

10  A.  He was in --

11  Q.  Please wait for me to finish.  Are you saying that he was

12  in that conversation or not?

13  A.  He wasn't in the conversation.

14  Q.  You said he was not?

15  A.  He was not in the conversation.

16  Q.  So you have taken him out of that one, too.  Let me show

17  you what's marked as 3503 -- the same document, 3503-6.  You

18  have that in front of you still, right?  Look at the second

19  page, the second paragraph.  Read it to yourself.

20          Did you not tell the government, July 18, 2012, Gucci

21  was at the house at 260 First Street and said that he told

22  Reckless not to shoot.  This conversation occurred just before

23  noon.  McDermott -- I'm sorry, you -- overheard Gucci talking

24  with Gotti and J-Mark about the night before.

25          Did you not tell the government that on July 18, 2012?

E8jnchr6                        McDermott - cross

1   A.  I remember what I said.  I said --

2   Q.  You said Gotti and Gucci --

3            MR. BAUER:  Your Honor, he has to let the witness

4   finish.

5   Q.  I'm asking you a yes or no question.  If you told the

6   government --

7            THE COURT:  Why don't you answer the question,

8   Mr. McDermott.

9            THE WITNESS:  I'm answering the question.  He's not

10  letting me finish.

11           THE COURT:  Answer the question.  It's a yes-or-no

12  question.

13           Do you want to rephrase it, Mr. Dratel.

14           MR. DRATEL:  Sure.  I'll repeat it, your Honor.

15  Q.  Did you not tell the government July 18, 2012 the

16  following:  That Gucci was at the house at 260 First Street and

17  said that he told Reckless not to shoot.  This conversation

18  occurred just before noon, that you overheard Gucci talking

19  with Gotti and J-Mark about the night before.

20  A.  No.

21  Q.  Are you testifying that way and leaving J-Mark out of

22  another conversation because you met up with him at the Geo

23  facility since then?

24  A.  No.

25  Q.  By the way, you also had someone else saying that Gucci

1    told Reckless not to shoot in a previous interview, right?  You

2    had someone else saying that, correct?  Didn't you initially

3    tell the government that someone else had said that Gucci told

4    Reckless not to shoot?

5    A.  No.

6    Q.  I'm going to show you what's marked as 3503-1.  Did you

7    meet with the government, by the way, February 17, 2012, right

8    at the very beginning of your cooperation, isn't it?  Right?

9    A.  I'm not sure about the date.

10   Q.  If you look at the date on the bottom, which is not the

11   date of the report, but the date of the interview, I ask you if

12   it refreshes your recollection that you met February 17, 2012

13   with the government.

14   A.  Yes.

15   Q.  That was the first time you met with the government, right?

16   A.  Yes.

17   Q.  To cooperate in a formal session?

18   A.  Yes.

19   Q.  Look at the end of the second paragraph there.  Did you not

20   say that someone else told you that Gucci had told Reckless not

21   to shoot the dude, but he still did it?  Right?  Did you not

22   tell the government that the first time?

23   A.  Can you repeat the question.

24   Q.  Sure.  Didn't you tell the government the first time you

25   met with them that it was someone else who told you that Gucci

1    had said to Reckless, not to shoot the dude but that Reckless

2    had done it anyway?

3    A.  No.

4    Q.  The robbery that you committed in January of 2011 involved

5    a nine-millimeter handgun, correct?

6    A.  Yes.

7    Q.  One of the persons who was robbed was shot in the leg,

8    correct?

9    A.  Yes.

10   Q.  You were stabbed and you stabbed someone, right?

11   A.  Yes.

12   Q.  A lot of blood, right?

13   A.  Yes.

14   Q.  In fact, one of your codefendants had blood on him, right?

15   A.  I don't know.

16   Q.  In fact, one of your codefendants had a red and black

17   Champion hoody, right?

18   A.  Yes, a hoody.

19   Q.  One of your codefendants had ACG Nikes, right?

20   A.  Yes.

21   Q.  The same person with the red and black hoody and the Nikes,

22   right?

23   A.  Dequan Jones, yes.

24   Q.  He is the person who did the shooting, right?  He's the

25   person with the gun that shot the person, right?

1    A.   Yes.

2    Q.   Isn't what you have done --

3    A.   That's not who shot the person.

4    Q.   Right.  Isn't what you have done is you have taken that

5    whole description of the red and black hoody and the Nike

6    sneakers, the ACGs and the blood, and you have put them on

7    Mr. Whitaker?

8    A.   No.  You said Champion.  You said Champion a while ago.

9    Q.   You changed it to Hollister?

10   A.   I said Hollister.

11   Q.   You changed it to Hollister for the purposes of today,

12   right?

13   A.   One was wearing a hoody and one was wearing a sweater.

14   Q.   You agreed with Mr. Bauer when he corrected you to say

15   sweatshirt, right, during your direct testimony?

16   A.   He didn't correct me.  I said sweatshirt.

17   Q.   Now you claim that the robbery that you participated in was

18   not known to you until you arrived at the location, right?

19   A.   Yes.

20   Q.   In fact, it was a setup, right?

21   A.   I didn't say that.

22   Q.   But one of your codefendants called the spot in advance to

23   order weed so that you guys could be let in, right?

24   A.   We was going to buy weed at first.  But --

25   Q.   That's why you took a gun, right?

E8jnchr6                           McDermott - cross

1   A.  I did not have a gun.

2   Q.  That's why Dequan Jones took a gun, so you could buy weed,

3   right?

4   A.  I didn't know he had a gun until we were outside the

5   location.

6   Q.  You had a knife with you, correct?

7   A.  Yeah, I always got a knife with me.

8   Q.  In fact, your deal with the government is your way of

9   trying to stay in the United States, right?

10  A.  Yes.

11  Q.  After your conviction for the assault, right?

12  A.  Yes.

13  Q.  As we said before, whether you get that deal or whether you

14  get that letter depends on what you perceive to be your --

15  withdrawn -- your cooperation, right?

16          For you, as you said before, with respect to what

17  might await you when you go back to Jamaica, it's a matter of

18  life or death potentially?

19  A.  Yes.

20  Q.  Would you lie in a matter of life and death for yourself?

21  A.  No.

22  Q.  You would rather die?  You would rather die?

23  A.  No.

24  Q.  So you would lie rather than die, right?

25          MR. BAUER:  Objection, your Honor.

E8jnchr6                              McDermott - cross

1          THE COURT:  Overruled.

2     Q.  You can answer?

3     A.  Anyone would lie if they are going to die.

4          MR. DRATEL:  Nothing further, your Honor.

5          One thing further, your Honor.

6     Q.  In fact, you lied to stay out of jail initially when you

7     told the police that ridiculous story about going there and not

8     participating in a robbery, about how you ran down the street

9     and all of that, right?

10    A.  It wasn't a lie.

11         MR. BAUER:  Objection, your Honor.

12         THE COURT:  Overruled.

13         MR. DRATEL:  Nothing further, your Honor.

14         MR. STRAZZA:  No questions.

15         THE COURT:  Redirect?

16         MR. BAUER:  Briefly, your Honor.

17    REDIRECT EXAMINATION

18    BY MR. BAUER:

19    Q.  Mr. McDermott, you were shown a number of reports by

20    Mr. Goltzer and Mr. Dratel during your cross-examination,

21    right?

22    A.  Yes.

23    Q.  Had you ever seen those reports before?

24    A.  I'm not sure.

25    Q.  Did you type those reports?

1   A.   No.

2   Q.   When you were meeting with the government was somebody

3   sitting there typing?

4   A.   They was writing with a pen.

5   Q.   Mr. Dratel showed you 3503-3 and asked you about the people

6   that Baynes told you were involved in the Joker murder.  Do you

7   remember that?

8   A.   Yes.

9   Q.   He mentioned that Baynes had told you that Bow Wow was

10  involved, right?

11  A.   Yes.

12  Q.   Baynes had said that Gucci was involved?

13  A.   Yes.

14  Q.   He said that Bash was involved?

15  A.   Yes.

16  Q.   Did Baynes tell you that Reckless was involved?

17  A.   No.

18  Q.   Do you remember telling the government that Reckless was

19  involved?  I'm sorry.  Do you remember telling the government

20  that Baynes told you that Reckless was involved?

21  A.   No.

22          MR. BAUER:  Your Honor, may I approach?

23          THE COURT:  You may.

24  Q.   Mr. McDermott, I'm showing you 3503-3 again.  I have

25  brackets around the part I want you to read and tell me if it

2017

E8jnchr6                          McDermott - redirect

1   refreshes your recollection.  You can keep it there.  Does it

2   refresh your recollection?

3   A.  I don't know.

4   Q.  Looking at that again, do you recall whether you told the

5   government that Baynes told you that Reckless was involved?

6           MR. STRAZZA:  Objection.

7   A.  No.

8           THE COURT:  Overruled.

9   Q.  Specifically, do you recall telling the government that

10  Baynes told you that Reckless --

11          MR. DRATEL:  Objection, your Honor.  He's asked and

12  answered twice now.

13          THE COURT:  Overruled.

14  Q.  That Reckless also had a gun the night of the Joker

15  homicide?

16          MR. STRAZZA:  Objection.

17  Q.  The gun was black?  I'm sorry.  I'll stop.

18          THE COURT:  Overruled.

19  Q.  And had what looked liked a neon green line in it?  Do you

20  remember telling the government that?

21  A.  No.

22  Q.  Mr. McDermott, defense counsel was asking you a couple of

23  questions about the blood on Bow Wow's clothes.  Do you

24  remember those questions?

25  A.  Yes.

1  Q.  They were asking what you meant when you described it.  Do

2  you remember those questions?

3  A.  Yes.

4  Q.  You used the word splatter, right?

5  A.  Yes.

6         MR. GOLTZER:  Objection.

7  Q.  Can you explain a little --

8         MR. GOLTZER:  Actually covered with splatter.

9         THE COURT:  Overruled.

10  Q.  One of the words that you used was splatter, wasn't it?

11  A.  Yes.

12  Q.  Can you help explain for the jury what you meant by the

13  word splatter?

14  A.  It looked like, more like small polka dots.

15  Q.  Did it look like anything else you had seen before, either

16  with blood or otherwise?

17  A.  Yeah.  It's like if you, like if I had a bottle of water

18  and I splash it on the wall.

19  Q.  And then whatever the water bounced back?

20  A.  It bounced back, yeah, whatever it --

21  Q.  Both Mr. Goltzer and Mr. Dratel were asking you about that

22  black and red Hollister sweatshirt that Bow Wow was wearing.

23  Do you remember those questions?

24  A.  Yes.

25  Q.  You testified on direct that you sold clothes for a living,

E8jnchr6                          McDermott - redirect

1    right?

2    A.  Yes.

3    Q.  Stolen clothes, but you sold clothes for a living, right?

4    A.  Yes.

5    Q.  Are clothes important to you?

6    A.  You could say that.

7    Q.  If something memorable happens, is that one of the things

8    you notice about the situation, what someone is wearing?

9    A.  Yes.

10   Q.  How about Hollister.  What kind of brand is Hollister?

11   A.  It is not a main brand, but it's a likeable bland.

12   Q.  It is a likeable brand?

13   A.  Yes.

14   Q.  It is a brand that you notice?

15   A.  Yes.

16          MR. BAUER:  No further questions, your Honor.

17          THE COURT:  Mr. Goltzer.

18   RECROSS EXAMINATION

19   BY MR. GOLTZER:

20   Q.  When was the last time you met with the government and went

21   over your questions and answers?

22   A.  I'm not sure about the date, the exact date.  I don't keep

23   up on dates.

24   Q.  Was it two days ago or two months ago if you remember?  The

25   last couple of days?

E8jnchr6                              McDermott - recross

1    A.  No, not the last couple of days.

2    Q.  When was it?

3    A.  Weeks.

4    Q.  How many weeks?

5    A.  I'm not sure exactly how many, but I think it's two.

6    Q.  Two weeks ago?

7    A.  Yeah.

8    Q.  Who was there?

9    A.  Mr. Bauer.

10   Q.  What color tie was he wearing?

11   A.  I don't wear ties, so I wouldn't look at ties.

12   Q.  What color shoes was he wearing?

13   A.  His feet was under the table and the table was blocked off.

14   Q.  What color pants was he wearing?

15   A.  He was wearing a jacket and --

16   Q.  What color?

17   A.  About the same color he's wearing right now.

18   Q.  You don't remember, do you?

19   A.  I remember that he was wearing a jacket suit, but I

20   don't -- I wasn't looking at the tie.

21   Q.  Was it blue?  Was it gray?

22   A.  You know, it wasn't blue.  It was like multicolored.

23   Q.  Does it matter?

24   A.  The tie doesn't matter to me.

25   Q.  When you were overhearing the conversation between, was it

1  Gotti and Bow Wow?  Before the murder?  Was Gotti wearing boots

2  sneakers or slippers?

3  A.  I wasn't in the room.

4  Q.  By the way, you can remember what people were wearing a

5  year and a half ago?

6  A.  It depends.

7  Q.  Two years ago?

8  A.  All depends.

9  Q.  Depends on whether you need to remember, right?

10  A.  It depends if they was wearing something interesting.

11  Q.  Interesting?  Blue jeans are interesting?

12  A.  If he got something extra on it, it's interesting.

13  Q.  Was if there's something extra on the blue jeans that you

14  observed Bow Wow wearing on what you say was the night of the

15  murder?

16  A.  Yes.

17  Q.  What do you remember that was so interesting about his

18  jeans as you sit here today?

19  A.  There was blood on it.

20  Q.  Anything else about the jeans?

21  A.  That it had blood on it.

22  Q.  Did they tell you what the lawyer was going to ask you

23  about the blood when you were in the back room with these

24  prosecutors?

25  A.  I don't remember if they asked me about the blood.

E8jnchr6                        McDermott - recross

1    Q.  Did they tell you you were going to be asked about the

2    blood by the defense lawyers?

3    A.  Maybe I think at one point they probably did.

4    Q.  At one point they probably did.  Didn't they tell you the

5    defense lawyers were going to ask you what you meant by the

6    word covered when you used that in an interview so long ago?

7    A.  I don't remember.

8    Q.  Didn't they ask you what you meant by the word splattered?

9    A.  Yes, they asked me about the word splattered.

10   Q.  Didn't you go over the answer about the bottle of water

11   against the wall?

12   A.  Yes, I did say about the bottle of water against the wall.

13   Q.  You first said that a couple of weeks ago?

14   A.  Yes.

15   Q.  In preparation for your testimony before this jury?

16   A.  I'm not sure.

17   Q.  But a couple of years ago you said it was covered in blood?

18   A.  I said covered in splatter.

19   Q.  You don't know how that happened because he wouldn't tell

20   you?

21   A.  Can you repeat the question.

22   Q.  You don't know whether he walked out of the house wearing

23   the garbage bag or without underwear, without pants on, do you?

24   A.  No.

25            MR. GOLTZER:  Thank you.

E8jnchr6                          McDermott - recross

1   REDIRECT EXAMINATION

2   BY MR. BAUER:

3   Q.  Mr. McDermott, when we met a couple of weeks ago and all

4   those other times, did I or anybody else at the government tell

5   you to do anything other than tell the truth?

6   A.  No.

7   Q.  When we met a couple of weeks ago, did I put blood on you?

8           MR. GOLTZER:  Objection, your Honor.

9   A.  No.

10  Q.  A couple of weeks ago, did I have any blood on me?

11          MR. GOLTZER:  Objection, your Honor.

12          THE COURT:  Sustained.

13          MR. BAUER:  About which question, your Honor?

14          THE COURT:  Both.

15  Q.  Mr. McDermott when we met a couple of weeks, did I ask you

16  to get rid of any of my clothes?

17  A.  No.

18          MR. BAUER:  No further questions.

19  RECROSS EXAMINATION

20  BY MR. GOLTZER:

21  Q.  Do you know the difference between things that matter and

22  don't matter?

23  A.  Yes.

24  Q.  Do you know the difference between things that stick out in

25  the mind and don't stick out in the mind?

E8jnchr6                          McDermott- recross

1   A.  I'm not sure what you are talking about.

2   Q.  Well, for example, you said you were being shot at by a

3   .357 magnum, is that correct?

4   A.  Yes, that's correct.

5   Q.  That's something you would remember?

6   A.  Yes.

7   Q.  That's something that would scare the heck out of you?

8   A.  Which it did, it did scare me.

9   Q.  That's something that would make you run for your life?

10  A.  Well, if you say that.

11          MR. BAUER:  Your Honor, objection to this line of

12  questioning.  It is outside the scope of my re-redirect.

13          THE COURT:  Overruled.

14  Q.  That's something that would make you stay way for two days,

15  right?

16  A.  I never said two days.  I said a couple.

17          MR. GOLTZER:  OK.  You win.

18          MR. BAUER:  Objection to that last statement.

19          MR. GOLTZER:  I apologize and withdraw the statement.

20          THE COURT:  OK.  Anything further, Mr. Bauer?

21          MR. BAUER:  No, your Honor.  Thank you.

22          THE COURT:  Mr. McDermott, you may step down.

23          (Witness excused)

24          THE COURT:  Mr. Bauer?

25          MR. BAUER:  Judge, that was the government's last

E8jnchr6                         McDermott- recross

1    witness.  The government rests.

2              THE COURT:  Very well.

3              Ladies and gentlemen, the government has rested.  What

4    we are going to do now is I am going on do some legal work with

5    the lawyers, so we're going let you go.  It is anticipated that

6    the defense will put on something of a case tomorrow morning.

7              Then we expect to move directly into closing

8    arguments, so please be on time tomorrow.  We'll get started at

9    9:30, so try to be here sometime before that.  Until then,

10   please do not discuss the case, even on social media.

11             (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (Jury not present)

2              THE COURT:  Mr. Greenfield, Mr. Goltzer, Mr. Buchwald,

3    any motions?

4              MR. GOLTZER:  Oh, yes, your Honor.  On the record I

5    respectfully move pursuant to Rule 29 for a judgment of

6    acquittal.

7              THE COURT:  I can't hear you.

8              MR. GOLTZER:  I rest upon the record, Judge.

9              THE COURT:  Very well.

10             MR. STRAZZA:  On behalf of Mr. Christian I join in

11   that application, and we rely upon the record.

12             THE COURT:  OK.

13             MR. BUCHWALD:  Your Honor, with respect to Mr. Thomas,

14   we make the motion with respect to each and every count and

15   rely on the record.  But more specifically I would like to

16   address the conspiracy counts with respect to the drug

17   conspiracy and the Hobbs Act robbery conspiracy, which are

18   alleged to have existed between 2008 and 2012.  With respect to

19   Mr. Thomas concerning the drug conspiracy, there is really not

20   an iota of evidence other than the claim that December 15, 2010

21   the intention was to rob the place presumably of money and

22   drugs and that therefore whatever drugs were obtained would be

23   sold.

24             (Continued on next page)

25

E8j9chr7

1            MR. BUCHWALD:  (Continuing) And that is not the

2   conspiracy charged here.  That was the conspiracy charged in

3   the original indictment.  The original indictment simply

4   charged a December 15 or December 2010 drug conspiracy.  They

5   then superseded that indictment and they added a four-year time

6   period, 2008 to 2012.  That four-year addition means that they

7   were charging more than December 15 of 2010.

8            I'd like to hand up to your Honor the testimony

9   concerning the drugs as it affects Mr. Thomas in this case.

10   Your Honor will recall the government's concession in its in

11   limine motion that the 2007 drugs were not from this

12   conspiracy; that they were from a time period preceding the

13   conspiracy and at a time period when Mr. Thomas was involved or

14   associated with Crips as opposed to Bloods or any of these

15   codefendants or witnesses.

16            The entirety of Mr. Mallory's testimony is set forth,

17   if I might hand this up as a defendants' exhibit for purposes

18   of the motion, give your Honor a chance to look at this and

19   then continue.

20            THE COURT:  Okay.  For the record, I've read the

21   portions highlighted by Mr. Buchwald from pages 1160 to 1162 of

22   the transcript; 1162 to 1165; and 1168.  I've read these.

23            MR. BUCHWALD:  Thank you, your Honor.  Mr. McDermott

24   testified that he never saw Gucci with drugs, was not aware of

25   any drug involvement.

E8j9chr7

1            Mr. Evans testified today that he saw him -- I believe

2       the number was once or twice between 2008 and 2010 with

3       hand-to-hand sales which presumably would be -- and that was in

4       the presence of J-Mark, Mallory, that will be consistent with

5       Mallory's testimony about having given Thomas on a few

6       occasions a 20 to sell rather than giving him money when he

7       needed money.

8            THE COURT:  Okay.

9            MR. BUCHWALD:  This testimony does not amount to the

10      conspiracy that was charged here.  There may be individual

11      instances of selling 20s that he received from Mallory but that

12      is not the conspiracy that is charged here.  The conspiracy

13      that is charged here is a conspiracy that exists at least

14      between Mr. Thomas and Mr. Christian were the named defendants,

15      named coconspirators in the charge.  And there is no evidence

16      whatsoever of that.

17           What we have, as a general proposition, is disparate

18      sales by disparate people in various places in Newburgh.  But

19      even with respect to those, there is certainly not a coherent

20      single conspiracy.

21           THE COURT:  Let me ask you this, Mr. Buchwald.  You

22      say that the government, when it superseded, expanded the time

23      period of the conspiracy.  What would your argument be if this

24      case were to have gone to trial on that earlier iteration of

25      the indictment?  Would you be making a Rule 29 motion with

E8j9chr7

1    respect to this charge if we were going on the original

2    indictment?

3              MR. BUCHWALD:  On the earlier iteration I think that

4    the government's claim would be that the agreement to rob a

5    weed spot or drug spot contemplates the possibility of

6    obtaining drugs which then in turn would have to be sold or

7    distributed and that is a coherent charge that's limited to a

8    specific conspiracy.

9              So the short answer is no, I don't believe if we -- if

10   he was charged here with the December 15 drug conspiracy, I

11   don't believe that we can succeed on a Rule 29 motion.

12             THE COURT:  Okay.

13             MR. BUCHWALD:  But they make the choice to expand that

14   into something more.

15             THE COURT:  Okay.

16             Does someone want to respond on that side?

17             MR. BAUER:  Judge, I want to thank Mr. Buchwald for

18   making all of our arguments for us because all the evidence he

19   pointed to -- although I would note that he did omit parts of

20   Mr. Mallory's testimony in which he was continuing to talk

21   about Gucci selling crack, but it's fine.

22             Judge, when we extended the conspiracy time period

23   that doesn't -- that doesn't change the fact that December 15,

24   2010 is in the middle of the conspiracy.  We extended the

25   timeframe.  Absolutely.  But there is a mountain of evidence

E8j9chr7

1    that Gucci was involved in that robbery of a crack spot

2    conspiracy.  So even if it was that alone, it would satisfy

3    Rule 29.  The fact that the dates are extended one way or the

4    other means nothing here.  I think the law is very clear that

5    to participate in a conspiracy you don't need to be

6    participating in every day of that conspiracy or with every

7    coconspirator.  If he had only done that December 15, 2010

8    robbery that would have been insufficient.  However, we have

9    two cooperators who testified credibly that they saw him sell

10   crack.  And in particular Jamar Mallory sold -- said that he

11   gave him crack as part of an agreement to give him -- to give

12   it to him, on a repeated basis.  That is also an agreement.

13   That is also a conspiracy.  We're far past Rule 29 here, your

14   Honor.

15          By the way, to this point, what I will say is that --

16   and perhaps this will inform your charging conference later, is

17   that the conspiracy that we've charged is a conspiracy that

18   involves Gucci.  It involves Reckless.  It involves L-1.

19   Gotti, J-Mark.  And although this is not a -- one cohesive team

20   that sold together and split the profits, there is evidence all

21   throughout the record about how these individuals were working

22   together as part of their drug sales, even if they were hoping

23   to profit individually.  There is proof that Reckless and

24   Mallory went and got crack together from the same supplier when

25   Reckless was out -- or when Mallory was out and Reckless helped

E8j9chr7

1    him.  There was proof that Mallory and L-1 sold together.

2    Proof that Gotti -- Gotti and Bow Wow sold together.  Bow Wow

3    is not in the conspiracy because of his age.  But,

4    nevertheless, that's our conspiracy.  It's one conspiracy.

5    I'll save the multiple conspiracy argument for Mr. Nawaday but

6    for the purposes of Rule 29, it's a clear conspiracy.  I rest

7    on the record as well as our arguments as well as

8    Mr. Buchwald's arguments for us.

9              THE COURT:  I think that even if the government were

10   to limit Mr. Thomas' involvement in the conspiracy to the

11   December 15 robbery there is sufficient evidence before the

12   jury that they can determine that he was part of the

13   conspiracy.  So, the motion in that regard is denied.

14             MR. BUCHWALD:  If I just might for the record direct

15   the Court's attention to United States v. Bertolotti at 529

16   F.2d 149 and to United States v. Ganoya at 451 F.2d 959, the

17   cases cited therein, both of which I believe are Second Circuit

18   law, good Second Circuit law, with respect to the need in a

19   prolonged conspiracy to show more than isolated disparate

20   events.  And specifically to the doctrine within the Second

21   Circuit of a single instance rule that there is a prolonged

22   conspiracy, that involvement in a single transaction does not

23   suggest an agreement to enter into the overall conspiracy

24   charge.

25             THE COURT:  Okay.

E8j9chr7

<br>

1          MR. BUCHWALD:  I make the same argument with respect

2     to the alleged robberies.  There is no -- the robbery

3     conspiracy again was expanded to a four-year conspiracy.

4          MR. BAUER:  That's not true, by the way.

5          THE COURT:  Let him finish.

6          MR. BAUER:  I'm sorry.

7          MR. BUCHWALD:  If I'm inaccurate about that --

8          MR. BAUER:  Count One the robbery conspiracy is

9     limited to December 2010.

10          THE COURT:  Okay.

11          MR. BAUER:  Judge for the record the government

12     opposes the other Rule 29 motions and unless you want to hear

13     more argument, I will --

14          THE COURT:  No.  Those motions are denied as well.  I

15     think that there is sufficient evidence before the jury which

16     the jury is entitled to credit which would tend to establish

17     that the government has met all of the elements of each of the

18     crimes charged.  Accordingly, all of the Rule 29 motions are

19     denied.

20          MR. BAUER:  Judge, can I take the opportunity to make

21     a bit of an announcement with regard to what we'd like to

22     proceed with with the jury.

23          THE COURT:  Okay.  This sounds very exciting.

24          MR. BAUER:  Looking at the record the government has

25     decided that for the -- for the conspiracy charge, that the

1  narcotics conspiracy, Count Three, that rather than proceed on

2  the (b)(1)(A) that is charged I think it makes the most sense

3  to proceed with the lesser included offense of a (b)(1)(C) as

4  it relates to crack cocaine.  I think that's -- we obviously

5  could go forward on the (b)(1)(A).  We heard evidence from

6  Mallory and evidence on how much crack they sold, but given the

7  record we think it matches with the -- we think it's the right

8  thing to do as it relates to the jury deliberation and we could

9  argue about weight at sentencing if necessary.

10            THE COURT:  Okay.

11            MR. BAUER:  But it would eliminate the question of

12  weight for the jury.

13            THE COURT:  In that regard I still haven't gotten

14  proposed verdict forms either from the government or from the

15  defense.

16            Did the government intend to submit one?

17            MR. BAUER:  We did, your Honor.  It's sitting on my

18  computer.  I'll work on that and submit it.

19            THE COURT:  Very well.

20            MR. BAUER:  I apologize.

21            THE COURT:  Okay.

22            MR. BUCHWALD:  Your Honor, we still have a few

23  stipulations to work out that we've all discussed.  They are

24  obviously some new stipulations based on today's testimony and

25  the denials by McDermott.  I don't recall if there's anything

1    involving Evans but there certainly is involving McDermott.

2              THE COURT:  How long is all this going to take to read

3    to the jury, by the way?  How many stipulations are there?  How

4    lengthy are they?

5              MR. GOLTZER:  Maybe an hour.

6              MR. BAUER:  Judge, it's so hard.  We got a lot of

7    them.  I think there are maybe between ten and fifteen

8    stipulations.  A couple of them are long but most of them are

9    one to two pages.

10             THE COURT:  Okay.  So that shouldn't take an hour.

11             MR. BAUER:  I hope it doesn't take an hour.

12             MR. BUCHWALD:  I know I was, I think, two minutes late

13   coming back and I may have missed the argument on it and I

14   apologize.  But given that virtually everybody here, including

15   the septuagenarians on the defense side, was up last night

16   until 1:30; and given that it would be extraordinarily useful

17   to have the charging conference and have some time to digest

18   the results of that conference; and given that we, because of

19   the evidence testimony that we weren't counting on yesterday

20   are not going to get the start in the morning that would have

21   enabled us to do straight through on summations and finish all

22   of the summations in the same day, I would again propose that

23   we finish up in the morning with the stipulations, that we then

24   proceed to the charging conference at a time when everybody is

25   awake and can contribute coherently to it and then sum up the

1    following day.

2         We have made great progress here.  At of middle of

3    last week it looked like we were going to be going into the

4    following week.

5         I think the level of argument in what has been I

6    believe a well-tried case on all sides will be substantially

7    better if people, in fact, could get a good night's sleep.  And

8    I would urge your Honor to consider proceeding in that manner

9    with the -- whatever it is, half-hour to hour of stipulations,

10   which are going to require some work tonight to get them in

11   order, followed by the charging conference, and then the

12   summations the following day.

13        MR. GOLTZER:  As somebody who has to sum up I couldn't

14   agree more, Judge.  I'm tired.

15        MR. GREENFIELD:  I'm too tired to get up.

16        MR. GOLTZER:  I'm --

17        MR. GREENFIELD:  I'm teasing.  I would join in that

18   application.  It would be so much better, the quality of the

19   summations, and also putting together the stipulations.  We

20   have a while to go with.  We have not gotten there.  The

21   government has to speak with a witness who is the subject of

22   one of our stipulations, Detective Cortez.  And that might

23   not -- we might not have an answer for that until the morning.

24   So I would join in the motion.

25        MR. GOLTZER:  We're losing half a day which we'll make

1   up for in efficiency the next morning.

2           MR. DRATEL:  To make it more efficient, last night --

3   and we finished it this morning -- the charges that we -- that

4   the defense proposes, which I can -- because I was busy

5   watching Mr. McDermott did not get a chance to e-mail to

6   everyone, I can e-mail them so the court has them in writing

7   and in form.

8           And also if the court were to send me a Word document

9   of the court's draft charge that was PDF yesterday, I could do

10  track changes that would include the little things because I

11  didn't include what's written here because it's hard to do that

12  in one evening, which I had yesterday to do it.  We could put

13  it in.  And that way we could have a much more efficient charge

14  conference rather than going through every page and us saying

15  on line three we would put in this language, these two words,

16  these three words.  We could do that tonight and have that by

17  the time I go to sleep tonight, the court would have it so that

18  we can start tomorrow's charge conference with a much fuller

19  sense of where we are.

20          MR. GOLTZER:  And he's summing up.

21          MR. DRATEL:  So I can't do both, obviously.

22          THE COURT:  And I don't put you in a septuagenarian --

23          MR. DRATEL:  Some day.

24          MR. GOLTZER:  Nor do I concede to that either.

25          MR. BUCHWALD:  Perilously close.

E8j9chr7

1          MR. GOLTZER:  Close enough but not there yet.  I'm

2     going to try to get there.

3          MR. BAUER:  Judge, I'm not -- we're not insensitive to

4     the septuagenarian issues here.

5          I think our biggest concern is the jurors and what

6     this means for the back end.  If we were to close on

7     Thursday -- so let's say we killed all Thursday with argument.

8     And frankly I don't know -- no offense to any defense

9     counsel -- but I don't believe that we're going to be done in

10    one day.  I would like it to be.  But I'm a little concerned

11    about that.

12         So then I -- I think this jury wants to get out of

13    here by Friday.  If we give them something less than half --

14    less than a full day, I think all parties might be sacrificed.

15         So if -- so that's our concern.

16         THE COURT:  I don't want to lose an entire day.  And I

17    don't think that having them here for, you know, 30 or 45

18    minutes of read-backs is going to be -- well, it's not

19    acceptable to me and I think it would just upset them, quite

20    honestly, to bring them in here for a half-hour or 45 minutes.

21         What I think I would be willing to do is have them

22    come in in the morning.  We'll finish with the defense case.

23    We'll break for some time -- until sometime after lunch, during

24    which we can do the charging conference, and then have the

25    government begin its summation in the afternoon.  Then the

E8j9chr7

1    government can do its initial summation and then we can go into

2    defense summations Thursday.

3              MR. GOLTZER:  That's fine.  Thank you.

4              MR. BAUER:  I'm sure you see what that does, is that

5    puts the burden only on me to be prepared for tomorrow.

6    Besides the fact that it -- besides the fact that it breaks up

7    the arguments and there's a disadvantage to that.  I mean it's

8    our preference --

9              THE COURT:  First of all, I don't buy into this

10   argument on either side that there's a disadvantage to having

11   the arguments broken up.  It happens everyday in courthouses,

12   in this courthouse.  So I don't know that I necessarily buy

13   that.  We can go into the first defense argument.

14             How long is the government's argument going to be,

15   opening argument?

16             MR. BAUER:  I haven't timed it yet.  I'm going to hope

17   for under two hours.  I guess an hour-and-a-half.

18             THE COURT:  I'm sorry, Mr. Dratel.  Did you say that

19   you had some submissions that you wanted to make?

20             MR. DRATEL:  Yes.  And I have a hard copy and I also

21   will also e-mail them to you.

22             THE COURT:  By the way, this doesn't only sort of put

23   the burden on the government if we go forward tomorrow.  It

24   also puts the burden on the court.  We are on the last day of a

25   three-week trial and I'm getting defense requests for charges

E8j9chr7

1    on the eve of the jury charge.

2              My preference is to plow forward, to finish up the

3    defense case.  I'm happy to give the folks tonight to do

4    whatever preparation they need by way of the stipulations and

5    the charges and that we proceed tomorrow and we start with the

6    government's summation tomorrow afternoon.

7              MR. DRATEL:  Your Honor, still I'll be happy to do

8    what I proposed with respect to -- if you have a Word version

9    that I can work on.  I think it will make the charge conference

10   faster.

11             THE COURT:  Except that I -- Word track changes just

12   makes my eyes cross so that's not going to do me any good.

13             And I don't know that I wouldn't want to provide the

14   parties with the Court's Word version because I don't know how

15   I can mask the metadata that's behind it.  I don't know that we

16   have the capability of doing that.  And I wouldn't want you to

17   know all of our secrets.  So we'll just do it the old-fashioned

18   way.

19             So does that sound like a plan?  Is there anything

20   more that we can do this afternoon?

21             MR. BAUER:  Well, Judge, may I -- so sounds like our

22   summation will begin after lunch?

23             THE COURT:  Yes.

24             MR. BAUER:  Do we take a slightly earlier lunch

25   probably for the jury's benefit as well?

1              THE COURT:  We'll see where we are.

2              Again, the charge from my perspective is as fair -- I

3      don't know that there's anything controversial in the draft

4      that I gave you.  Or at least in 95 percent of what I gave you.

5      It's standard charges.  There is no creative writing.  There is

6      no original drafting in this draft, so.

7              MR. NAWADAY:  Your Honor, our comments for your charge

8      were pretty much just word changes like typos, things like

9      that.

10             THE COURT:  By the way, please if you see any typos,

11     do point them out because I do intend to give the jury a draft

12     of it so -- the final draft so that they're reading along when

13     I give the charge.

14             MR. GOLTZER:  I'd like the record to reflect that I

15     handed up to your Honor's secretary -- legal secretary a --

16             THE COURT:  I did receive --

17             MR. GOLTZER:  Law clerk a requested charge.

18             THE COURT:  Stop talking, Mr. Goltzer.  You're just

19     getting yourself -- just tell me what you handed up.

20             MR. GOLTZER:  You can see how tired I am.  My sexist

21     generational disabilities are coming through.  My apologies to

22     your deputy or whatever --

23             THE COURT:  Once again.

24             MR. GOLTZER:  It's a state court disability.

25             MR. GREENFIELD:  State court clerks are called legal

E8j9chr7

1    secretaries.

2              MR. BAUER:  Judge, to be very clear.  If the

3    government will start 1:00 after an earlier lunch we'd hope

4    that one of the defense summations would follow because there

5    will be time.

6              THE COURT:  Yes.

7              MR. BUCHWALD:  We'd all like to get sleep tonight and

8    none of us worry about that and also avoid fisticuffs of the

9    order of summations.

10             THE COURT:  Is there -- will there be an issue amongst

11   the defendants?

12             MR. GOLTZER:  We'll work it out.

13             MR. DRATEL:  It's just harder --

14             MR. GOLTZER:  I'm willing to change.

15             MR. DRATEL:  Okay.

16             THE COURT:  And what about in terms of the time?

17   Because I don't want -- do you have a sense of how much time

18   you're going to spend on your summations?

19             MR. GOLTZER:  Less than a day.

20             MR. DRATEL:  I would like to be -- I would like to be

21   less than an hour.  That's my goal.  But like, what is the

22   saying, "If I had more time I would have written a shorter

23   letter."

24             MR. GOLTZER:  I'd like to be an hour.  If it's a

25   little over --

E8j9chr7

1              THE COURT:  But certainly under an hour-and-a-half?

2              MR. GOLTZER:  I wouldn't go over an hour-and-a-half.

3              MR. GREENFIELD:  I believe I need about an

4    hour-and-a-half, but I might borrow a few minutes on the

5    uptick, so maybe an hour and 45 down, I believe.  I will try --

6    I will try to cut it too.  But right now it's an unfinished

7    product.

8              MR. GOLTZER:  We could always cut their rebuttal

9    short.

10             MR. BAUER:  It's important to move forward because of

11   the back end for the jury on Friday.

12             THE COURT:  Exactly.

13             MR. BAUER:  If the government is done by let's say

14   3:00 tomorrow I don't want to end early.  It's not fair to the

15   jury.  It's not fair to any of the parties here.  I think that

16   we'll need -- we'll need at least one defense counsel to be

17   ready.  We don't need more than one.  But we need one brave

18   soul to do that.

19             THE COURT:  Okay.  Which one of you can be ready,

20   Mr. Dratel?

21             MR. DRATEL:  I'm going to be arguing the charge

22   conference tomorrow so it's going to be --

23             MR. GOLTZER:  I'll do it.

24             THE COURT:  Okay.  Very well.  So Mr. Goltzer.  Okay.

25   So we have a full day.  That means we can let you gentlemen go

E8j9chr7

1     off and take a nap.

2                MR. GOLTZER:  If the government ends early I may go a

3     little longer to fill up the day.

4                THE COURT:  Sure.  Absolutely.  Okay.

5                (Adjourned to August 20, 2014 at 9:00 a.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    INDEX OF EXAMINATION

2      Examination of:                              Page

3       AKINTO BOONE

4      Direct By Mr. Bauer  . . . . . . . . . . . .1751

5      Cross By Mr. Greenfield  . . . . . . . . . .1790

6      Cross By Mr. Buchwald  . . . . . . . . . . .1796

7      Redirect By Mr. Bauer  . . . . . . . . . . .1803

8      Recross By Mr. Buchwald  . . . . . . . . . .1806

9      Recross By Mr. Greenfield  . . . . . . . . .1810

10     DAVID EVANS

11     Direct By Mr. Nawaday  . . . . . . . . . . .1811

12     Cross By Mr. Goltzer . . . . . . . . . . . .1842

13     Cross By Mr. Buchwald  . . . . . . . . . . .1877

14     Redirect By Mr. Nawaday  . . . . . . . . . .1877

15     Recross By Mr. Goltzer . . . . . . . . . . .1880

16      BARBARA MORREALE

17     Direct By Mr. Bauer  . . . . . . . . . . . .1882

18     Cross By Mr. Buchwald  . . . . . . . . . . .1912

19

20

21

22

23

24

25

2045

RAMONE McDERMOTT

Direct By Mr. Bauer  . . . . . . . . . . . .1914

Cross By Mr. Goltzer . . . . . . . . . . . .1964

Cross By Mr. Dratel  . . . . . . . . . . . .2002

Redirect By Mr. Bauer  . . . . . . . . . . .2015

Recross By Mr. Goltzer . . . . . . . . . . .2019

Redirect By Mr. Bauer  . . . . . . . . . . .2023

Recross By Mr. Goltzer . . . . . . . . . . .2023

GOVERNMENT EXHIBITS

Exhibit No.                              Received

 423  . . . . . . . . . . . . . . . . . . .1829

 281 and 903  . . . . . . . . . . . . . . .1913